# Exhibit A

**Page 1**

1　　UNITED STATES DISTRICT COURT

2　　MIDDLE DISTRICT OF LOUISIANA

3　KIRK MENARD　　NO. 19-cv-00050

4　　Plaintiff,

5　　　　JUDGE JACKSON

6　VERSUS

7

8　TARGA RESOURCES LLC

9　　Defendant.

10

11

12

13　　Deposition of KIRK MENARD, 510 3rd Street in

14　Jennings, Louisiana 70546, taken in the offices of

15　Simien & Simien, 7908 Wrenwood Boulevard, Baton

16　Rouge, Louisiana 70809, Baton Rouge, Louisiana on

17　Monday, July 22, 2019, commencing at 9:42 a.m.

18

19

20

21

　　REPORTED BY:

22　　KRISTIE GARRISON

　　CERTIFIED COURT REPORTER

23

24

25

**Page 2**

1　APPEARANCES:

2　　SIMIEN & SIMIEN

　　　(BY:  ROY L. BERGERON, JR., ESQUIRE)

3　　7908 Wrenwood Boulevard

　　Baton Rouge, Louisiana 70809

4

　　　　ATTORNEYS FOR THE PLAINTIFF

5

6　　SCOTT PATTON PC

　　　(BY:  DANIEL PATTON, ESQUIRE)

7　　5301 Katy Freeway

　　Suite 201

8　　Houston, Texas 77007

9　McGLINCHEY STAFFORD, PLLC

　　　(BY:  KYLE A. FERACHI, ESQUIRE)

10　　301 Main Street

　　14th Floor

11　　Baton Rouge, Louisiana 70801

12　　　ATTORNEYS FOR THE DEFENDANT

13

　ALSO PRESENT:  TED KELLER

14

　VIDEOGRAPHER PRESENT:  BENJAMIN MORRIS

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1　　E X A M I N A T I O N  I N D E X

2

3　　　　PAGE

4

5

6　MR. PATTON　　　　7

7　MR. BERGERON　　　246

8　MR. PATTON　　　254

9

10

11

12

13　　　E X H I B I T  I N D E X

14

15

　Exhibit 1　　　51

16　Code of Conduct

17　Exhibit 2　　　53

　Anti-Harassment Policy

18

　Exhibit 3　　　62

19　E-mail

20　Exhibit 4　　　75

　October 23, 2018, Letter

21

　Exhibit 5　　　125

22　E-mails

23　Exhibit 6　　　128

　Complaint

24

　Exhibit 7　　　199

25　Pleadings

**Page 4**

1　Exhibit 8　　　205

　My Safe Workplace Complaint

2

　Exhibit 9　　　207

3　Transcribed Conversation with

　Fitzgerald

4

　Exhibit 10　　　210

5　Transcribed Conversation with Hawkins

6　Exhibit 12　　　215

　Transcribed Conversation with

7　Fitzgerald

8　Exhibit 11　　　217

　Discovery Answers

9

　Exhibit 13　　　239

10　Text Messages

11　Exhibit 14　　　242

　E-mails

12

　Exhibit 15　　　243

13　Call Details

14

15

16

17

18

19

20

21

22

23

24

25

KIRK MENARD                                                  July 22, 2019
MENARD vs TARGA RESOURCES LLC                                      5–8

Page 5

1      S T I P U L A T I O N

2

3      It is stipulated and agreed by and between

4  Counsel that the deposition of KIRK MENARD, on

5  Monday, July 22, 2019, is hereby being taken under

6  the Federal Rules of Civil Procedure for all

7  purposes as permitted under law.

8

9      The witness waives the right to read and

10 sign the deposition.  The original is to be

11 delivered to and retained by the noticing attorney

12 for proper filing with the Clerk of Court.

13

14     All objections, except those as to the form

15 of the question and/or the responsiveness of the

16 answers, are reserved until the time of the trial of

17 this cause.

18

19     Kristie Garrison, Certified Court Reporter,

20 Certificate No. 2014015, in and for the State of

21 Louisiana, officiated in administering the oath to

22 the witness.

23

24

25

Page 6

1          KIRK MENARD,

2  after being first duly sworn by the above-mentioned

3  court reporter, did testify as follows:

4

5      THE VIDEOGRAPHER:

6          This is the videotaped deposition of

7  the Kirk Menard in the matter of Kirk Menard

8  versus Targa Resources, LLC, being heard

9  before the United States District Court Middle

10 District of Louisiana.  Case Number

11 19-cv-00050.

12         This deposition is being held at

13 7908 Wrenwood Boulevard, Baton Rouge,

14 Louisiana.  Today's date is July 22nd, 2019.

15 The time on the record is 9:42 a.m.

16         My name is Benjamin Morris, and I'm

17 the videographer.  The court reporter is

18 Kristie Garrison.

19         Counsel, will you please introduce

20 yourselves and affiliations and the witness

21 will be sworn.

22     MR. PATTON:

23         Dan Patton here on behalf of the

24 defendant.

25     MR. BERGERON:

Page 7

1          Roy Bergeron, Junior, for the

2  plaintiff.

3      MR. FERACHI:

4          Kyle Ferachi on behalf of the

5  defendant.

6      MR. PATTON:

7          Ted Keller is here.

8      (Court reporter administers the oath.)

9          EXAMINATION

10 BY MR. PATTON:

11     Q.   Okay.  Mr. Menard, I have noticed while

12 we've been sitting here that you are a little

13 soft-spoken.  I do not have the luxury of turning

14 you up through a microphone, so there might be a

15 point in time where I may ask you to speak up.  I'm

16 not trying to be rude, but I want to make sure I can

17 hear you.  Okay?

18     A.   Okay.

19     Q.   Okay.  Great.

20         My name is Dan Patton, and I'm here with

21 Kyle Ferachi.  You understand that we represent the

22 defendant, Targa Resources, LLC?

23     A.   Correct.

24     Q.   Okay.  And you understand that Targa

25 Resources, LLC, was your prior employer, correct?

Page 8

1      A.   Correct.

2      Q.   Have you ever been deposed before?

3      A.   Yes, sir.

4      Q.   How many times approximately would you

5  say?

6      A.   Maybe once.

7      Q.   Okay.  Was it a case where you acted as a

8  private investigator or were you a party to the

9  lawsuit?

10     A.   As a private investigator.

11     Q.   Okay.  Well, let me go over some of the

12 guidelines for us to follow today or make it easier

13 on you and I, but it will especially make it easier

14 on the court reporter.  Just remember at all times

15 when we are on the record that you are under oath.

16 The court reporter is not going to ask you to raise

17 your right hand if we take a break and you come back

18 and sit in that chair.  Okay?

19     A.   Correct.

20     Q.   Also, if at any point in time you need a

21 break, let your attorney know or let me know and I

22 will try to grant you that wish.  The only thing

23 that I ask is that if we have a pending question

24 that you answer my question before we take that

25 break.

Page 9

1   A.   Okay.
2   Q.   Okay.  Also, you're doing a very good job
3   so far.  But, please, allow me to finish my question
4   before you begin your answer and I will allow you to
5   finish your answer before I begin my next question.
6   That allows the court reporter to get both of us --
7   not get both of us at the same time.  As you can
8   tell, she's reading and not typing, which probably
9   makes it even more difficult.
10       Also, if you ever nod your head or say
11  huh-huh or uh-huh, she can't really record that.  So
12  I may say "Is that a yes, Mr. Menard?"  Or "Is that
13  a no, Menard?"  Again, I'm not doing that to be
14  rude.  I just want to make sure that we have a clean
15  record.
16  A.   Yes, sir.
17  Q.   Okay.  Are you under the influence of any
18  kind of medications, drugs, or alcohol, or anything
19  else that might impair your ability to give
20  testimony today?
21  A.   No, sir.
22  Q.   Can you think of any reason why you can't
23  answer my questions truthfully, honestly, and
24  accurately?
25  A.   No, sir.

Page 10

1   Q.   Okay.  Also, it's important that you
2   understand my questions.  So if at any point in time
3   you don't understand one of my questions I ask, that
4   you stop me and ask me what I need to do so you can
5   understand the question?
6   A.   Yes, sir.
7   Q.   Okay.  Can we have an agreement that
8   anytime you provide me an answer that you understood
9   my question?
10  A.   Yes, sir.
11  Q.   Also, can we have an agreement that
12  anytime I or you use the phrase "Targa" that we are
13  referring to the defendant in this case, Targa
14  Resources, LLC?
15  A.   Yes, sir.
16  Q.   I just don't want to sit here and say
17  "Targa Resources, LLC" every time.  Okay?
18  A.   That's correct.
19  Q.   Okay.  Could you state and spell your
20  full name for the record, sir?
21  A.   Kirk Randall Menard.
22  Q.   And that's M-E-N-A-R-D, correct?
23  A.   Yes, sir.
24  Q.   And where do you reside?
25  A.   510 3rd Street in Jennings, Louisiana

Page 11

1   70546.
2   Q.   Date of birth?
3   A.   March 29, 1967.
4   Q.   Are you married?
5   A.   Yes, sir.
6   Q.   Who are you married to?
7   A.   Jessica Menard.  Currently going through
8   a divorce.
9   Q.   Are y'all legally separated?
10  A.   Yes, sir.
11  Q.   Okay.  When did you first become
12  separated from Ms. Menard?
13  A.   Around January of 2019.  I'm not positive
14  of the date.
15  Q.   Okay.  And if at any point in time today,
16  I'm not going to try to trick you up on dates or
17  anything like that, but I may ask you just to give
18  me a ballpark.  And if you don't know for absolute
19  certainty just say "I don't know.  I think it was
20  around this date."  Okay.  A lot of witnesses get
21  way too nervous about dates in the deposition.  Just
22  try to give me the roundabout dates.  Okay?
23  A.   Yes.
24  Q.   Do you have children?
25  A.   Yes, sir.

Page 12

1   Q.   How many?
2   A.   Let me count.  Seven.
3   Q.   Okay.  Are they all with Jessica?
4   A.   No, sir.
5   Q.   Okay.  Have you been married before
6   Jessica?
7   A.   Yes, sir.
8   Q.   Okay.  You said that you are in the
9   middle of a divorce --
10  A.   Yes, sir.
11  Q.   -- and y'all have been separated since
12  approximately 2018.  Do you have any idea when that
13  is going to be finalized?
14  A.   Should be within the next month.
15  Q.   Okay.  Did you review any documents in
16  preparation for your deposition today?
17  A.   Yes, sir.
18  Q.   And what documents did you review?  If
19  you can recall.
20  A.   Just the complaint.
21  Q.   Okay.  The complaint that was filed on
22  behalf -- on your behalf by your attorneys?
23  A.   Yes, sir.
24  Q.   Do you know if it was the original
25  complaint or the first amended superseding

KIRK MENARD                                          July 22, 2019
MENARD vs TARGA RESOURCES LLC                       13–16

Page 13

1 complaint?

2   A.   I can't recall.

3   Q.   Okay.  That's fine.

4       Was there anything contained in that
5 complaint that you found to be either untruthful or
6 inaccurate?

7   A.   No, sir.

8   Q.   Okay.  Other than reviewing the
9 complaint, did you review anything else in
10 preparation of your deposition?

11   A.   No, sir.

12   Q.   Okay.  Did you meet with your attorneys?

13   A.   Yes, sir.

14   Q.   Okay.  I don't want to know anything that
15 y'all discussed, but how many times would you say
16 you met with your attorneys in preparation of your
17 deposition?

18   A.   Once over the phone, once here.

19   Q.   Do you recall when the phone conversation
20 took place?  On what date?

21   A.   Friday.

22   Q.   Okay.  And then you said you met with
23 them as well?

24   A.   Yes, sir.

25   Q.   Did that occur this morning?

Page 14

1   A.   Yes, sir.

2   Q.   How long did you meet with your
3 attorneys?

4   A.   Approximately an hour.

5   Q.   Okay.  Other than your attorneys, did
6 anyone else attend that meeting?

7   A.   No, sir.

8   Q.   On the phone call, are you aware of
9 anyone other than your attorneys being on that phone
10 call?

11   A.   No, sir.

12   Q.   Have you spoken to -- let me ask it this
13 way:  Have you spoken to any current Targa employees
14 about this lawsuit?

15   A.   Yes, sir.

16   Q.   Who have you spoken to?

17   A.   Matt Fitzgerald.

18   Q.   And do you know what position Matt
19 Fitzgerald is at at Targa?

20   A.   He's an operator.

21   Q.   Do you know where?

22   A.   In Lacassine, Louisiana.

23   Q.   Can you spell that for the record?

24   A.   L-A-C-C-S-S-I-N-E.

25   Q.   When was the last time that time you

Page 15

1 talked to Mr. Fitzgerald about this lawsuit?

2   A.   Approximately five days ago.

3   Q.   And what did you all talk about?

4   A.   He just asked basically what was going
5 on.

6   Q.   Are you and Mr. Fitzgerald -- would you
7 consider yourself to be good friends?

8   A.   Yes, sir.  I've been knowing him since
9 2000.

10   Q.   Okay.  Consider him to be one of your
11 best friends?

12   A.   Good friends.  I wouldn't say best.

13   Q.   How did you come to know Mr. Fitzgerald?

14   A.   He was -- I was living in [inaudible] and
15 he was running for mayor.

16   Q.   Do you know if Mr. Fitzgerald has any
17 personal knowledge regarding any of the facts
18 involving in your lawsuit?

19   A.   No, sir, I don't know.

20   Q.   Is everything that Mr. Fitzgerald has
21 learned is through hearsay?

22   A.   Pretty much.

23   Q.   And would it be fair to say that
24 everything that Mr. Fitzgerald has learned through
25 hearsay from you?

Page 16

1   A.   Yes, sir.

2   Q.   Okay.  Other than Mr. Fitzgerald, have
3 you spoken to any other current Targa employees
4 about this lawsuit?

5   A.   No, sir.

6   Q.   Have you spoken to any former employees
7 of Targa about this lawsuit?

8   A.   No, sir.

9   Q.   Have you ever spoken to Jessica about
10 this lawsuit?

11   A.   Yes, sir.

12   Q.   And what discussions did you and Jessica
13 have about this lawsuit?

14   A.   Nothing really.  She receives mail from
15 my attorney and she opens it and reads it.  That's
16 about it.

17   Q.   And where does Jessica reside?

18   A.   Same address as me.  It's the only
19 address I have right now since I'm working in Texas.

20   Q.   Okay.  So I assume that's your and
21 Jessica's home -- homestead?

22   A.   Yes, sir.

23   Q.   The 510 3rd Street location?

24   A.   Correct.

25   Q.   When is the last time that you lived at

Page 17

1  510 3rd Street?
2  A.  This would have been April 11th.
3  Q.  Of?
4  A.  Of 2019.
5  Q.  Okay.  Where are you currently working?
6  A.  I'm working for Tulsa Inspection in
7  Kermit, Texas.
8  Q.  In what part of Texas?  I'm sorry.
9  A.  Kermit.
10  Q.  Kermit?
11  A.  Yes.
12  Q.  And how long have you been working -- is
13  it okay if I call them Tulsa Inspection?
14  A.  Yes.
15  Q.  How long have you been working for Tulsa
16  Inspection?
17  A.  Since April 11th.
18  Q.  I assume you live out there?
19  A.  Yes, sir.
20  Q.  And what is the address that you live at?
21  A.  919 County Road 313, Lot 112.
22  Q.  And the city?
23  A.  Lot 112.  Kermit, K-E-R-M-I-T, Texas
24  79745.
25  Q.  Is that near the Oklahoma state line?

Page 18

1  It's up in North Texas?
2  A.  It's West Texas.
3  Q.  West Texas.  Okay.  What do you do for
4  Tulsa?
5  A.  Health safety environmental of Phillips
6  66.
7  Q.  Other than this lawsuit, have you ever
8  been involved in another civil lawsuit?  Let me say
9  it this way.  It's a little bit too broad.
10      Have you ever been a party either a
11  defendant or a plaintiff in another civil lawsuit
12  other than this one?
13  A.  Other than my divorces and bankruptcy,
14  no.
15  Q.  How many divorces have you had?
16  A.  This is my second one.
17  Q.  And then you also said you were also a
18  party to a bankruptcy?
19  A.  Yes, sir.
20  Q.  How many bankruptcies have you had?
21  A.  One prior to this current one.  This is
22  Chapter 13 and then I had a Chapter 7.
23  Q.  Which one was first?  The 7 or the 13?
24  A.  The 7.
25  Q.  Do you recall what year the Chapter 7 was

Page 19

1  filed?
2  A.  In 2010.
3  Q.  And then you said you had a Chapter 13?
4  A.  Yes, sir.
5  Q.  When was that filed?
6  A.  That was filed December the 11th or 10th.
7  Q.  Of '18?
8  A.  Yes, sir.
9  Q.  Okay.  So sitting here today, the only
10  time that you are aware of that you were a party to
11  a lawsuit either as a plaintiff or a defendant was
12  your two divorces and your two bankruptcies,
13  correct?
14  A.  Yes, sir.
15  Q.  Have you ever been convicted of a crime?
16  A.  No, sir.
17  Q.  Have you ever been arrested?
18  A.  Yes, sir.
19  Q.  When were you arrested?
20  A.  Back in 1999.
21  Q.  For what?
22  A.  For stalking.  That was with my first
23  divorce.
24  Q.  Did you say "stalking"?
25  A.  Stalking.

Page 20

1  Q.  Okay.  And that was with wife Number 1?
2  A.  Yes.
3  Q.  Okay.  Were you charged with stalking or
4  just arrested?
5  A.  Just arrested.  All charges were dropped.
6  Q.  Okay.  And other than -- were you
7  arrested any other time?
8  A.  No, sir.
9  Q.  And so sitting here today you're not
10  aware of you ever being convicted of either a
11  misdemeanor or a felony, correct?
12  A.  No, sir.
13  Q.  Have you ever heard of a charge of
14  discrimination?  Do you know what that is?
15  A.  A what?  I'm sorry.
16  Q.  A charge of discrimination.
17  A.  No, sir.
18  Q.  Okay.  A charge of discrimination is a
19  formal document is filed with the Equal Employment
20  Opportunity Commission where an employee, either
21  current or former, is making an allegation that they
22  have been discriminated against.  Have you ever
23  filed a document like that with any of your
24  employers?
25  A.  No, sir.

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                              21–24

Page 21

1   Q.   Have you ever -- prior to this lawsuit,
2  have you ever made an allegation of retaliation
3  against an employer?
4      A.   The only one I can recall would be prior
5  to the BP incident.
6      Q.   Can you tell me a little bit more about
7  that?
8      A.   That was regarding -- I was their health,
9  safety and environmental coordinator and it was in
10  Fourchon, Louisiana.
11      Q.   Can you speak up?
12      A.   Fourchon, Louisiana.
13      Q.   Okay.
14      A.   I was in charge of the Seaport 1 they
15  call it. And as I wrote a letter to the -- to Tony
16  Hayward, which was the CEO regarding their policies
17  and procedures that where I listed if they didn't
18  have -- if their employees didn't start following
19  the policies and procedures, they would have a
20  disastrous consequences.
21      Q.   Okay. So you wrote a letter to Tony
22  Hayward who was the CEO of BP at that time?
23      A.   Yes, sir.
24      Q.   And the crust of the letter was the fact
25  that if your employees don't start following

Page 22

1  policies and procedures that there is going to be
2  some kind of catastrophic event, fair?
3      A.   Correct.
4      Q.   And this was before the BP spill in the
5  Gulf, fair?
6      A.   Yes, sir.
7      Q.   Did you ever receive a response from BP
8  regarding your complaint?
9      A.   Yes, sir, I did. And they employed the
10  services of Liskow and Lewis to investigate it.
11      Q.   Okay. And do you know what resulted from
12  the investigation from Liskow and Lewis?
13      A.   Just that everything was fine.
14      Q.   Is it fair to say then that the
15  allegations in your letter were deemed to be
16  unfounded as a result of an investigation?
17      A.   That's correct.
18      Q.   Did they interview you in the
19  investigation?
20      A.   Yes, sir.
21      Q.   And I know you wrote a letter to Mr.
22  Hayward. Did you file a complaint with anyone other
23  than writing the letter to Mr. Hayward?
24      A.   No, sir.
25      Q.   Did you ever report them to an

Page 23

1  environmental agency?
2      A.   No, sir.
3      Q.   Did BP have, like, a complaint hotline or
4  ethics hotline that you could report to?
5      A.   Not that I knew of.
6      Q.   Okay. As a result of sending that letter
7  to Mr. Hayward, did you sustain any kind of
8  consequence to your job?
9      A.   No, sir. What I was told was that they
10  were disbanding my position as well as my relief's
11  position.
12      Q.   I'm sorry, say that second part again.
13      A.   As well as my relief's position.
14      Q.   The person who worked under you?
15      A.   With me.
16      Q.   With you. Okay.
17      A.   We worked seven and seven.
18      Q.   Okay. So same title as you? The ES&H?
19      A.   Yes, sir.
20      Q.   So you would work 7:00 to 7:00 and then
21  the second person would work 7:00 to 7:00?
22      A.   Yes, sir.
23      Q.   And they eliminated that position
24  altogether?
25      A.   Correct.

Page 24

1      Q.   And how soon after you sent the letter to
2  Mr. Hayward did that happen?
3      A.   Approximately eight months later.
4      Q.   And was it your contention that the
5  reason they got rid of the position was because you
6  made that report to Tony Hayward?
7      A.   That's drawing a conclusion, but, yes.
8      Q.   As a result of drawing that conclusion
9  that your position was eliminated as a result of
10  writing the letter to Mr. Hayward, did you ever file
11  a retaliation lawsuit?
12      A.   No, sir.
13      Q.   Why not?
14      A.   I just didn't feel like going through
15  this. I mean, you know, it wasn't nothing against
16  me. I was looking out for the health and safety of
17  other employees.
18      Q.   But you would agree with me, Mr. Menard,
19  you felt like you were retaliated against by the
20  company for writing that letter, correct?
21      A.   Yes, sir. But the company also paid me
22  while they investigated it.
23      Q.   Oh, you were put on investigative leave?
24      A.   Yes, sir.
25      Q.   Okay. Why did they -- if you were making

Page 25

1  the report, do you know why they put you on
2  investigative leave?
3      A.  I have no idea.  But they've paid me from
4  the time I made the complaint until the time the
5  investigation was complete, which was approximately
6  eight months.
7      Q.  Okay.  I'm trying to get the timeline,
8  because eight months is in there twice now, so I
9  want to make sure I understand it.
10         You filed a letter to Mr. Hayward.  How
11  soon after sending that letter to Mr. Hayward was
12  your position eliminated?  Was it eliminated before
13  you sent the letter or was it eliminated eight
14  months after the letter was sent?
15     A.  It was eliminated eight months after I
16  sent the letter.  They paid me approximately two
17  weeks after I sent the letter up until the time the
18  investigation was complete.  Then they eliminated
19  the position.
20     Q.  Okay.  Is it fair to say then according
21  to your timeline once the investigation was
22  completed at the same time your position was
23  eliminated?
24     A.  Correct.
25     Q.  And you would agree with me that you felt

Page 26

1  that you were retaliated against in that situation,
2  correct?
3      A.  Yes, sir.
4      Q.  But you didn't file a lawsuit, fair.
5      A.  Fair.
6      Q.  All right.  Can you give me -- well,
7  other than the BP situation and this case, have you
8  ever felt you've been retaliated by an employer?
9      A.  No, sir, other than the current
10  defendant.
11     Q.  Can you give me your educational
12  background?
13     A.  I have a Bachelor's degree in
14  occupational health and safety.
15     Q.  And where did you get your Bachelor's in
16  occupational health and safety?
17     A.  Columbia Southern University.
18     Q.  Columbia?
19     A.  Southern University.
20     Q.  Where is that located?
21     A.  Orange Beach, Alabama.
22     Q.  Other than your BA, have you ever done
23  any postgraduate work?
24     A.  I am currently in law school right now.
25     Q.  Where at?

Page 27

1      A.  Abraham Lincoln University.
2      Q.  Where is Abraham Lincoln University?
3      A.  California -- Los Angeles, California.
4      Q.  Are you doing that online or you are
5  attending --
6      A.  That's online.
7      Q.  And is that an ABA accredited law school?
8      A.  No, sir.
9      Q.  How many years is it going to take to get
10  that law degree?
11     A.  Four years.
12     Q.  And what year are you in?
13     A.  I'm a freshman.  I started January 6th.
14     Q.  And then is the hope that once you
15  graduate from there you'll take the bar exam
16  somewhere?
17     A.  Yes, sir, in California.
18     Q.  Okay.  All right.  Other than the
19  postgraduate work at Abraham Lincoln Law School,
20  have you done any other kind of postgraduate work?
21     A.  No, sir.
22     Q.  Okay.  Do you have any kind of
23  professional licenses or certifications?
24     A.  Yes, sir.  I have a graduate safety
25  professional by the Board of Certified Safety

Page 28

1  Professionals.
2      Q.  And did you have to go to school or
3  training to get that?
4      A.  Yes, sir.
5      Q.  Did you have to, like, pass a test as
6  well?
7      A.  Yes, sir.
8      Q.  And how long did the training or
9  schooling take to get that certification?
10     A.  Two-and-a-half years.
11     Q.  And when did you first get it?
12     A.  June of 2000- -- June 28th of 2018.
13     Q.  So at or near the time that you started
14  with Targa?
15     A.  Yes, sir.
16     Q.  Okay.  Has this license or certification
17  been in good standing ever since?
18     A.  Yes, sir.
19     Q.  Do you have to take, like, continuing
20  education classes?
21     A.  Yes, sir.
22     Q.  Okay.  And pay a fee?
23     A.  Yes, sir.
24     Q.  Okay.  Other than that, do you have any
25  other kind of professional license or certification?

Page 29

1    A.    I have industrial hygiene.
2    Q.    Industrial hygiene?
3    A.    Yes, sir.
4    Q.    And tell the ladies and the gentlemen of
5    the jury what that is.
6    A.    Industrial hygiene is based on
7    occupational health and safety based on diseases and
8    health and chemicals.
9    Q.    And when did you get that?
10   A.    That was in October of 2017,
11   approximately.
12   Q.    And who did you get it from?
13   A.    Chicago Bridge and Iron.
14   Q.    Is this a formal license or
15   certification?
16   A.    No, sir, it's not.
17   Q.    Okay.  It's just something you attended
18   and --
19   A.    Correct.
20   Q.    Okay.  Anything else?
21   A.    No, sir.
22   Q.    Do you have some kind of private
23   investigators license or certification?
24   A.    Yes, sir, I have a private investigators
25   license.

Page 30

1    Q.    Where did you get that from?
2    A.    From the State Board of Private
3    Investigator Examiners.
4    Q.    When did you get it?
5    A.    In 2004.
6    Q.    Is that license still active today?
7    A.    Yes, sir.
8    Q.    Do you have to register that with, like,
9    the State of Louisiana?
10   A.    Yes, sir.
11   Q.    So if I looked it up, it'll show it on a
12   website or something?
13   A.    Yes, sir.
14   Q.    When is the last time that you did any
15   private investigation for a customer or a client?
16   A.    Approximately two years.
17   Q.    So since the last time was sometime in
18   2017?
19   A.    Yes, sir.
20   Q.    Why is it that you haven't done anything
21   in the last two years?
22   A.    Because I have 35 employees that work for
23   me.  And basically they receive all of the
24   compensation from the company.
25   Q.    What is the name of the company?

Page 31

1    A.    Advanced Investigative Technologies, LLC
2    partnership.
3    Q.    Is it okay if I call it Advance Tech?
4    A.    Or AIT.
5    Q.    AIT, okay.
6          Are you -- is it a corp, LLC,
7    partnership?
8    A.    Yes, sir, we are classified as an S Corp.
9    Q.    S Corp.  And do you own any shares of
10   stock in AIT?
11   A.    I'm a managing member.
12   Q.    Do you consider yourself to be an owner?
13   A.    Yes, sir.
14   Q.    And do you know how much ownership
15   interest you have in AIT?
16   A.    100 percent.
17   Q.    Okay.  So you are the sole owner of AIT,
18   correct?
19   A.    Correct.
20   Q.    And you have 35 employees at AIT?
21   A.    Yes, sir.
22   Q.    Are they considered employees or
23   independent contractors?
24   A.    Independent contractors.
25   Q.    And do they all do, like, investigative

Page 32

1    work?
2    A.    Yes, sir.
3    Q.    Are any of them certified as a private
4    investigator?
5    A.    Yes, sir.
6    Q.    How many?
7    A.    All 35.
8    Q.    And does AIT generate any income for Kirk
9    Menard or Jessica Menard?
10   A.    No, sir.
11   Q.    Why is that?
12   A.    Because all of the income that we
13   generate goes to the employees.
14   Q.    Why do you have it set up like that?  Why
15   as the owner why are you not getting any money from
16   them?
17   A.    We just dedicate everyone to -- all of
18   our income to the 1099 employees.
19   Q.    Is that how it's always been?
20   A.    Yes, sir.
21   Q.    Who handles the accounting for AIT?
22   A.    Jessica Menard.
23   Q.    Do you use an accounting firm to file
24   taxes or anything?
25   A.    No, sir.

KIRK MENARD                                            July 22, 2019
MENARD vs TARGA RESOURCES LLC                              33–36

Page 33

1    Q.   So Jessica does all of that?
2    A.   Yes, sir.
3    Q.   So Jessica would be the best person to
4  talk about the finances or the accounting of AIT?
5    A.   That's correct.
6    Q.   Okay.  Do you handle that at all?
7    A.   No, sir.
8    Q.   And so is it fair to say that since
9  October of 2018, you have received no income from
10 AIT?
11   A.   No, sir.
12   Q.   That's a double negative.  When you say
13 "no, sir," you have not received anything, correct?
14   A.   I have not received any income.
15   Q.   Now, you said your current employer is
16 Tulsa, correct?
17   A.   Correct.
18   Q.   Forget that.  What was the full name?
19   A.   Tulsa Inspection, TIR.
20   Q.   And, again, can you tell me what your
21 official title is at Tulsa Inspections?
22   A.   Health, safety and environmental.
23   Q.   Is that just all the title is just
24 health, safety and environmental?
25   A.   Yes, sir.

Page 34

1    Q.   When did you first start working for
2  Tulsa?
3    A.   April 11, 2019.
4    Q.   You told me.  I apologize.
5         What was your salary when you started at
6  Tulsa -- Tulsa Inspections?
7    A.   194.50 per day.
8    Q.   So it's a day rate?
9    A.   Yes, sir.
10   Q.   And who is your direct supervisor?
11   A.   Alton Howard.
12   Q.   Alton Howard?
13   A.   Yes, sir.
14   Q.   And has Mr. Howard been your supervisor
15 since April of 2019?
16   A.   Yes, sir.
17   Q.   And was the 194.50 day rate what you
18 started with in April 11, 2019?
19   A.   Yes, sir.
20   Q.   Has that changed since then?
21   A.   No, sir.  I do receive per diem, but
22 that's about it.
23   Q.   And how much is the per diem?
24   A.   It just depends.  I mean, I receive $25
25 truck allowance per day.

Page 35

1    Q.   Okay.
2    A.   194.50 living expenses, and 194.50 excess
3  mileage, and 191.50 for safety equipment?
4    Q.   And how often is that paid?
5    A.   Weekly.
6    Q.   Weekly?
7    A.   Weekly.
8    Q.   So you have a 194 day rate and then
9  weekly you receive a $25 truck allowance, a 194.50
10 living allowance, a 194.50 -- you say excess?
11   A.   Excess mileage.
12   Q.   Excess mileage, and then 191.50 for
13 safety?
14   A.   Correct.
15   Q.   Have you ever received a bonus from Tulsa
16 Inspection?
17   A.   No, sir.
18   Q.   Other than the five items that we listed,
19 the day rate and the per diems, have you ever
20 received any other form of compensation from Tulsa?
21   A.   No, sir.
22   Q.   Do you have benefits from Tulsa?
23   A.   No, sir.
24   Q.   Currently, do you have health insurance?
25   A.   No, sir.

Page 36

1    Q.   Do you know what a disciplinary write-up
2  or a disciplinary counseling is?
3    A.   Yes, sir.
4    Q.   Have you had any kind of disciplinary
5  write-up or disciplinary counseling while working at
6  Tulsa?
7    A.   No, sir.
8    Q.   Has your boss, Mr. Howard, had any issues
9  with your work performance or conduct?
10   A.   No, sir.
11   Q.   Have you ever had -- I know you haven't
12 been working there for a year yet, but have you ever
13 had an evaluation done -- conducted on you yet?
14   A.   Not that I know of.
15   Q.   How many hours a day would did you say
16 you worked?
17   A.   Ten hours a day.
18   Q.   Five days a week?
19   A.   Sometimes six, sometimes seven.
20   Q.   Are you paid overtime?
21   A.   No, sir.
22   Q.   Before Tulsa Inspections, where did you
23 work?
24   A.   Targa.
25   Q.   And your employment with Targa ended in

KIRK MENARD                                      July 22, 2019
MENARD vs TARGA RESOURCES LLC                    37–40

Page 37

1  October of 2018, correct?
2     A.   Yes, sir.
3     Q.   And so from October 2018 to April 11th,
4  2019, it's your testimony that you have not worked
5  at any other employer?
6     A.   No, sir.
7     Q.   Before we get into your Targa, you told
8  me that you worked as an environmental, health and
9  safety for BP, correct?
10    A.   Yes, sir.  That was consultant.
11    Q.   You were a consultant, but it included
12 environmental, health and safety work?
13    A.   Yes, sir.
14    Q.   Other than BP, prior to Targa, had you
15 had any other environmental experience?
16    A.   The only other place I've worked prior to
17 them was Stoker and Spiehler.  That was with BP.
18    Q.   Did you say Stokes and Spiller?
19    A.   Stokes and Spiehler.  Spiehler is spelt
20 S-P-I-E-H-L-E-R.  They are in Lafayette, Louisiana.
21    Q.   And was Stokes the company that you were
22 working for that got hired on as a consultant for
23 BP?
24    A.   Yes, sir.
25    Q.   Okay.  So Stokes was your employer, but

Page 38

1  then BP hired Stokes to consultant?
2     A.   Correct.
3     Q.   How long did you work as a consultant for
4  BP?
5     A.   Up until March of 2015.
6     Q.   So how long?  When did you first start
7  consulting with BP?
8     A.   In -- I want to say around June of 2005.
9     Q.   So for almost ten years you worked at BP
10 as a consultant?
11    A.   Yes, sir.
12    Q.   And the entire time --
13    A.   Not for -- strictly for BP.
14    Q.   Okay.  So you worked as a consultant for
15 Stokes and Spiehler?
16    A.   Yes, sir.
17    Q.   Other than -- how long did you work as an
18 environmental, health and safety person for BP?  I
19 know you were a consultant through Stokes and
20 Spiehler, but how long did that last?
21    A.   In Oklahoma, I was working for BP
22 Oklahoma in Texas about three to five years.  And
23 then when that job ended, I was transferred to
24 Fourchon, Louisiana, for BP.
25    Q.   And how long did you work at the

Page 39

1  Louisiana facility?
2     A.   Approximately six months.
3     Q.   When you were working in the Oklahoma and
4  Texas location for BP, were you doing environmental,
5  health and safety work?
6     A.   Yes, sir.  If they had any spills, I
7  would have to draft reports.
8     Q.   Okay.  Did you have a formal title when
9  you were working at the Oklahoma Texas location?
10    A.   Health, safety and environmental.
11    Q.   And then you went to the Louisiana -- you
12 were transferred -- you then picked up a job
13 consulting at the Louisiana BP location, fair?
14    A.   Correct.
15    Q.   And you worked there for six months?
16    A.   Yes, sir.
17    Q.   After you were -- I don't want to say let
18 go.  But after the Louisiana location, did you work
19 for Stokes and Spiehler after that?
20    A.   No, sir.
21    Q.   Were you let go by Stokes and Spiehler
22 after the Louisiana BP tenure?
23    A.   No, sir.
24    Q.   When did you leave Stokes and Spiehler?
25    A.   March of 2015.

Page 40

1     Q.   Why did you leave Stokes and Spiehler in
2  March of 2018?
3     A.   There was a layoff because of the decline
4  in the oil industry.
5     Q.   So the reason you left in March 2015 from
6  Stokes and Spiehler was because of layoff?
7     A.   Yes, sir.
8     Q.   Was there other employees laid off at the
9  same time?
10    A.   Yes, sir.
11    Q.   Okay.  After March 2015 where did you go
12 work?
13    A.   For Chicago Bridge and Iron.
14    Q.   What did you do for them?
15    A.   For them, I was health, safety and
16 environmental.  Mostly health and safety.  They have
17 their own environmental department.
18    Q.   How long did you work for them?
19    A.   From November 11, 2015, up until the time
20 I was hired with Targa.
21    Q.   You started at Targa roughly June 2018?
22    A.   Yes, sir.
23    Q.   Is that about the same time you finished
24 up at Chicago?
25    A.   Yes, sir.

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                             41—44

Page 41

1    Q.    When you worked for Chicago Bridge and
2    Iron -- did I say that correctly?
3    A.    Yes, sir.
4    Q.    Did you have any performance or conduct
5    issues?
6    A.    No, sir.
7    Q.    When you worked for Stokes and Spiehler
8    working at BP, did you ever have any performance or
9    conduct issues?
10    A.    No, sir.
11    Q.    Prior to Stokes and Spiehler, did you
12    have any environmental experience?
13    A.    No, sir.
14    Q.    Now, I have that you began working at
15    Targa on June 11, 2018.  Does that sound about
16    right?
17    A.    Yes, sir.
18    Q.    Did you apply online for the position?
19    A.    Yes, sir.
20    Q.    And what position were you applying for?
21    A.    Their health, safety and environmental
22    position.
23    Q.    If I was to say your title was
24    environmental, safety and health specialist, does
25    that sound correct to you?

Page 42

1    A.    Yes, sir.
2    Q.    And as a result of submitting an
3    application with Targa, did you interview with
4    anyone at Targa?
5    A.    Yes, sir, I did.
6    Q.    And do you recall who you interviewed
7    with?
8    A.    David Smith and Jarrod Gregg.
9    Q.    Do you recall where you interviewed with
10    Mr. Smith and Mr. Gregg?
11    A.    Over the phone.
12    Q.    Did you felt the interview went well?
13    A.    Yes, sir.
14    Q.    Did you have any issues with Mr. Smith or
15    Mr. Gregg at that time?
16    A.    No, sir.
17    Q.    How long would you say the interview
18    lasted?
19    A.    Approximately 30 to 45 minutes.
20    Q.    Other than Mr. Gregg and/or Mr. Smith,
21    did you interview with anyone else?
22    A.    Other than the in-person interview, no.
23    Later on I did interview with Mr. Keller and Mr.
24    David Smith in person, which I believe was in New
25    Orleans.

Page 43

1    Q.    So I have two different interviews.  I
2    have a phone interview with Mr. Smith and Mr.
3    Gregg--
4    A.    That was initially, yes, sir.
5    Q.    -- and that lasted approximately 30 to 45
6    minutes, correct?
7    A.    Yes, sir.
8    Q.    And then you have an in-person interview
9    where you believe in New Orleans with Mr. Keller and
10    Mr. Smith?
11    A.    That's correct.
12    Q.    And how long would you say that interview
13    lasted?
14    A.    Same.  An hour or so, approximately.
15    Q.    Did you felt you had a good interview
16    with Mr. Keller?
17    A.    Yes, sir.
18    Q.    And then did they offer you a job at some
19    point after that?
20    A.    Yes, sir.
21    Q.    What were your duties and
22    responsibilities as the ES&H specialist at Targa?
23    A.    Basically to -- it was a lot of
24    administrative work.  Filling out reports, making
25    rounds, collecting water samples, collecting sewer

Page 44

1    samples, drafting permits, replying to regulatory
2    agencies, and notifying of any safety or health or
3    environmental issues.
4    Q.    Can you say that last one again?
5    A.    Notifying my supervisor of any safety,
6    health, or environmental issues.
7    Q.    Anything else that you can think of
8    sitting here today?
9    A.    Accident and incident investigations.
10    Q.    Anything else?
11    A.    That's mostly the gist of it.
12    Q.    Was it part of your job -- were you
13    responsible for identifying and reporting violations
14    of environmental and safety standards under state
15    and federal law?
16    A.    Yes, sir.
17    Q.    And you would have reported those
18    violations, correct?
19    A.    Correct.
20    Q.    And is that some of the -- well, let me
21    ask you this:  How would you go about doing that?
22    If you discovered a violation of law, how would you
23    handle that as an ES&H specialist for Targa?
24    A.    As a courtesy, I would go to Mr. Keller
25    and I would also call my immediate supervisor, David

KIRK MENARD                                                   July 22, 2019
MENARD vs TARGA RESOURCES LLC                                45–48

Page 45

1  Smith, and they together would help me find a
2  solution.
3  Q.  You reported directly to David Smith?
4  A.  Yes, sir.
5  Q.  And what was Mr. Smith's title?  If you
6  know.
7  A.  He was over environmental, health and
8  safety.
9  Q.  What about Mr. Keller?  What was his
10  title?  If you know.
11  A.  District manager.
12  Q.  Do you recall what your salary was when
13  you started at Targa?
14  A.  It was $87,500 per year with benefits.
15  Q.  Did you ever receive a bonus from Targa?
16  A.  No, sir.
17  Q.  Was there anything in your -- did you
18  receive, like, an offer letter from Targa?
19  A.  Yes, sir.
20  Q.  Was there anything in the offer letter
21  that said you were going to be entitled to some kind
22  of bonus?
23  A.  Yes, sir.
24  Q.  Do you recall what that specifically
25  said?

Page 46

1  A.  No, sir, I cannot.
2  Q.  Do you know if the bonus was
3  discretionary?
4  A.  I'm not sure.
5  Q.  Do you know if the bonus was guaranteed?
6  A.  I'm not sure.
7  Q.  Did you have a good working relationship
8  with David Smith?
9  A.  Yes, sir.
10  Q.  Did you have a good working relationship
11  with Mr. Keller?
12  A.  Yes, sir.
13  Q.  Did you find Mr. Smith to be an honest
14  person?
15  A.  Yes, sir.
16  Q.  Did you find Mr. Keller to be an honest
17  person?
18  A.  Yes, sir.
19  Q.  While working at Targa from June 11,
20  2018, up until your employment ended in
21  October 2018, did anyone at Targa discuss with you
22  any performance problems with you as an ES&H
23  specialist?
24  A.  No, sir.
25  Q.  If Mr. Keller was to testify that he did

Page 47

1  have performance issues with you and he did go over
2  those with you, would that be true or untrue
3  testimony?
4  A.  That would be untrue.
5  Q.  If Mr. Smith was to testify that he also
6  had performance issues with you and that he spoke to
7  you about them, would that be true or untrue
8  testimony?
9  A.  That would be untrue.
10  Q.  On average, how many hours a week would
11  you work at Targa?
12  A.  We worked roughly from 6:00 a.m. to 3:00
13  to 4:00 p.m.  Sometimes I would go in at night and
14  collect samples.
15  Q.  On average, do you know how many hours
16  you work a week?
17  A.  Ten hours a day at five days a week.
18  Roughly 50 to 60.
19  Q.  So approximately 50 to 60 hours a week?
20  A.  Yes, sir.
21  Q.  Okay.  Did anyone report to you?
22  A.  No, sir.
23  Q.  You said that you had benefits while you
24  worked at Targa?
25  A.  Yes, sir.

Page 48

1  Q.  Do you recall what benefits you had?
2  A.  I had a company truck, company credit
3  card, health, life, disability, medical, dental,
4  vision, 401(k).
5  Q.  Anything else that you can think of?
6  A.  That's about it.
7  Q.  In regards to the company truck, you were
8  only supposed to use the company truck for business
9  purposes only, correct?
10  A.  Correct.
11  Q.  In regards to the company credit card,
12  the use of that credit card was only for business
13  purchases, correct?
14  A.  Correct.
15  Q.  You said that you had 401(k)?
16  A.  Yes, sir.
17  Q.  When you worked for Targa, did you
18  contribute to your 401(k)?
19  A.  Yes, sir.
20  Q.  Do you recall what percentage of your
21  check you contributed to 401(k) or the amount?
22  A.  No, sir.  Targa enrolled me in that
23  automatically.
24  Q.  Were you enrolled -- do you know how much
25  was taken out of your paycheck and put into your

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
49–52

Page 49

1  401(k)?
2  A.  No, sir.
3  Q.  Do you know if that was happening?
4  A.  Yes, sir.  I could look on my check
5  stubs.
6  Q.  Do you know if Targa was contributing to
7  your 401(k)?
8  A.  Yes, sir.
9  Q.  Do you know what percentage they were
10  doing it?
11  A.  No, sir, I don't.
12  Q.  As an employee of Targa, you received the
13  employee handbook, correct?
14  A.  Yes, sir.
15  Q.  And you understood, as an employee of
16  Targa, that you were to follow the policies and
17  procedures that were contained in that handbook?
18  A.  Yes, sir.
19  Q.  And you understood as an employee of
20  Targa that if you were to violate one of their
21  policies and procedures that you could be subject to
22  discipline up to and including termination?
23  A.  Yes, sir.
24  Q.  And you understood that as an employee of
25  Targa that you could be terminated for a single

Page 50

1  offense of one of those policies, correct?
2  A.  Yes, sir.
3  Q.  Are you aware of a policy that exist --
4  well, let me ask you this:  Do you know the phrase
5  progressive discipline?  Have you ever heard of
6  that?
7  A.  No, sir.
8  Q.  Are you aware of any kind of policy at
9  Targa that says in order to be terminated, that a
10  person has to go through certain steps?  For
11  example, like one violation results in a coaching,
12  two violations results in a written disciplinary
13  document, three violations may be termination.
14  A.  Yes, sir.
15  Q.  Are you aware of any kind of policy or
16  procedure at Targa that says that has to happen?
17  A.  That is what I was told from David Smith.
18  Q.  Okay.  Tell me exactly what David Smith
19  with regards to -- is it okay if we call it
20  progressive discipline what I've described?
21  A.  Yes, sir.
22  Q.  What did David Smith tell you about this
23  progressive discipline at Targa?
24  A.  Each week I would ask David if he had
25  heard from Ted Keller about my performance or how he

Page 51

1  was doing.  He said everything was fine.  He said if
2  we wouldn't, we would definitely hear from Ted
3  regarding any problems or performances that he's
4  had.
5  Q.  Okay.  Other than that, did Mr. Smith
6  talk to you anything else about some kind of
7  progressive discipline at Targa?
8  A.  No, sir.
9  Q.  Is it fair to say that you never saw
10  anything in writing at Targa that talked about any
11  kind of progressive discipline?
12  A.  No, sir.  Expect what you just mentioned
13  about the disciplinary action and up to including
14  termination.
15  Q.  Okay.  But the fact of if there is a
16  violation, you can be subject to discipline?
17  A.  Yes, sir.
18  Q.  Okay.  Mr. Menard, I'm going to show you
19  what has been marked as Exhibit 1 to your
20  deposition.  And if you would, take a look at that.
21  And let me know when you are ready to talk about it.
22  A.  (Witness reviews document.)
23  Q.  Have you ever seen this document before
24  today?
25  A.  I'm not sure.

Page 52

1  Q.  When you worked for Targa, you understood
2  that they had a code of conduct policy, correct?
3  A.  Yes, sir.
4  Q.  And you understood that as an employee of
5  Targa that you were to follow and adhere to the code
6  of conduct?
7  A.  Yes, sir.
8  Q.  And you understood that if there were any
9  violations in regards to Targa's Code of Conduct,
10  that you could be subject to disciplinary action up
11  to and including termination, correct?
12  A.  Yes, sir.
13  Q.  And you could be subject to termination
14  just with a single offense of Targa's Code of
15  Conduct, correct?
16  A.  Correct.
17  Q.  And when you worked at Targa, were you
18  aware of an ethics line called My Safe Workplace?
19  A.  Yes, sir.
20  Q.  If you could, tell the ladies and
21  gentlemen of the jury what you understood the
22  employee hotline My Safe Workplace was for?
23  A.  You could call and either give your name
24  or remain anonymous to report any unethical or
25  immoral conduct by Targa, any of its directors, or

KIRK MENARD                                                       July 22, 2019
MENARD vs TARGA RESOURCES LLC                                    53–56

Page 53

1  officers, or management, or any employee.

2      Q.   And was it your understanding that the My

3  Safe Workplace was run by a third-party?  Someone

4  outside of Targa?

5      A.   No, sir.  At that time I did not know.  I

6  thought it went directly to Targa.

7      Q.   Okay.  But you understood that that

8  hotline was available to you as an employee,

9  correct?

10     A.   Yes, sir.

11     Q.   And you understood that you could make a

12 report or a complaint about anyone at Targa

13 anonymously as well, correct?

14     A.   Yes, sir.

15     Q.   Mr. Menard, I'm going to show you what's

16 been marked as Exhibit 2 to your deposition.  I'll

17 represent to you that this is Targa's

18 anti-harassment policy.

19     A.   (Witness reviews document.)  Okay.

20     Q.   Are you aware as an employee of Targa

21 that you were to follow Targa's anti-harassment

22 policy; is that correct?

23     A.   Yes, sir.

24     Q.   And you understood that if you did not

25 follow Targa's anti-harassment policy, that you

Page 54

1  could be subject to discipline up to and including

2  termination, correct?

3      A.   Yes.

4      Q.   And you understood that even if you

5  violated Targa's anti-harassment policy on a single

6  offense, that you could be terminated for that

7  single offense, correct?

8      A.   Yes, sir.

9      Q.   And in looking at the definitions on page

10 1 -- you with me?

11     A.   Yes, sir.

12     Q.   I'm reading the second harassment,

13 "Harassment includes, but is not limited to the

14 following conduct."  You with me?

15     A.   Mm-hmm.

16     Q.   It talks about "Verbal conduct such as

17 threats, name calling, derogatory comments or slurs,

18 or stereotyping including communications through the

19 use of the internet, electronic mail, voice mail, or

20 text message."

21          Did I read that correctly?

22     A.   Mm-hmm.

23     Q.   Is that a yes?

24     A.   Yes, sir.

25     Q.   Sorry.

Page 55

1      It then talks about also "Nonverbal

2  contact as potential harassment such as making

3  inappropriate gestures or displaying inappropriate

4  or offense of posters, photography, cartoons,

5  drawings, or language including the use of internet,

6  electronic mail, or text message."

7          Did I read that correctly?

8      A.   Yes, sir.

9      Q.   So you understood as an employee of Targa

10 that also nonverbal conduct such as showing

11 inappropriate photos could be considered harassment,

12 correct?

13     A.   Correct.

14     Q.   And when you were employed at Targa, Mr.

15 Menard, did you receive any kind of harassment or

16 sexual harassment training?

17     A.   No, sir.  Not that I can recall.

18     Q.   Okay.  In any of your prior employers,

19 did you ever receive any kind of harassment or

20 sexual harassment training?

21     A.   Yes, sir, I have.

22     Q.   So when you arrived at Targa, you were

23 not unfamiliar with the term of harassment or sexual

24 harassment, correct?

25     A.   No, sir.

Page 56

1          Can we take a break, please?

2      Q.   Sure.

3          THE VIDEOGRAPHER:

4              We are going off the record.  The

5      time is 10:44 a.m.

6              (Recess taken.)

7          THE VIDEOGRAPHER:

8              We are back on the record.  The time

9      is 10:56 a.m.

10 BY MR. PATTON:

11     Q.   Mr. Menard, earlier when we were talking

12 about deposition preparation, you had told me that

13 you met with your lawyers in person for about an

14 hour and you said you had also had a telephone call

15 last Friday.  How long were you on the phone with

16 your counsel on Friday?

17     A.   Approximately an hour.

18     Q.   Okay.  Can you tell me in your own words

19 why you sued Targa?

20     A.   Because I felt what I was asked to do was

21 wrong and when I reported it to my supervisor, it

22 was kind of brushed off as nothing.  Like, it was

23 something that they were used to.

24     Q.   Anything else as to why you sued Targa?

25     A.   I'm still confused as to why I was let

KIRK MENARD                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                  57—60

Page 57

1  go.  I even text Ted regarding the reason for my
2  termination.
3     Q.   Anything else?
4     A.   No.  It just bothered me.  To this day it
5  still bothers me.  I told Ted and I told David Smith
6  that I intended to retire with Targa.
7     Q.   Okay.  Anything else?
8     A.   That's about it.
9     Q.   Okay.  You said that you felt what you
10  were asked to do was wrong.  What were you asked to
11  do?
12     A.   To dilute water samples.
13     Q.   Who asked you to dilute water samples?
14     A.   Perry Berthelot.
15     Q.   Other than Mr. Berthelot, did anyone else
16  ask you to dilute water samples?
17     A.   No, sir.
18     Q.   Other than asking you to dilute water
19  samples, was there anything else that you felt
20  someone asked you to do while working at Targa that
21  you thought was wrong?
22     A.   No, sir.
23     Q.   At the time that Mr. Berthelot asked you
24  to dilute water samples, did you think that he was
25  asking you to commit a crime?

Page 58

1     A.   Yes, sir.
2     Q.   You also said that you reported this to
3  someone at Targa, correct?
4     A.   Yes, sir.
5     Q.   And I believe you said that you felt it
6  was brushed off as nothing?
7     A.   Yes, sir.
8     Q.   And who did you report this to?
9     A.   Friday after the phone call with Mr.
10  Berthelot, I phoned David Smith.  He didn't answer
11  and he ended up calling me back, and I told him.
12  And he just basically said don't worry about that.
13  You know, we're still going with the sewage expert.
14     Q.   Is it fair to say that you didn't feel
15  that Mr. Smith wasn't taking it serious?
16     A.   Yes, sir.
17     Q.   Other than Mr. Smith on that Friday, did
18  you tell anyone else about what Mr. Berthelot
19  allegedly asked you to do?
20     A.   Monday I did walk into the control room.
21  Mr. Keller was in there along with other people,
22  Keith Adams, and I did say that Perry, you know,
23  questioned me more than -- at this time the Brett
24  Kavanaugh hearings was going on and I did make the
25  comment that he questioned me more than Kavanaugh.

Page 59

1  I didn't explicitly say it, but I thought one of
2  them would have asked, but no one asked, you know,
3  what it was about.
4     Q.   Okay.  So the Monday following the Friday
5  conversation, you walked into the control room and
6  you believe Mr. Keller was there, Mr. Adams, and a
7  few other people?
8     A.   Yes, sir.
9     Q.   Can you name any of the other people?
10     A.   I can't recall who all was in there.  I
11  do remember Mr. Keller and Mr. Adams.
12     Q.   And you brought up the fact that you had
13  spoken to Mr. Berthelot on Friday?
14     A.   Yes, sir.
15     Q.   And you had brought up the fact that you
16  felt that Mr. Berthelot, I don't want to say -- put
17  words in your mouth, but you felt like you were
18  questioned like Brett Kavanaugh was being
19  questioned?
20     A.   Yes, sir.
21     Q.   Did you ever tell Mr. Keller or Mr. Adams
22  or anyone else in that room on that day specifically
23  that Mr. Berthelot asked you to dilute water
24  samples?
25     A.   No, sir.

Page 60

1     Q.   Did you ever tell anyone in that control
2  room whether Mr. Keller, Mr. Adams, or anyone else
3  who was in there, that Mr. Berthelot asked you to
4  commit a crime?
5     A.   No, sir.
6     Q.   All right.  So the only person that you
7  told what Mr. Berthelot allegedly told you with
8  regards to diluted water samples was Mr. Smith?
9     A.   Yes, sir.
10     Q.   Prior to your termination on October 11,
11  2018, did you ever put in writing what Mr. Berthelot
12  told you to do?
13     A.   No, sir.
14     Q.   And why didn't you?
15     A.   Okay.  If we can go back.  Repeat that
16  last question.
17     Q.   Sure.  Prior to your termination on
18  October 11, 2018, did you ever submit in writing to
19  anyone at Targa what Mr. Berthelot asked you to do?
20     A.   No, sir.
21     Q.   And my question is:  Why?  Why didn't you
22  put it in writing to someone?
23     A.   I figured that David Smith would handle
24  it.  He was my immediate supervisor.
25     Q.   Okay.  Well, you would agree with me that

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
61–64

Page 61

1 you just indicated to me that you thought Mr. Smith
2 brushed it off as nothing, correct?
3    A.   Correct.
4    Q.   And you also indicated to me that Mr.
5 Smith did not take it seriously, correct?
6    A.   Correct.
7    Q.   Okay.  So if Mr. Smith brushed it off as
8 nothing and didn't take it serious, you would agree
9 with me that you did not think Mr. Smith was
10 handling it?
11    A.   Not necessarily.  Because that's how Mr.
12 Smith is.  That's his disposition a lot of times.
13    Q.   Well, you would agree with me that what
14 Mr. Berthelot allegedly asked you to do was a big
15 deal, was it not?
16    A.   Yes, sir.
17    Q.   I mean, it was a crime according to you,
18 correct?
19    A.   Yes, sir.
20    Q.   Prior to your termination on October 11,
21 2018, would you agree with me that you never filed a
22 complaint with My Safe Workplace, My Targa's Safe
23 Workplace, hotline?
24    A.   That's correct.
25    Q.   And you were aware at that time that you

Page 62

1 had the ability to make that complaint on that
2 hotline even anonymously, correct?
3    A.   Yes, sir.
4    Q.   Mr. Menard, I am showing you what has
5 been marked as Exhibit 3 to your deposition.  If you
6 would, take a look at that and if you'll let me know
7 when you are ready to discuss.
8    A.   (Witness reviews document.)
9    Q.   Ready to continue?
10    A.   Yes, sir.
11    Q.   So I want to start with Targa 748.  Do
12 you see the Bates labels on the bottom right-hand
13 corner?
14    A.   Yes, sir.
15    Q.   Those are some identifiers that mean the
16 documents have been produced in this lawsuit, so
17 I'll be going off of those.
18        But if you could turn to Targa 748.  This
19 is an e-mail from Ms. Hawkins to you dated October
20 15, 2018, at 1:28 p.m.; is that correct?  On the
21 bottom?
22    A.   Yes, sir.
23    Q.   And this was Ms. Hawkins writing to you
24 with regards to, I believe, a My Safe Workplace
25 complaint you filed?

Page 63

1    A.   Mm-hmm.
2    Q.   Yes?
3    A.   Yes, sir.
4    Q.   And do you recall filing a My Safe
5 Workplace complaint prior to October 15th?
6    A.   Yes, sir.  It wasn't directly on the My
7 Safe Workplace.  It was to Joe Bob Perkins and he
8 passed it through.
9    Q.   I think from what I've read is for some
10 reason the My Safe Workplace complaint number you
11 dialed was not working properly?
12    A.   Correct.
13    Q.   And then so you decided to make that a
14 complaint to Joe Bob Perkins, correct?
15    A.   Correct.
16    Q.   And what is Mr. Joe Bob Perkins' position
17 at Targa?
18    A.   He's CEO.
19    Q.   He's the highest?
20    A.   Yes, sir.
21    Q.   Did Mr. Perkins take your complaint
22 seriously?
23    A.   Yes, sir.
24    Q.   Do you think he acted quickly enough on
25 it?

Page 64

1    A.   Yes, sir.
2    Q.   And I believe he routed it to a Ms.
3 Elizabeth Hawkins to start handling?
4    A.   Yes, sir.
5    Q.   And did she contact you quite quickly?
6    A.   Yes, sir.
7    Q.   Then, if you look at Targa 747, the
8 previous page, you send a response to Ms. Hawkins'
9 e-mail just under two days later on October 17th,
10 2018, at 12:56 p.m.; is that correct?
11    A.   Yes, sir.
12    Q.   And were you at the e-mail of
13 kmenard@ait-la.com?
14    A.   Yes, sir.
15    Q.   Was that your personal e-mail at that
16 time?
17    A.   Yes, sir.
18    Q.   Is this with your private investigation
19 company?
20    A.   Yes, sir.
21    Q.   Okay.  Were you using any other e-mail at
22 this time?
23    A.   Not that I can recall.
24    Q.   Okay.  Now, on the very first sentence of
25 your e-mail on October 17th, 2018, you say, "Thank

Page 65

1  you for your prompt response.  At this time, I
2  decided to retain the service of a law firm in
3  Dallas, Texas, regarding my complaint.  Since the
4  complaint in question involves requesting that I
5  commit a criminal act and also involves the Clean
6  Water Act and the whistleblowers act."
7       Did I read that correctly?
8    A.   Yes, sir.
9    Q.   And so you would agree with me that as of
10  October 17th, 2018, you had retained an attorney?
11   A.   I had spoke to an attorney.  Not
12  retained.
13   Q.   You would agree with me, at least in that
14  first sentence, you said you've decided to retain
15  the services or a law firm, correct?
16   A.   Yes, sir.  But at that time they were not
17  retained.
18   Q.   Okay.  You also say that it involves a
19  question requesting that you commit a criminal act.
20  What specific crime were you asked to commit?
21   A.   Dilute a water sample.
22   Q.   Okay.  But do you know where or what act
23  or penial code or anything that that violates or
24  that suggest that's a crime?
25   A.   No, sir, I do not.

Page 66

1    Q.   But you would agree with me that it's
2  your position in this lawsuit that at the time Mr.
3  Berthelot allegedly asked you to do this, you did
4  think it was a crime to dilute water samples?
5    A.   Yes, sir.
6    Q.   If you could, could you turn to -- stay
7  there.  Sorry.
8    A.   747?
9    Q.   Yes.  On Targa 747 in the second
10  paragraph there you said, "First, the reason I was
11  terminated was stated that I made inappropriate
12  conducts -- comments, sorry -- comments, but I was
13  not told what those inappropriate comments were."
14       Did I read that correctly?
15   A.   Yes, sir.
16   Q.   So you would agree with me that you
17  thought the reason -- one of the reasons you were
18  terminated was because of the inappropriate
19  comments?
20   A.   Yes, sir.
21   Q.   And is it your contention that you never
22  made any inappropriate comments while working at
23  Targa?
24   A.   Yes, sir.
25   Q.   Is it your contention that you didn't

Page 67

1  engage in any kind of inappropriate conduct while
2  working at Targa?
3    A.   Yes, sir.
4    Q.   Let's turn to 748, sir.  I'm looking at
5  the second paragraph starting with "All this."
6    A.   Mm-hmm.
7    Q.   It says, "All this, as I'm sure will be
8  your defense, a disgruntled employment making
9  allegations that can't be substantiated, except for
10  the fact that it is recorded (Texas and Louisiana is
11  a one-party consent state) and other issues around
12  the Venice plant was recorded as well."
13       Did I read that correctly?
14   A.   Yes, sir.
15   Q.   So was it your contention, when you were
16  writing this e-mail to Ms. Hawkins, that you had all
17  the allegations to be substantiated by recordings?
18   A.   No, sir.
19   Q.   Okay.  Was it your contention, when you
20  wrote this, that you had the conversation between
21  you and Mr. Berthelot recorded?
22   A.   No, sir.
23   Q.   Was it your contention that you had the
24  conversation between you and Mr. Smith immediately
25  following the Mr. Berthelot communication recorded?

Page 68

1    A.   No, sir.
2    Q.   So tell me then, in your words, when you
3  said to Ms. Hawkins, all of this is "I'm sure will
4  be your defense, a disgruntled employment making
5  allegations that can't be substantiated, except for
6  the fact that it is recorded" what recordings were
7  you referring to that would substantiate your
8  allegations that Mr. Berthelot asked you to commit a
9  criminal act?
10   A.   Because at the time that I wrote this, I
11  thought my fiancé, because I was on my way home was
12  on the other line and then I found out that she
13  wasn't.  She's also a private investigator and she
14  records all of her phone conversations.
15   Q.   So your fiancé, who was that?
16   A.   Brooke Migues.
17   Q.   Spell the last name?
18   A.   M-I-G-U-E-S.
19   Q.   And so I just want to understand this.
20  So your fiancé records all of her phone calls?
21   A.   Yes, sir.
22   Q.   And when you had your conversation with
23  Mr. Berthelot, were you using your fiance's phone?
24   A.   No, sir.  But she was also, like -- I
25  would put her on hold and tell her to hold on while

KIRK MENARD

July 22, 2019

MENARD vs TARGA RESOURCES LLC

69–72

Page 69

1  I would make phone calls.

2      Q.    Okay.  Was she, like, on the phone on

3  three-way?

4      A.    No, sir.

5      Q.    So she was on --

6      A.    I have a -- I had a personal phone and

7  company phone.  So when I would call Mr. Berthelot,

8  sometimes I would tell her "hold on," I have to make

9  a phone call and she would be on the other line

10  listening on my personal phone.

11      Q.    Okay.  Here is what I'm confused about.

12  If your fiancé is on hold, how is she listening in

13  on a conversation --

14      A.    She's not her --

15      Q.    Hold on.  Let me finish my question.

16      A.    Okay.  I'm sorry.

17      Q.    Where I'm confused is that if your fiancé

18  is on hold, how is she listening in on a

19  conversation you were having with another

20  individual?

21      A.    She would only hear one side of the

22  conversation.

23      Q.    Okay.  How is it that she would hear one

24  side of the conversation?

25      A.    Because she would be on my personal

Page 70

1  phone; Perry would be on the company phone.

2      Q.    I got it.  So, for example, you're

3  talking on the phone, she's on a different phone,

4  you just tell her to hold on, you don't physically

5  put her on hold, you just put the phone down?

6      A.    Correct.  That's correct.

7      Q.    And so she can overhear your side of the

8  conversation?

9      A.    Yes, sir.

10      Q.    Okay.  And so she has recordings similar

11  to you where it's set up -- recording 6:00 to 6:00

12  or something like that?

13      A.    Yes, sir.

14      Q.    And do you know if your fiancé was on

15  hold at the time you talked to Mr. Berthelot that

16  day?

17      A.    I asked her and she says she doesn't

18  believe she.

19      Q.    Okay.  When did you ask her?

20      A.    A few days ago.  She has over 5,000

21  recordings on her phone.

22      Q.    So the first time you asked her if

23  she had any recordings regarding the conversation

24  you had with Mr. Berthelot, was a few days ago?

25      A.    Yes, sir.

Page 71

1      Q.    Did you ask her if she had any recordings

2  or calls being put on hold when you talked to Mr.

3  Smith that same day immediately following the call

4  with Mr. Berthelot?

5      A.    Yes, sir.  It was pretty early in the

6  morning, and I believe she was still sleeping.  She

7  was pregnant at that time.

8      Q.    Okay.  Well, did you ask her, though, if

9  she had a recording of the conversation that you had

10  with Mr. Smith immediately following Mr. Berthelot's

11  conversation?

12      A.    Yes, sir.

13      Q.    And did she have that?

14      A.    She said she didn't know.

15      Q.    Okay.  When is the first time you asked

16  your fiancé whether she had a recording of the

17  conversation with Mr. Smith immediately following

18  the conversation with Mr. Berthelot?

19      A.    This was whenever my attorney did the

20  first discovery.

21      Q.    So you would agree with me prior to

22  telling Mr. Hawkins that you had recordings that

23  substantiated your allegations in this case, you

24  never did a factfinding mission to determine if that

25  statement was even true?

Page 72

1      A.    No, sir.

2      Q.    Have you produced all of the recordings

3  that you feel -- all of the recordings to your

4  attorney that you feel substantiate the allegations

5  in this case?

6      A.    Yes, sir.

7      Q.    You would agree with me that sitting here

8  today that you do not have a recording of the

9  conversation that allegedly occurred between you and

10  Mr. Berthelot with regards to him asking you to

11  dilute the water sample?

12      A.    Not to my knowledge, no, sir.

13      Q.    And you would agree with me that you do

14  not have a recording of the conversation between you

15  and Mr. Smith with regards to the conversation that

16  took place immediately following the Perry Berthelot

17  conversation?

18      A.    Not to my knowledge, no, sir.

19      Q.    Okay.  So what recordings, if any, did

20  you have that you were aware of that made you make

21  the statement to Ms. Hawkins that you had recordings

22  that substantiated your allegations?

23      A.    Everything that I submitted to my

24  attorney.  Like I said, I inadvertently thought my

25  fiancé was on the phone, because we're always on the

KIRK MENARD                                          July 22, 2019
MENARD vs TARGA RESOURCES LLC                        73–76

Page 73

1  phone.  She was about ready to go into labor.  In
2  fact, I think a couple of weeks later she did go
3  into labor.
4      Q.   I will tell you that your attorneys have
5  produced six recordings in total with regards.  Are
6  those the six recordings that you believe
7  substantiate the allegations in this case?
8      A.   No, sir, not entirely.
9      Q.   Okay.  How many recordings would you say
10  you have produced to your attorney?
11     A.   Whatever he has.
12     Q.   Going to the third paragraph, Mr. Menard,
13  it says, "I vehemently and aggressively deny that I
14  made inappropriate comments and my work performance
15  was inadequate.  My termination comes less than a
16  week after failing two sewage samples and asked to
17  commit a criminal act.  The timing of my termination
18  coupled with a my credibility that is easily proved
19  and substantiated with recordings will cause any
20  reasonable person pause."
21        Did I read that correctly?
22     A.   Yes, sir.
23     Q.   So tell me then -- you say that "coupled
24  with your credibility that's easily proved and
25  substantiated with recordings."  What recordings are

Page 74

1  you referring to there?
2      A.   My fiancé.  Like I said, I inadvertently
3  thought that she was on the line whenever I made the
4  phone call.
5      Q.   Okay.  So the recordings that you are
6  referring to in paragraph 3 of Targa 748 that you
7  say will substantiate your credibility do not exist,
8  correct?
9      A.   Yes, sir.  Not to my knowledge.  Like I
10  said, she has 5,000 recordings on her phone.
11     Q.   Going to the last paragraph, sir.  It
12  says, "I've been asked to withhold the name of the
13  law firm representing me in this matter, but I have
14  given them your name and contact information so they
15  can contact you directly with the veracity of the
16  complaint."
17        Did I read that correctly?
18     A.   Yes.
19     Q.   So you would agree with me that on the
20  date of this e-mail you had a law firm that was
21  representing you, right?
22     A.   Yes, I asked them to contact her.
23     Q.   And you said, "I respect Mr. Perkins
24  unequivocally and believed he needed to be made
25  aware of the situation before it escalated."  And

Page 75

1  you say, "We certainly do not want another BP
2  situation on our hands."
3        What did you mean by "we certainly do not
4  want another BP situation on our hands"?
5      A.   If I'm reporting an unsafe act or
6  condition and it does not get handled, then it can
7  certainly escalate to the point of disastrous
8  circumstances.
9      Q.   But you had told me previously that you
10  filed a complaint with Mr. Hayward who was the CEO
11  of --
12     A.   BP.
13     Q.   -- BP, right?
14     A.   Yes, sir.
15     Q.   Do you think, Mr. Menard, that if BP had
16  taken your complaint seriously that the BP situation
17  in the Gulf wouldn't have happened?
18     A.   I can't speculate on that.
19     Q.   Mr. Menard, I'm showing you what has been
20  marked as Exhibit 4 to your deposition.  If you will
21  take a look at that and let me know when you are
22  ready to proceed.
23     A.   (Witness reviews document.)  I'm familiar
24  with the letter.
25     Q.   You're unfamiliar with the letter?

Page 76

1      A.   I'm familiar with the letter.
2      Q.   Okay.  I was going to say it's your
3  letter.
4        All right.  You would agree with, Mr.
5  Menard, that this is a letter that was drafted by
6  you and sent to Ms. Hawkins on October 23, 2018,
7  correct?
8      A.   Correct.
9      Q.   And you also sent a letter -- the
10  identical letter to Joe Bob Perkins; is that
11  correct?
12     A.   Correct.  I CC'ed him.  I copied him on
13  it.
14     Q.   And if we look at Exhibit 3 -- go back to
15  Exhibit 3, sir.  You would agree that this letter
16  was sent after the latest e-mail on Exhibit 3, which
17  is dated October 17th?
18     A.   Correct.
19     Q.   Okay.  All right.  Looking at the
20  letter -- looking at the very first sentence.  "This
21  is a written correspondence to our exchange to
22  e-mails concerning my alleged wrongful termination
23  when it was requested that I commit a criminal act."
24        I don't want to keep going over this, but
25  the only alleged criminal act that you were asked to

Page 77

1  do was dilute the water samples?
2      A.   Yes, sir.
3      Q.   So any reference to a criminal act in any
4  of these documents in this case, would you agree
5  with me you're referring to being asked to dilute
6  water samples?
7      A.   Yes, sir.
8      Q.   And tell me exactly what Mr. -- what did
9  he mean by diluting water samples?  Did he explain
10  exactly how to do that on a phone call?  Or did you
11  know what he meant?
12     A.   Half bottled water and half sewage
13  sample.  Because I wanted to turn in an early
14  sample.
15     Q.   Explain to me what you mean by an "early
16  sample."
17     A.   When we had failed, I had made the
18  decision to grab another sample to turn it in to get
19  another opinion before the quarter ended.  Sewage
20  samples are done quarterly.  So I was going to turn
21  it in to get a passing.  Because when you put it
22  into the DMR, you have to put the highest for every
23  quarter.
24     Q.   Okay.
25     A.   And that's basically what I meant.

Page 78

1      Q.   And before you did that -- can I call it
2  the second sample?
3      A.   I did not do one, because David Smith
4  when I called him, said we were already passed the
5  quarter.  To let it go.
6      Q.   Okay.  But you would agree with me that
7  before you did or attempted to do the second sample,
8  what you really wanted to do was retest that first
9  sample, right?
10     A.   I wanted to take another sample and send
11  it to the lab.
12     Q.   Okay.  It's your contention that with
13  regards to the failed exceedance, you did not ask to
14  have that sample retested?
15     A.   Please explain.  Rephrase.
16     Q.   Sure.  Well, you had the failed sample
17  that had the exceedance on the sewage, correct?
18     A.   Correct.
19     Q.   And then you said that you wanted to
20  attempt to do a second sample, correct?
21     A.   Correct.
22     Q.   And David Smith instructed you that you
23  could not do a second sample because it was too
24  late?
25     A.   Correct.

Page 79

1      Q.   Now, in between the time of the
2  exceedance to the point of you wanting to attempt to
3  do a second sample, at any point in time did you
4  ever ask for the original sample to be retested?
5      A.   Yes, sir, I did.
6      Q.   Okay.  And you understand that it was not
7  able to be retested?
8      A.   Correct.
9      Q.   And at the time that you asked for it to
10  be retested, you were not aware of the fact that a
11  sample like that couldn't be retested?
12     A.   Correct.
13     Q.   Going back to the letter, sir.  "When
14  asked to commit the illegal activity, I laughed it
15  off and said, 'No, we'll get it fixed the correct
16  way,' and the phone call ended."
17          Are you referring to the phone call with
18  Mr. Berthelot?
19     A.   Yes, sir.
20     Q.   So when he asked you to dilute the water
21  samples, you laughed it off and you said, "No, we're
22  going to fix it the correct way."
23     A.   I nervously laughed, because I couldn't
24  believe he was asking me to do such a thing.
25     Q.   You would agree with me in this letter,

Page 80

1  you did not say you nervously laughed.  You just say
2  "I laughed it off," correct?
3      A.   Correct.
4      Q.   When you did nervously laugh it off and
5  tell Mr. Berthelot that you are going to get it
6  fixed the correct way, did Mr. Berthelot say
7  anything after that?
8      A.   No, sir.  He just told me -- well, I told
9  him that I would call David Smith about the sewage
10  expert and he mentioned that it would cost money.
11     Q.   Okay.  Was this a large sum of money to
12  hire a septic expert?
13     A.   I'm not sure how much it cost to hire a
14  septic expert.  I mean, he implied that, you know,
15  that they've had problems in the past with that
16  sewage system.
17     Q.   Okay.  So it's your contention -- before
18  we go into can you explain exactly what sewage
19  system we're talking about?  Because isn't there two
20  out there?
21     A.   Yes, sir.  This is the one that the DGS,
22  Delta Gas System.
23     Q.   Okay.  So we have DGS and then we have
24  Venice?
25     A.   The Venice plant, yes, sir.

KIRK MENARD

July 22, 2019

MENARD vs TARGA RESOURCES LLC

81–84

Page 81

1    Q.    And when we're talking about the dilution
2    of water samples, we're talking with regards to the
3    DGS, correct?
4    A.    Yes, sir.
5    Q.    And it was your understanding -- let me
6    ask you this:  Was it your understanding that the
7    DGS sewage plant -- did I say that correctly?
8    A.    Yes, sir.
9    Q.    Had issues with exceedances in the past?
10    A.    Yes, sir.
11    Q.    Was that -- did you have that
12    understanding at the time you were talking to Mr.
13    Berthelot?
14    A.    No, sir.
15    Q.    Okay.  When did you come and have an
16    understanding that DGS sewage plant was having
17    issues with exceedances prior to your water sample?
18    A.    During a conference call on that previous
19    Friday.
20    Q.    Are we talking about the weekly
21    conference call?
22    A.    Yes, sir.
23    Q.    And was that before or after your
24    conversation with Mr. Berthelot?
25    A.    That was before.

Page 82

1    Q.    Okay.  And was it during this conference
2    call that someone made you aware and the others on
3    the telephone call that there had been issues with
4    regards to exceedances at the DGS sewage plant?
5    A.    Yes, sir.
6    Q.    Okay.  So at the time that you spoke to
7    Mr. Berthelot immediately after the meeting, you
8    were aware that the DGS sewage plant had issues with
9    exceedances in the past?
10    A.    Yes, sir.
11    Q.    Do you recall how far in the past?  Was
12    it immediately?  Was it ten years ago?  15 years
13    ago?
14    A.    I'm not sure, sir.
15    Q.    Okay.  Did you ever do any kind of
16    independent investigation into whether the DGS
17    sewage plant ever had exceedances in the past prior
18    to your sample?
19    A.    No, sir.  They had records on it, but I
20    can't recall what the records actually said.
21    Q.    Okay.  After you laughed it off and told
22    Mr. Berthelot, "No, you're going to get it fixed the
23    correct way," did Mr. Berthelot tell you, "No,
24    you're going to dilute the water samples"?
25    A.    No, sir, not that I recall.

Page 83

1    Q.    Did Mr. Berthelot, after you made that
2    statement, did he ever make an objection to you
3    doing what you called it "fixing it the correct
4    way"?
5    A.    He just objected because of the money it
6    would cost to hire a septic expert.
7    Q.    Well, let me ask you this:  In regards to
8    hiring an expert, what would you consider to be a
9    large sum of money that would give a company pause
10    for you to do it the correct way?
11    A.    Companies -- I mean, Targa has complained
12    about $2,500 in the past.
13    Q.    Okay.  When did Targa complain about a
14    $2,500 charge?
15    A.    The maintenance guys would want to order
16    certain things and it would always be kicked back
17    because of the money issues.
18    Q.    What types of things were the maintenance
19    guys attempting to order that cost $2,500?
20    A.    Motors.  I mean, they even complained
21    about the chlorine.  Perry was the one that
22    complained about the chlorine.
23    Q.    The pool chlorine?
24    A.    Yes, sir.
25    Q.    Okay.  Anything else regarding

Page 84

1    maintenance people attempting to order $2,500 and
2    Targa having a complaint with it?
3    A.    No, sir.  I mean, they would always
4    complain that this will cost money, that'll cost
5    money.  I remember a $2,500 figure coming out from
6    one of the maintenance individuals.
7    Q.    Okay.  Continuing on with your letter
8    there.  It says, "Less than one week later I was
9    advised by my supervisor, David Smith, to hire a
10    septic expert to determine the problem.  I did
11    advise him of what higher management advised me to
12    do and how I refused."
13        Are you talking about the fact that you
14    told Mr. Smith about what Mr. Berthelot told you to
15    do?
16    A.    Yes, sir.
17    Q.    So when you say "higher management,"
18    you're only referring to Mr. Berthelot?
19    A.    Yes, sir.
20    Q.    So as "In fact, Mr. Smith said, 'No,
21    Kirk, don't do that, because if the Louisiana
22    Department of Environmental Quality does a "check"
23    and we fail, then we will know that something was
24    done to pass previously water samples.'"
25        Did I read that correctly?

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
85–88

Page 85

1    A.   Yes, sir.

2    Q.   What did you do -- do you know what Mr.
3    Smith meant by that?

4    A.   Yes, sir.  He meant that DEQ will
5    sometimes go out and test the water themselves if
6    they have any inkling that someone is diluting water
7    samples are sometimes using coffee filters.  And
8    David also explained to me that that doesn't fix the
9    problem.

10   Q.   Okay.  So after you told Mr. Smith about
11   what Mr. Berthelot told you, he told you
12   specifically not to do that, correct?

13   A.   Yes, sir.

14   Q.   And he also told you that it wouldn't
15   work anyways?

16   A.   Correct.

17   Q.   Now, you had mentioned symptoms in
18   regards to coffee filters.  What do you mean by
19   that?

20   A.   Sometimes you can put coffee filters when
21   you're taking your sample and it will catch all of
22   the remnants from the water and just the clean water
23   goes in.  They did that offshore years ago.  And
24   some places still do it, I'm sure.  But it's still
25   illegal, you know.

Page 86

1         And so you use coffee filters to -- just
2    like a filter you might use to catch the water.  And
3    then when you're taking your sample, you pour it
4    through a coffee filter into the bottle and the
5    sample goes to the lab.

6    Q.   And you said people had done that out on
7    the rigs.  Is that would you said?

8    A.   Offshore, yes, sir.

9    Q.   Offshore?

10   A.   I've never seen it.  I've just heard
11   about it.

12   Q.   So in your employment at other places,
13   you had never seen anyone actually do this coffee
14   filter sampling?

15   A.   No, sir.

16   Q.   Had you ever done it before?

17   A.   No, sir.

18   Q.   Had you ever suggested for someone to do
19   it?

20   A.   No, sir.

21   Q.   Continuing on.  It says, "I advised Mr.
22   Smith, "Oh, no, that is never an option, because it
23   does not repair the problem."'

24        Was it your understanding as well that
25   based on that statement that you thought that

Page 87

1    diluting of the water sample would not repair the
2    problem as well?

3    A.   It would not fix the problem.

4    Q.   Okay.  It says, "Of course, at that time,
5    we're speaking of the weekly pond sampling and not
6    the sewage system, which failed later during
7    sampling by the lab."

8         Did I read that correctly?

9    A.   Yes, sir.

10   Q.   Okay.  So walk me through it.  It says,
11   "At that time we were speaking of the weekly pond
12   sampling."  So did Mr. Berthelot ask you to dilute
13   the pond samples?

14   A.   No, sir.

15   Q.   What did you mean here then when you
16   said, "Of course, at that time, we were speaking of
17   the weekly pond sampling and not the sewage system"?

18   A.   That's when I was still being trained by
19   Brogan Smith and he made a comment regarding
20   diluting water samples.

21   Q.   Tell the ladies and gentlemen of the jury
22   who Brogan Smith is.  Is it Brogan Smith?

23   A.   Brogan Smith was my predecessor and he
24   was there to train me.  I would go to the pond with
25   him.  He trained me on how to collect the water

Page 88

1    samples.  He talked to me about the pumps.  They had
2    a flow chart also that are available.  And he made a
3    comment he said, "You know, we could dilute it to
4    make sure we pass."  I said, "Well, that doesn't
5    fixe the problem.  The problem still remains."

6    Q.   So when you were working with Mr.
7    Brogan -- Brogan Smith, and the pond samplings were
8    getting exceedances as well?

9    A.   Yes, sir.

10   Q.   And did Mr. Brogan -- Mr. Smith -- Brogan
11   Smith suggest to you to dilute water samples?

12   A.   I don't know if he was joking.  You know,
13   he just said that Ted and Perry didn't want anymore
14   exceedances.

15   Q.   I'm going to object to nonresponsive to
16   your answer.

17        What asked you, though, was at that time,
18   did Brogan Smith ask you or suggest to you to dilute
19   a water sample with regards to the pond?

20   A.   No.

21   Q.   The next thing you say is, "Looking back
22   at previously sampling of weekly water samples,
23   there were several failures by my predecessor and
24   several failed sewage samples by my predecessor as
25   well.  So these failures were not the cause of a

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
89—92

Page 89

1   safety specialist not knowing how to pass a water or
2   sewage sample."
3        Did I read that correctly?
4   A.   Yes, sir.
5   Q.   So you apparently based on this that you
6   looked back at samplings of weekly water samples?
7   A.   Yes, sir.
8   Q.   Did you do that while you were employed
9   at Targa?
10  A.   Yes, sir.
11  Q.   And you said that your predecessor had
12  several failures?
13  A.   Yes, sir.
14  Q.   Were you talking about the pond?
15  A.   Brogan Smith.
16  Q.   Yes.  And were you talking about pond
17  samples or sewage samples?
18  A.   I believe there was also a sewage sample
19  that had failed, too.  I'm not clear on that.
20  Q.   Okay.  Well, based on your review of the
21  records while you worked at Targa, what did you
22  consider to be several failures?
23  A.   Dating back to 2016 and '17.
24  Q.   What did you consider to be several?  Is
25  that more than one?  More than two?  More than five?

Page 90

1   A.   More than one.  More than three,
2   actually, I believe it was.
3   Q.   So when you said several failures, you
4   were referring to it had more than three failures?
5   A.   Yes, sir.
6   Q.   And you also say that there were several
7   failed sewage samples.  And would you agree with me
8   that you also meant that there were at least three
9   sewer samples that failed from 2016 to the time that
10  you were with Targa?
11  A.   2015, '16, somewhere up around there.
12  Q.   And was this DGS, Venice, or both in
13  regards to the sewage?
14  A.   I want to say DGS.
15  Q.   And that was based on your review of the
16  records, correct?
17  A.   Yes, sir.
18  Q.   All right.  Going -- you said on
19  October 10th, 2018, you received a phone call from
20  Jarrod Gregg stating that they had a complaint
21  against me, meaning you, from making inappropriate
22  comments and it was reported human resources."  You
23  said, "When I inquired as to what "inappropriate
24  comments" I've made, he stated, 'I'm not going to go
25  through that with you.'  My supervisor, David Smith,

Page 91

1   was also on the phone when Mr. Gregg informed me of
2   the human resources complaint.  However, Mr. Smith
3   did not comment or say anything during the
4   conference.  I do have that phone call on
5   recording."
6        Did I read that correctly?
7   A.   Yes, sir.
8   Q.   Have you produced the recording of the
9   phone call between you, and Mr. Gregg, and Mr. Smith
10  where they told you about the inappropriate
11  comments?
12  A.   No, sir, I don't.  I don't have that on
13  recording.
14  Q.   Okay.  So when you made the statement, "I
15  do have that phone call on recording," that wasn't a
16  true statement, was it?
17  A.   No, sir.
18  Q.   Did you know that you didn't have a phone
19  call of that recording?  I'm sorry.  Did you know
20  that you didn't have a recording of that phone call
21  when you wrote this letter on October 23, 2018?
22  A.   I'm sure I did.  I'm sure I -- I knew
23  that I didn't have a recording.
24  Q.   So you would agree with me that you
25  intentionally lied to Ms. Hawkins with regarding the

Page 92

1   fact that you had a recording of the phone call
2   between you, Mr. Gregg, and Mr. Smith?
3   A.   Yes.
4   Q.   Okay.  Why is it that you would
5   intentionally lie to a general counsel of a company?
6   A.   Because I wanted something done.  I
7   wanted it thoroughly investigated.  And I knew that
8   they thought that if there was evidence there, that
9   they would thoroughly investigate this.
10  Q.   So if you want something done, you
11  thinking it's okay to lie, correct.
12  A.   Not necessarily.  In this circumstance, I
13  do.
14  Q.   Are there any other lies that you told
15  Targa during this process that I'm unaware of other
16  than the fact that you had this recording?
17  A.   Not that I'm aware of, no, sir.
18  Q.   Well, if at any point in time while we
19  are reviewing these documents and you see that you
20  have lied to Targa, will you point it out for me?
21  A.   Yes, sir.
22  Q.   Okay.  Going down.  I'm skipping around a
23  little bit.  You say -- starting with "I was given,"
24  which is the third line up.  You said, "I was given
25  two reasons for termination of my employment and was

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
93–96

Page 93

1  not entitled to an investigation."
2      Did I read that correctly?
3  A.  Yes, sir.
4      Q.  And you would agree with me that the two
5  reasons you were given for termination was
6  performance, correct?
7  A.  Yes, sir.
8      Q.  And then inappropriate conduct of
9  comments?
10  A.  Correct.
11      Q.  Starting down here where it says "I've
12  struggled."  Are you with me?
13  A.  Yes, sir.
14      Q.  It says, "I have struggled continuously
15  if I should report what I was asked to do to pass
16  water samples and sewage samples because I am not a
17  person to cause drama and I basically laughed it off
18  and apparently the person that asked me to do it,
19  did not think it was humerus when I took steps to
20  repair the problem, which, of course, would have
21  cost Targa money."
22      Did I read that correctly?
23  A.  Yes, sir.
24      Q.  So is it your contention that you were
25  asked to dilute both water samples and sewage

Page 94

1  samples?
2  A.  I'm not sure if he was talking about
3  sewage or water.  I assume he was talking about just
4  the sewage.  And I probably just put water in there.
5      Q.  Okay.  Well, you would agree with me,
6  though, that in this sentence that I just read from
7  your letter you say that you things that you were
8  asked -- strike that.
9      That you were struggling continuously if
10  you should report what you were asked to do to pass
11  water sample and sewage samples.  And you would
12  agree with me what you were asked to do was dilute
13  water samples, correct?
14  A.  Correct.
15      Q.  And according to this letter, you say
16  that you were asked to do that both with water and
17  sewage samples, correct?
18  A.  Yes, sir.
19      Q.  And you would agree with me that
20  according to you, Mr. Berthelot only asked you to
21  dilute the sewage samples?
22  A.  Correct.
23      Q.  So would this be an example of another
24  lie of what you told in the letter with regards to
25  the water samples?

Page 95

1  A.  I wouldn't call it a lie.  I'd probably
2  call it writing an e-mail and just ranting or
3  venting.
4      Q.  But you would agree with me, though, that
5  Mr. Berthelot did not ask you to dilute water
6  samples with regards to the pond?
7  A.  That's correct.
8      Q.  Going down to the bottom, sir, where you
9  start with "Sometimes."  It says, "Sometimes it's
10  not whether you win or lose in a court case, but
11  rather achieving your objective.  I consider myself
12  a person of honesty and integrity in reporting the
13  issue the right thing to do even though the result
14  will be that Targa has done nothing wrong."
15      Did I read that correctly?
16  A.  Yes.
17      Q.  You would agree with me that you consider
18  yourself to be an honest person --
19  A.  Yes.
20      Q.  -- according to what you wrote there?
21  A.  Yes, sir.
22      Q.  But you would also agree with me that on
23  the previous page you intentionally lied?
24  A.  Yes.
25      Q.  Do you think an honest person

Page 96

1  intentionally lies?
2  A.  If it's to get them to do the right
3  thing.
4      Q.  Now, you also say "That I consider myself
5  a person of honesty and integrity and reporting the
6  issues the right thing to do even though the result
7  will be that Targa has done nothing wrong."  Were
8  you saying that reporting was the right thing to do?
9  A.  Reporting was the right thing to do and
10  if the court considers that Targa did nothing wrong,
11  then I'll live with it.
12      Q.  So you would agree with me that reporting
13  the fact that Mr. Berthelot asked you to commit a
14  crime or dilute water samples was the right thing to
15  do, correct?
16  A.  Yes, sir.
17      Q.  And you would agree with me that prior to
18  October 23, 2018, you never made any kind of report
19  to the state with regards that someone from Targa,
20  Mr. Berthelot, asked you to commit a crime?
21  A.  On what date was that?  I'm sorry.
22      Q.  October 23, 2018.
23  A.  No, sir, I did not.  I wanted to handled
24  it internally if I could.
25      Q.  Do you think it's your obligation as an

Page 97

1 environmental, safety, and health specialist to
2 report things to the state?
3     A.    I believe in a chain of command.  That I
4 should go through my supervisor and he should handle
5 it appropriately on my behalf.
6     Q.    You recall earlier when we were talking,
7 Mr. Menard, that when I asked you what your duties
8 and responsibilities were as an environmental,
9 safety and health specialist, what you told me one
10 of things you said was you're responsible for
11 identifying and reporting violations of
12 environmental and safety standards under state and
13 federal laws.
14         Did I read that correctly?
15     A.    Yes sir.
16     Q.    And you would agree with me that Mr.
17 Berthelot asking you to commit a crime would be a
18 violation of an environmental or safety standard
19 under state or federal law?
20     A.    Yes, sir.
21     Q.    And you would agree with me that you did
22 not report this alleged request by Mr. Berthelot for
23 you to commit a crime to either the state or federal
24 agency prior to October 23, 2018?
25     A.    No, sir, I did not report it to the

Page 98

1 state.
2     Q.    And you, also, didn't report it to any
3 federal agency, correct?
4     A.    No, sir.
5     Q.    At any point in time, did you report what
6 Mr. Berthelot allegedly asked you to do to a state
7 or federal agency?
8     A.    Yes, sir, I did.
9     Q.    And when was the first time that you made
10 a report to either state or federal agency with
11 regards to what Mr. Berthelot asked you to do?
12     A.    I can't quite recall the date.
13     Q.    Is it fair to say that the first time
14 that you made a report about what Mr. Berthelot
15 asked you to do to either -- well, let me ask you
16 this.
17         Who did you make the report to?
18     A.    DEQ -- Louisiana DEQ.
19     Q.    Okay.  Did you ever make a report to a
20 federal agency?
21     A.    No, sir.
22     Q.    And if I refer to it as DEQ, can we
23 understand that that's Louisiana agency?
24     A.    Correct.
25     Q.    And is it fair to say that the first time

Page 99

1 that you made a report to the DEQ about what Mr.
2 Berthelot allegedly asked you to do was after you
3 had been terminated by Targa?
4     A.    Correct.
5     Q.    Would it also be fair to say that the
6 first time that you had made a report to the DEQ
7 would be after you had retained an attorney?
8     A.    That's correct.
9     Q.    If we can turn to the next page, which is
10 Targa 768, sir, i'm going down here and I'm starting
11 with "As far as the recordings" right there, sir.
12 "As far as the recordings that I have, it was
13 completely forgotten that my phone was set to audio
14 record all phone conversations as well as ambient
15 recordings in the room.  The recordings were
16 scheduled to record from 6:00 a.m. to 6:00 p.m. and
17 these were used when I would interview clients or
18 witnesses when I was handling the day-to-day
19 operations of the investigative agency."
20         Did I read that correctly?
21     A.    Correct.
22     Q.    So at the time that these events were
23 occurring, were you aware that your telephone was
24 even recording?
25     A.    Yes, sir.

Page 100

1     Q.    Okay.  And your personal cell phone was
2 recording from 6:00 a.m. to 6:00 p.m.?
3     A.    Correct.
4     Q.    Everyday?
5     A.    Correct.
6     Q.    And was it sent into the cloud?
7     A.    No, sir.  I don't use the cloud.
8     Q.    Okay.  Was it all stored on your phone?
9     A.    Yes, sir.
10     Q.    At any point in time, have you deleted
11 any of those messages?
12     A.    Yes, sir.
13     Q.    And is it fair to say that you deleted
14 some of these messages after October 23, 2018?
15     A.    It's possible.
16     Q.    But sitting here today, do you know
17 whether you deleted any conversations?
18     A.    No, sir, I'm unsure.  But I have deleted
19 some conversations more of a personal nature.
20     Q.    What is your -- the cell phone at the
21 time that was recording conversations and ambient
22 recordings in the room from 6:00 a.m. to 6:00 p.m.,
23 what was that telephone number?
24     A.    (337) 298-6803.
25     Q.    Do you recall what your work number was

KIRK MENARD                                                          July 22, 2019
MENARD vs TARGA RESOURCES LLC                                        101–104

Page 101

1  with Targa?
2     A.   No, sir.  It was a 504 area code.  That's
3  all I know.
4     Q.   But it was a 504 area code?
5     A.   Yes, sir.
6     Q.   And after your termination, did you give
7  that phone back to Targa?
8     A.   Yes, sir.
9     Q.   Did the 504 Targa work phone, did that
10 have any -- was that set up at all to record?
11    A.   No, sir.
12    Q.   All of the recordings that you did were
13 on the personal cell phone, (337) 298-6803?
14    A.   Yes, sir.  Or mine.  That's my fiancé's
15 number.  My phone number as well (337) 246-0933.
16    Q.   So (337) 246-0933 is Kirk Menard's
17 personal phone number?
18    A.   Yes, sir.
19    Q.   And then (337) 298-6803 is your
20 fiancé's --
21    A.   Yes, sir.
22    Q.   -- Brooke --
23    A.   Migues.
24    Q.   -- Migues.  Are you still with Ms. Migues
25 today?

Page 102

1     A.   Yes, I am.
2     Q.   Do you know if Ms. Migues still has the
3  cell phone that she had back in the fall of 2018?
4     A.   Yes, sir.
5     Q.   Do you know -- did you ever ask her to go
6  through her phone and determine whether or not she
7  had any recordings that may be or may not be
8  relevant to this lawsuit?
9     A.   Yes, sir, I have.
10    Q.   Did you personally do it or did she do
11 it?
12    A.   We both done it.
13    Q.   And did you produce any of those
14 recordings to your counsel?
15    A.   I want to say we produced some, yes.  I'm
16 not sure.
17    Q.   Okay.  Well, how did you determine what
18 to produce and what not to produce to your counsel?
19    A.   Because we were listening for anything
20 that involved Targa.
21    Q.   But sitting here today, you do recall
22 that you did produce at least some recordings from
23 Ms. Migues' telephone?
24    A.   Yes.
25    Q.   And is it fair to say that you also did

Page 103

1  the same process with regards to your personal
2  phone?
3     A.   Yes, sir.
4     Q.   And did you also produce recordings to
5  your counsel from your phone?
6     A.   Yes, sir.
7     Q.   And sitting here today, can you give me a
8  ballpark of how many recordings you've produced?
9     A.   I'm not sure.  Anywhere from four to six.
10    Q.   Gong to paragraph 3, starting with "On
11 some of these recordings, you will hear area manager
12 Ted Keller tell me that I am doing a great job and
13 that my safety meetings were the best that he's ever
14 attended."
15         Did I read that correctly?
16    A.   Correct.
17    Q.   And when you wrote this letter, did you
18 have a recording of Mr. Keller telling you that you
19 were doing a great job and the safety meetings were
20 the best he's ever attended?
21    A.   I assumed I did, because I assumed that
22 my fiancé was on the phone at the time, and when he
23 walked in, I told him to hold on -- I told her to
24 hold on.
25    Q.   You would agree with me, though, that

Page 104

1  there is no recording of Mr. Keller telling you that
2  you are doing a great job and that your safety
3  meetings were the best he's ever attended?
4     A.   Not that I can find.
5     Q.   Wouldn't you agree with me that it's
6  important before you put something in a letter that
7  you have recordings that you actually determine that
8  you have them?
9     A.   Yes, I would.
10    Q.   It says, "You will also hear Ted Keller
11 advise me to stay away from the person that advised
12 me to commit the illegal act because he will throw
13 me under the bus."
14         Did I read that correctly?
15    A.   Correct.
16    Q.   Is it fair to say that you do not have a
17 recording, that Mr. Keller advises you to stay away
18 from the person that advised me to commit the
19 illegal act because he will throw you under the bus?
20    A.   That's correct.
21    Q.   Were you intentionally lying when you
22 told Ms. Hawkins that you had these recordings
23 identified in paragraph 3 of 768?
24    A.   No, I was not.
25    Q.   Continuing on.  It says, "If you ask Mr.

Page 105

1  Keller if he told me that, I'm sure he will admit
2  it."
3      Is that because you believe Mr. Keller to
4  be an honest guy?
5      A.  Yes, sir.
6      Q.  It says, "In fact, it was so serious that
7  Mr. Keller didn't even want me communicating with
8  the person in question because he was known to blame
9  circumstances on other."
10     A.  That's correct.
11     Q.  And you were referring to Mr. Berthelot?
12     A.  Correct.
13     Q.  And would you agree with me that Mr.
14 Keller advised you prior to that phone call on
15 Friday with Mr. Berthelot to actually even not
16 communicate with Mr. Berthelot?
17     A.  That's correct.
18     Q.  But despite Mr. Keller's clear
19 instructions, you called Mr. Berthelot anyways,
20 correct?
21     A.  On Mr. Berthelot's -- yes.
22     Q.  And you believe -- let me ask you this:
23 In the safety meeting -- that weekly safety meeting,
24 did Mr. Berthelot tell you to call him?
25     A.  Yes, sir, he did.

Page 106

1      Q.  Okay.  And did he do that during the
2  safety weekly meeting or did he do it after?
3      A.  He did it during.
4      Q.  During?
5      A.  Yes, sir.
6      Q.  Who else was on this -- well, let me ask
7  you this.  I apologize.
8      Was this a meeting in person or on the
9  telephone?
10     A.  It was over the telephone.
11     Q.  Okay.  So all the people were on the
12 telephone?
13     A.  All of the operations personnel, yes.
14     Q.  Okay.  Who -- if you recall, who were the
15 other people on the phone call other than yourself?
16     A.  I'm not sure.  I know that the
17 maintenance supervisor was -- we were using his
18 phone, but all of the operations personnel from Lake
19 Charles all the way to Mississippi was on that call.
20     Q.  So who is the maintenance supervisor that
21 you are referring to?
22     A.  I can't remember his name.  He's a black
23 guy.
24     Q.  Okay.  And so during the telephone call
25 in the safety -- in the weekly safety call, Mr.

Page 107

1  Berthelot, during that call, told you, Mr. Menard,
2  to call me, correct?
3      A.  Correct.  He said --
4      Q.  What did he say specifically?  If you
5  recall.
6      A.  During the phone call?
7      Q.  Yes.  Not during the alleged asking you
8  to commit and act.  Before that during that weekly
9  conference call.
10     A.  I explained to him about the exceedances
11 that we had and that others were on the phone and he
12 said we've had problems at DGS before.  After you
13 leave, please give me a call and I'll tell you what
14 we've done to correct the problem.
15     Q.  So he indicated to you that there had
16 been problems before with the sewage at DGS,
17 correct?
18     A.  Yes, sir.
19     Q.  And as a result he said that there were
20 issues -- there were ways to deal with it and he
21 told you to give him a call?
22     A.  Correct.
23     Q.  So you felt, as a result of Mr.
24 Berthelot's position in the company -- well, let me
25 ask you this:  Was Mr. Berthelot higher than you in

Page 108

1  the company in the chain of command?
2      A.  Yes, sir.
3      Q.  And as a result of Mr. Berthelot's
4  position in the company, you felt that you needed to
5  call him because he specifically told you to call
6  him?
7      A.  Yes, sir.
8      Q.  And prior to Mr. Berthelot telling you to
9  specifically call him, Mr. Keller had already
10 previously specifically told you to not even
11 communicate with Mr. Berthelot?
12     A.  That's correct.
13     Q.  Is there a particular reason you didn't
14 go to Mr. Keller before calling Mr. Berthelot and
15 say, "Hey, Perry is asking me to call him.  What
16 should I do?"
17     A.  Prior to that, Mr. Keller had told me
18 that Perry may give me a call regarding the
19 exceedance.  Keith Adams was in the room and also
20 the maintenance supervisor when he told me that.
21 And then after that, Mr. Keller, this was a Friday,
22 everybody leaves on Friday, he was already gone.  I
23 don't know where he went, but he was unreachable for
24 some reason.
25     Q.  Okay.  So when Mr. Keller in front of Mr.

KIRK MENARD                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                 109–112

Page 109

1  Adams told you to -- that Mr. Berthelot would want
2  you to call him or he might be calling you, that was
3  before this weekly safely meeting, fair?
4     A.  That's correct.
5     Q.  Was it that same day?
6     A.  I'm not sure.  I think it may have been
7  the day before.
8     Q.  Okay.  So maybe the Thursday?
9     A.  Yes, sir.
10    Q.   And then when Mr. Berthelot asked you to
11 call him regarding presenting different ways of how
12 to handle the DGS sewage exceedance, did he indicate
13 to you that he wanted to call you right away or
14 could you have waited a couple of days?  Or what was
15 your understanding?
16    A.  I took it as he wanted me to call him
17 right away.
18    Q.  Why did you take it that way?
19    A.  The way he said it.  He said, "After this
20 call, give me a call and we'll -- I'll tell you the
21 problems we've had in the past and the ways that
22 we've corrected it."
23    Q.  Okay.  Let's talk -- and so what phone
24 did you call Mr. Berthelot from?
25    A.  The company phone.

Page 110

1     Q.  The 504?
2     A.  Yes, sir.
3     Q.  Did you have your personal phone call --
4  or cell phone on you at the time?
5     A.  Yes, sir.
6     Q.  And you didn't decide to call him from
7  the personal phone?
8     A.  No, sir, I called him from the company
9  phone.
10    Q.  Tell me exactly what Mr. Berthelot said
11 during this phone call.
12    A.  During this phone call he said they've
13 had problems at DGS and that at one time they had to
14 have the washing machines disconnected because they
15 felt that that causing the sewage failures at DGS.
16 And he also -- and then I said that they were using
17 the wrong chlorine tablets as well.  I said they
18 were using pool chlorine tablets rather than
19 commercial chlorine tablets.  He made a certain
20 comment like, well, I don't know when they changed,
21 but they were supposed to have been using commercial
22 tablets.  And I told him that I would grab an early
23 sample to try to get it passed through.  This was
24 prior to talking to David Smith.  And he said,
25 "Well, if you're going to grab an early sample, then

Page 111

1  just go ahead use half bottled water, half sewage
2  water we can pass it that way so we can avoid an
3  exceedance."
4     Q.  Okay.  Is there anything else about that
5  conversation?
6     A.  I nervously laughed and I said, "Well,
7  David Smith suggested a sewage expert, but he wants
8  to talk to Ted Keller about it first."
9     Q.  Okay.  And did Perry say anything after
10 you said that?
11    A.  Not to my knowledge.
12    Q.  And at that point, did the
13 conversation end?
14    A.  Yes, sir.
15    Q.  Did you ever have any other
16 communications with Mr. Berthelot after that phone
17 conversation?
18    A.  No, sir.
19    Q.  Okay.  You had indicated that during that
20 phone call you had told Mr. Berthelot that Targa or
21 the Venice facility was using the wrong chlorine
22 tablets?
23    A.  Correct.
24    Q.  It was your position that Targa was using
25 pool chlorine as opposed to commercial chlorine?

Page 112

1     A.  Correct.
2     Q.  And I believe you've taken a position in
3  this case that the use of pool chlorine is a
4  violation of the EPA; is that correct?
5     A.  Yes, sir.
6     Q.  Can you tell me what specific part of the
7  environmental protection act that says that Targa is
8  not allowed to use pool chlorine in its septic?
9     A.  I'm not sure.  But it was something that
10 I googled that came up.
11    Q.  Okay.  Tell me exactly what you googled
12 in order to determine that use of pool chlorine is a
13 violation of the EPA?
14    A.  I googled chlorine tablets for commercial
15 septic systems.
16    Q.  And as a result -- and did you just type
17 that in the search engine?
18    A.  Yes, sir.
19    Q.  And it was chlorine tablets for
20 commercial septic systems?
21    A.  Yes, sir.
22    Q.  And if I go and do that on Google
23 tonight, I would be able to pull up the EPA --
24 strike that.
25        Somewhere in that page -- was it on the

Page 113

1  first page or the second page, third page?
2      A.   I want to say it came up right on the
3  first page.
4      Q.   Okay.  So on the first page I will be
5  able to find something that says that the use of
6  pool chlorine is a violation of the EPA?
7      A.   Yes, sir.  It talked about fines as well.
8      Q.   Volumes?
9      A.   Fines.
10     Q.   Fines.  Okay.
11          When you were working for Targa, did you
12  become familiar with their permits?
13     A.   I tried to, yes, sir.
14     Q.   Sitting here today, do you recall
15  anything in Targa's permits that prevented them from
16  using pool chlorine on septics?
17     A.   No, sir, I don't recall.
18     Q.   Okay.  All right.  Going down to the
19  bottom and starting with "After failing" -- I'm
20  sorry, it says, "After failing," down here
21  somewhere.  Are you with me?
22     A.   Mm-hmm.
23     Q.   "After failing water samples previously,
24  Ted Keller, apparently at the request or urging of
25  the individual that requested I commit the 'illegal

Page 114

1  act,' sent an e-mail to all Venice employees that
2  stated in part 'We absolutely cannot fail another
3  test, or we will face enforcement action from the
4  government.'"
5          Did I read that correctly?
6      A.   Yes, sir.
7      Q.   Now, you say in that sentence that Mr.
8  Keller sent this at the urging of Mr. Berthelot,
9  correct?
10     A.   Yes, sir.
11     Q.   What evidence do you have that Mr.
12  Berthelot urged Ted Keller to send that e-mail?
13     A.   I believed that Mr. Perry was copied on
14  the e-mail, and that's the only thing that I've gone
15  on.
16     Q.   Okay.  So the fact that you making the
17  statement that that e-mail sent by Mr. Keller was
18  the urge -- urged by Mr. Berthelot was the fact that
19  that Mr. Keller included Mr. Berthelot on the
20  e-mail?
21     A.   Correct.
22     Q.   You would agree with me that there were
23  other individuals that were listed on that e-mail,
24  right?
25     A.   Yes, sir, the entire Venice plant.

Page 115

1      Q.   Okay.  Is it possible that any of the
2  people who were CC'ed or on the two line of that
3  line, could they have urged Mr. Keller to do it?
4      A.   I'm not sure.
5      Q.   It's fair to say that you are speculating
6  that Mr. Berthelot Mr. Keller to send that
7  e-mail?
8      A.   Correct.
9      Q.   So that statement, according to you, is
10  not 100 percent accurate; is it?
11     A.   No, sir.
12     Q.   Now, it says -- is there a certain -- in
13  Louisiana DEQ, is there, like, a certain number of
14  exceedances that a company can have before there is
15  any potential violation or enforcement action?  Or
16  what is your understanding of exceedances in
17  Louisiana with regards to enforcement or violations?
18     A.   I'm not sure.
19     Q.   Okay.  So as an environmental safety and
20  health specialist for Targa, you're not aware of how
21  exceedances in Louisiana work with regards to
22  enforcement and violations?
23     A.   No, sir.
24     Q.   Is that something you're supposed to know
25  about for purposes of your job?

Page 116

1      A.   Not necessarily, no, sir.
2      Q.   Going to Targa 769, which is the
3  following page.  I'm looking at paragraph 3 starting
4  with "I will supply."  Are you with me?
5      A.   Yes.
6      Q.   It says, "I will supply the recordings to
7  the attorneys that I intend to retain to represent
8  my best interest in this matter.  These recordings
9  tell a lot and you will hear inappropriate comments
10  by employees in the safety meetings, but no action
11  was taken against them.  One such employee speaks of
12  chemicals being able to enter the body anally."
13          Did I read that correctly?
14     A.   Yes.
15     Q.   So it sounds like you had listened to the
16  recording and you were aware of what was contained
17  on the recording according to these sentences,
18  correct?
19     A.   Mm-hmm.
20     Q.   Yes?
21     A.   Yes.
22     Q.   And have you produced the recordings that
23  we can hear inappropriate comments by employees in
24  the safety meetings or a recording that an employee
25  speaks of chemicals being able to enter the body

KIRK MENARD                                                          July 22, 2019
MENARD vs TARGA RESOURCES LLC                                       117–120

Page 117

1  anally?
2      A.    No, sir.
3      Q.    Is it because those recordings don't
4  exist?
5      A.    I'm not sure if they do or don't.
6      Q.    When you wrote this letter in October 23,
7  2018, were you aware of whether these recordings
8  actually exited?
9      A.    No, sir.
10     Q.    Okay.  Would this be, again, you
11  misrepresenting or misleading Ms. Hawkins about what
12  actually was out there with regards to the
13  recordings?
14     A.    Possibly.
15     Q.    And were you doing that so, you know,
16  something you can get done as you phrased earlier?
17     A.    Yes, sir.
18     Q.    When you worked for Targa, explain to the
19  ladies and gentlemen of the jury of how to do a
20  water sample with regards to the pond.  If you
21  remember.
22     A.    To the pond, you basically you would keep
23  the flow closed and my strategy was to open the
24  flow, let the water out so it can clean out, put
25  filters in place to grab all the remnants and dirt

Page 118

1  and particles.  You have a cup, take the cup, grab
2  the water, pour it into the bottle, seal it, put it
3  in a chain of custody, and it goes to the lab.  It
4  also goes in an ice chest filled with ice.
5      Q.    Okay.  Was that written down anywhere or
6  was that -- how did you learn to do it that way?
7      A.    From Brogan Smith.
8      Q.    Did you know if there was ever a written
9  policy or procedure of how to take a water sample in
10  the pond at Venice?
11     A.    I'm not sure.  He's never shown me any
12  policy or anything like that.
13     Q.    And when you worked for Targa, you never
14  actually saw any kind of written policy or procedure
15  with regards to how to do a water sample in the
16  pond?
17     A.    No, sir.
18     Q.    You learned form Brogan?
19     A.    Correct.
20     Q.    Okay.  In regards to the sewage, could
21  you explain to the ladies and gentlemen of the jury
22  of how to do a sewage water sample?
23     A.    Basically go to the sewage, you let the
24  water run for two or three minutes, you know, and
25  then it gets all the remnants out and then you stick

Page 119

1  a bottle under the needle valve and it fills up to
2  the top, put it back on, and you seal it with a
3  chain of custody label and that also goes into an
4  ice chest topped with ice and goes to the lab.
5      Q.    And are you responsible for the chain of
6  custody of the sample to get to the lab?
7      A.    Yes.
8      Q.    Were you the one responsible for always
9  taking the water samples when you worked at Targa?
10     A.    Not entirely.  When Brogan was there
11  training me, he was partially responsible as well.
12     Q.    Okay.  Once Brogan had left, were you the
13  one solely responsible for taking the water samples?
14     A.    Yes.
15     Q.    When the water samples would get back
16  from the lab, did you have to clean these bottles or
17  do anything?
18     A.    No, sir.
19     Q.    What would happen?
20     A.    No, sir.  They kept the bottles, they
21  kept the sample, and they would send us an e-mail on
22  whether we passed or failed.
23     Q.    And when you would take a water sample,
24  were you grabbing brand-new bottles every time?
25     A.    Yes, sir.

Page 120

1      Q.    Kind of like needles in a medical place?
2      A.    Yes, sir.
3      Q.    At least we hope.
4      A.    Yes, sir.
5      Q.    If there was an exceedance at the Venice
6  facility, who was charged with the remediation
7  effort of how to fix the problem?
8      A.    I would report it to Ted as well as David
9  Smith.  Usually either verbally or through e-mail.
10     Q.    Okay.  Once you would report that an
11  exceedance occurred, who was the person responsible
12  for the remediation effort of how to bring the
13  exceedance down?
14     A.    It was operations.
15     Q.    So you as the ES&H specialist, it's your
16  contention that you had no responsibility with
17  regards to the remediation effort to get the
18  exceedance down?
19     A.    No, sir.
20     Q.    The bottles that you were using to
21  collect the samples, those were the new -- that was
22  the new thing, right?  The bottles.  Not the whole
23  process was new, it was just the actual sampling
24  bottle that you got was brand-new?
25     A.    Correct.

KIRK MENARD                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                   121–124

Page 121

1     Q.    The facilities or the testing agencies,
2   they would keep the sampling bottle?
3     A.    Correct.
4     Q.    And so it's your contention that
5   operations was solely responsible for figuring out
6   how to fix the exceedance that occurred either in
7   the pond or in the sewage, correct?
8     A.    Correct.
9     Q.    All right.  Going to Targa 770, sir.  I'm
10  looking at the last sentence -- well, second to last
11  sentence it says, "As with every company, there are
12  a few "bad apples" and sometimes it takes years for
13  those to come out.  My predecessor made a comment,
14  which is also on recording, that the person in
15  question taught him hot to 'stab someone in the
16  back' and not give it a second thought."
17        The predecessor you're referring to is
18  Brogan Smith, correct?
19    A.    Yes.
20    Q.    Do you find Mr. Smith to be an honest
21  person?
22    A.    Yes, sir.
23    Q.    And you say in this that you have a
24  recording of Brogan Smith whereby it says that Mr.
25  Berthelot taught him how to stab someone in the back

Page 122

1   and not give it a second thought, correct?
2     A.    Yes, sir.
3     Q.    Did you hear that on the recording before
4   you wrote this letter?
5     A.    No, sir.
6     Q.    Okay.  And you would agree with me that
7   there is no recording where Brogan Smith says that
8   Mr. Berthelot taught him to stab someone in the back
9   and not give it a second thought?
10    A.    To my knowledge, no.
11    Q.    So would this be another example of you
12  misleading or misrepresenting Ms. Hawkins with
13  regards to the recordings that you actually have?
14    A.    Correct.
15    Q.    Were you making this misrepresentation or
16  misleading statement to Ms. Hawkins so you would get
17  their attention?
18    A.    Correct.
19    Q.    Is it fair to say then, Mr. Menard, that
20  according to you, it is okay to misrepresent someone
21  or mislead someone in order to get things done?
22    A.    Not necessarily.  That comment was made,
23  but it was not on recording.
24    Q.    But you would agree with me that you
25  indicated on this document that you sent to Targa's

Page 123

1   general counsel that you had a recording of that
2   statement?
3     A.    Correct.
4       MR. PATTON:
5         Can we take a break?
6       MR. BERGERON:
7         Yes.
8       THE VIDEOGRAPHER:
9         We are going off the record.  The
10      time is 12:13 p.m.
11        (The Recess.)
12      THE VIDEOGRAPHER:
13        We are going back on the record.
14      The time is 12:48 p.m.
15  BY MR. PATTON:
16    Q.    All right.  Mr. Menard, we're back after
17  a brief lunch.  You're ready to continue?
18    A.    Yes, sir.
19    Q.    In regards to the sampling that you do
20  out at the plant, both sewage and pond, was there,
21  like, a vessel -- I don't know if that's the correct
22  name -- but was there a vessel that you poured the
23  water into the sampling tube or would pour the water
24  right into the sampling tube?
25    A.    I poured it directly into the sampling

Page 124

1   tube.
2     Q.    Okay.  When you were running the water
3   for a couple of minutes, like off the sewage, you
4   just would put the sampling tube right under there,
5   correct?
6     A.    Correct.
7     Q.    Talking about the recordings and you said
8   that your fiancé was recording on the other phone
9   while she was on hold at times, were you aware of
10  her -- I know you are aware of today -- but at the
11  time that you were having these conversations and
12  you had put the phone down and it was hold, were you
13  aware that she was recording at that time?
14    A.    I knew that she had a recorder on her
15  phone.
16    Q.    But what I asked was:  At the time of
17  those you had put her down on hold, were you aware
18  that that phone was actually recording?
19    A.    No, sir, I wasn't.
20    Q.    Okay.  Do you know if Brooke was aware
21  that that phone was actually recording?
22    A.    No, I don't.
23    Q.    Do you know if the people who were on the
24  other line that you were talking to were aware that
25  Brooke maybe recording the telephone conversation?

Page 125

1    A.   No, I don't.

2    Q.   I'm showing you what's been marked as

3  Exhibit 5 to your deposition, Mr. Menard.  If you'd

4  take a look at that and let me know when you are

5  ready to continue.

6    A.   (Witness reviews document.)  Okay.

7    Q.   Okay.  This is Bates labeled Targa 751 as

8  Exhibit 5 to your deposition.  In the e-mail

9  below -- the e-mail that you had sent above -- this

10 is an e-mail from Ms. Hawkins from Targa dated

11 November 9, 2018, at 3:04 p.m.; is that correct?

12   A.   Correct.

13   Q.   At this point in time you had already

14 filed a My Safe Workplace complaint, correct?

15   A.   Correct.

16   Q.   And the reason Ms. Hawkins is conversing

17 with you is the investigation that she is working on

18 with regards to that complaint, correct?

19   A.   Correct.

20   Q.   And in this e-mail, November 9th, she

21 says, "Mr. Menard, I'm writing again as a follow-up

22 to your assertions regarding Mr. Perry Berthelot.

23 You indicated when we spoke on October 31st that you

24 had a tape-recording of a conversation you had with

25 Mr. Berthelot where you claim he advised you to

Page 126

1  improperly handle a test sample.  I wrote you on

2  November 1st and requested a copy of that tape.  To

3  date, I have not heard from you."

4         Did you speak with Ms. Hawkins on

5  October 31st, 2018, on the telephone?

6    A.   I can't recall if -- yes.

7    Q.   Okay.  Did you have multiple

8  conversations with Ms. Hawkins on the telephone at

9  that time?

10   A.   I believe I had two.

11   Q.   Okay.  Did you record any of them?

12   A.   Yes.

13   Q.   Did you record both of them or just one

14 of them?

15   A.   I want to say just one.

16   Q.   Okay.  And you've produced that in this

17 lawsuit, correct?

18   A.   Yes, sir.

19   Q.   All right.  Now, in this -- during your

20 telephone conversation with Ms. Hawkins on October

21 31st, you would agree with me that you told her that

22 you had a conversation recorded between you and Mr.

23 Berthelot where he asked you to commit that crime,

24 correct?

25   A.   Correct.

Page 127

1    Q.   And you would agree with me that you do

2  not have that recording, do you?

3    A.   That's correct.

4    Q.   At any point in time, did you have a

5  recording between you and Mr. Berthelot where he

6  asked you to commit that crime?

7    A.   No.

8    Q.   Okay.  So when you told Ms. Hawkins

9  both -- or during the telephone conversation on

10 October 31st, 2018, that you had a recording where

11 Mr. Berthelot asked you to commit a crime, that was

12 not a truthful statement to her, was it?

13   A.   No.

14   Q.   Okay.  So you were lying to Ms. Hawkins

15 during the conversation regarding the very thing

16 that you are suing about in this lawsuit, correct?

17   A.   Correct.

18   Q.   In response on November 9, 2018, you

19 response about eight minutes later and you say, "Ms.

20 Hawkins, sorry it has taken so long for me to get

21 back to you.  I am now represented by attorney Roy

22 Bergeron, Junior, whose phone number is (225)

23 932-9221.  I have forwarded this e-mail to him as

24 well so you both have each other's e-mail address."

25         Did I read that correctly?

Page 128

1    A.   Correct.

2    Q.   Is it fair to say that from November 9th

3  forward, you no longer had any communications with

4  Ms. Hawkins that your attorney would be handling any

5  communications?

6    A.   That's correct.

7    Q.   Okay.  And, Mr. Menard, I'm going to

8  bounce around with your complaint a little bit,

9  because I know we've covered a lot.  If there is

10 some delays when I'm talking to you, it's only

11 because --

12   A.   Okay.

13   Q.   -- we've gone over some of the stuff, so.

14         I'm giving you what's marked as Exhibit 6

15 to your deposition.  And I will ask you if this was

16 the complaint that you reviewed in preparation of

17 your deposition?

18   A.   Okay.  (Witness reviews document.)  I'm

19 not sure.  I think it was the draft -- the initial

20 draft.

21   Q.   So you don't think Exhibit 6 is the

22 complaint that you reviewed in preparation of your

23 deposition?

24   A.   No, sir.

25   Q.   Are you aware that your attorneys filed

KIRK MENARD

July 22, 2019

MENARD vs TARGA RESOURCES LLC

129–132

Page 129

1  the first amending and superseding complaint for
2  damages on March 8th, 2019, on your behalf?
3      A.   Yes, I am.
4      Q.   And did you approve them to do so?
5      A.   Yes.
6      Q.   And do you know if you reviewed this
7  document before it was filed on your behalf?
8      A.   Yes.
9      Q.   And was everything contained in Exhibit 6
10  true and correct --
11      A.   Yes.
12      Q.   -- hold on -- based on your review?
13      A.   Yes.
14      Q.   Okay.  Do you want to review it first
15  before we go over it?  I don't want to rush you.
16      A.   You can go through it.
17      Q.   Okay.  Let's go to page 2, paragraph 5.
18  While looking at paragraph 4, which is the last
19  sentence in paragraph 4, it says, "As part of his
20  duties, Menard was responsible for identifying and
21  reporting violations of environmental and safety
22  standards under state and federal law."
23          Correct?
24      A.   Correct.
25      Q.   And you would agree with me that would

Page 130

1  also include reporting someone to ask you to commit
2  a crime?
3      A.   Correct.
4      Q.   Going to paragraph 5.  "On October 5th,
5  2018, Menard was on a conference call with the Targa
6  operations team.  During that call, Menard gave a
7  safety report and also raised the issue of
8  exceedances of regulatory standards for total
9  suspended solids and water samples."
10          Did I read that correctly?
11      A.   Correct.
12      Q.   So you were the one who brought up on the
13  phone call the exceedances that had occurred?
14      A.   Correct.
15      Q.   In which exceedances had occurred that
16  you brought up?
17      A.   I brought because I believe previously we
18  had failed a water sample and we had also failed a
19  sewage sample.
20      Q.   And is it fair to say that the failure of
21  the water sample and the failure of the sewage
22  sample occurred at or near -- I should say almost a
23  week or two before the October 5th, 2018, safety
24  call?
25      A.   Correct.  We're not talking about a

Page 131

1  failure that occurred in June or April or anything
2  like that.
3      Q.   And you recall -- you believe at that
4  time that there was a pond failure and a sewage
5  failure, correct?
6      A.   Correct.
7      Q.   Do you know sitting here today whether --
8  well, let me ask you this:  What is the TSS level
9  that it's supposed to be at with regard to the pond?
10      A.   45 or under.
11      Q.   Okay.  And then with regards to sewage
12  where is it supposed to be at?
13      A.   I would have to look at the sheet.  I'm
14  not sure.  I want to say it's supposed to be 28 or
15  under.  I'm not positive on that.
16      Q.   Okay.  And sitting here today, do you
17  recall where the pond TSS was that you reported?
18      A.   I want to say 88.
19      Q.   Okay.  And then do you recall what the
20  sewage level was at?
21      A.   It was up there.  I want to say maybe 35,
22  40.
23      Q.   And when we're talking the sewage, are we
24  talking about DGS, Venice, or both?
25      A.   Both.

Page 132

1      Q.   Okay.  And you think they are both in the
2  neighborhood of 35?
3      A.   TSS had to be over 45.
4      Q.   Okay.
5      A.   DGS was more around the 40 level, if I'm
6  not mistaken.  It's hard to remember.
7      Q.   During your tenure at Targa, did the pond
8  have a previous TSS exceedance before this one that
9  you mentioned during the call?
10      A.   Yes.
11      Q.   And do you recall approximately when that
12  occurred?
13      A.   It was June.
14      Q.   Okay.  And did you -- pond samples are
15  taken weekly, correct?
16      A.   Correct.
17      Q.   And when you had the TSS exceedance with
18  regard to the pond in June, were you able to
19  remediate and fix the issue before the next sample?
20      A.   No, sir.  We asked them to resample,
21  because sometimes they will make a mistake on the
22  lab, so we asked them to resample on the water
23  sample.
24      Q.   And what happened?
25      A.   And it came back as the same.

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
133–136

Page 133

1    Q.   Okay.  And then what happened next?
2    A.   Brogan was still training me at that
3  time.  So Brogan was still there, Brogan Smith.
4    Q.   So what did you and/or Brogan do to
5  remediate the problem?
6    A.   We just added more chemicals to it.  I'm
7  not sure of the chemical name or composition.
8    Q.   Who came up with the idea to add more
9  chemicals to get the TSS down?
10    A.   Brogan did.
11    Q.   Okay.  So you would agree with me that
12  Brogan came up with the remediation effort or the
13  remediation plan?
14    A.   Correct.  That was during my training.
15    Q.   Okay.  And would you agree with me that
16  that was part of Brogan's duties and
17  responsibilities that he was to come up with the
18  remediation plan with regards to how to get the TSS
19  exceedance down in the pond?
20    A.   I can't say that for certain.
21    Q.   Okay.  Did you have any other exceedance
22  between June and October?
23    A.   Yes.
24    Q.   And when did that exceedances occur?
25    A.   I'm not sure of the date.

Page 134

1    Q.   But you do know that it was between June
2  and October?
3    A.   Yes, sir.
4    Q.   And it was a TSS exceedance on the pond?
5    A.   Yes, sir.
6    Q.   And was Brogan there at the time that we
7  had this second exceedance during your tenure?
8    A.   Yes, sir.  I want to say we had two while
9  he was there.
10    Q.   And do you recall what remediation
11  efforts Targa did in order to get that second TSS
12  exceedance down?
13    A.   I want to say they moved the hose from
14  one pond to the other.
15    Q.   Is this the USS Brogan?
16    A.   No.  The USS Brogan is in the primary
17  pond, and I think it's pond one or something.  So
18  they took the hose and moved it to the other which
19  flushed more water into the pond that we were having
20  the exceedance in.
21    Q.   Okay.  And who came up with the idea of
22  moving the hose from the one pond to the other pond?
23    A.   That was Brogan.
24    Q.   Okay.  So you would agree with me in that
25  situation that Brogan came up with a remediation

Page 135

1  plan to assist with the TSS exceedance in the pond?
2    A.   I can't say that for certain.
3    Q.   Well, did anyone else other than Brogan
4  come up with the idea to move the hose?
5    A.   I don't know if he spoke to Ted or an
6  environmental specialist or what.
7    Q.   Okay.  Did it fix the problem?
8    A.   Not necessarily, no.
9    Q.   So the TSS exceedance didn't come down?
10    A.   No, sir.  It came down some, but not
11  much.
12    Q.   Well, did it fail?
13    A.   It failed a couple of test later.
14    Q.   So how many -- sitting here today, how
15  many exceedances are you aware of that occurred with
16  regards to the pond during your tenure at Targa?
17    A.   Three.  That's on the pond.
18    Q.   Okay.  We'll get to sewage next.  So you
19  recall there was one in June, there was in October,
20  there was one in between, correct?
21    A.   Correct.
22    Q.   Okay.  And so -- and you said that after
23  the August -- sorry.  After the in between
24  exceedance, whatever date that fell on, they
25  switched -- the remediation effort was to switch the

Page 136

1  hose from one pond to another pond, fair?
2    A.   Correct.  Yes.
3    Q.   Okay.  Now, on the next sample, next
4  weekly sample, was it below the TSS exceedance?
5    A.   Yes.
6    Q.   Okay.  So the hose did fix the problem?
7    A.   Yes.
8    Q.   Okay.  And you would agree with me that
9  in regards to the June exceedance, the chemicals
10  that Brogan suggested, that also fixed the problem?
11    A.   I'm not sure about that.
12    Q.   Well, did it have another exceedance?
13    A.   No, but later on it did.
14    Q.   Okay.  Well, let me ask you this:  If you
15  have a June exceedance and then let's say the second
16  one is in August, are you saying that same issue is
17  going to cause the problem in August?
18    A.   It's possible.  Depends on the pond
19  itself.
20    Q.   Well, if the issue -- this is just my
21  layman term talking.  But if the issue is the same
22  issue, why wouldn't it keep failing exceedances?
23    A.   Because the USS Brogan, which is in
24  there, had gave out a couple of times as well.  And
25  that also flushes freshwater into the pond.

Page 137

1      What eventually -- well, I'll wait for
2  that question.  Never mind.
3      Q.    I'm sorry, what were you saying?
4      A.    What did eventually fix the problem and
5  Ted came up with this idea about filters.  We found
6  out that they weren't using filters on the pond to
7  catch all the particles.
8      Q.    When did this occur?  On the June, the
9  middle one, or the October exceedance?
10     A.    I want to say this came up in August.
11     Q.    Okay.
12     A.    August or September.  I'm not sure of the
13  date.
14     Q.    Going to the last line in that paragraph
15  5, "Menard knew and relayed to others on the call
16  that if Targa failed another sample, Targa would be
17  subject to enforcement action by the Louisiana
18  Department of Environmental Quality."
19         Did I read that correctly?
20     A.    Yes.
21     Q.    And what evidence do you have to suggest
22  that that was going to happen?
23     A.    Because of Ted's e-mail that he sent out.
24     Q.    Okay.  Were you aware -- putting Ted's
25  e-mail aside, are you aware of how enforcement

Page 138

1  actions are handled with regards to DEQ?
2      A.    No, sir, I'm not.
3      Q.    Okay.  So as an environmental, health and
4  safety specialist sitting here today, you are not
5  aware of how DEQ handles enforcement actions with
6  regards to TSS exceedances, fair?
7      A.    No, sir.
8      Q.    Paragraph 6 on the next page, sir.  It
9  says, "Near the end of the conference call, Perry
10  Berthelot, a long-tenured Targa employee, who
11  currently serves as Targa's director -- district
12  manager over the area extending from Lake Charles,
13  Louisiana, to Hattiesburg, Mississippi, asked Menard
14  to separately call Berthelot after the conference
15  call to discuss possible solutions to the TSS
16  exceedances raised by Menard."
17         Did I read that correctly?
18     A.    Correct.
19     Q.    So according to you and according to this
20  document, Berthelot told you to call him?
21     A.    Correct.
22     Q.    Okay.  It said that, "Berthelot indicated
23  that he had addressed similar issues in the past and
24  had ideas on how to handle the current exceedances."
25         Did I read that correctly?

Page 139

1      A.    Correct.
2      Q.    Other than Mr. Berthelot allegedly
3  telling you to dilute the water samples, did he ever
4  give you any ideas of how to handle the current
5  exceedances during that phone call other than
6  diluting the water samples?
7      A.    No, sir.  He basically just asked me to
8  get with the operator and have the operator check
9  the chlorine.
10     Q.    Now, after this -- is it fair to say that
11  this was a third-quarter sewage test?
12     A.    Yes, sir.
13     Q.    After this third-quarter sewage test, you
14  would agree with me that you had approximately
15  almost 120 days or 90 days to fix this problem?
16     A.    No, I wouldn't agree with that.
17     Q.    Okay.  When would be the next time that
18  you would take a sample that you would have to
19  submit to DEQ?
20     A.    Brogan had taken the first sample in
21  June, and then we went over to the next quarter and
22  that's when Brogan had gone and I had taken the
23  sample.
24     Q.    But you had an exceedance with regard to
25  DGS sewage as a result of the September 28th sample

Page 140

1  you did, correct?
2      A.    Correct.
3      Q.    Now, the next time that you are going to
4  take a sample -- or I shouldn't say that.
5         But you would agree with me that you
6  could go all the way until the end of December
7  before you would have to report anything to the
8  state -- to DEQ, right?
9      A.    Correct.
10     Q.    So although you could do multiple
11  samples, you wouldn't have to report anything until
12  the end of December, fair?
13     A.    Yes.
14     Q.    So you would agree with me that you had
15  90 days to fix the exceedance problem with regards
16  to the DGS sewage?
17     A.    Not necessarily.
18     Q.    And why is that?
19     A.    Because we have to put all of the
20  exceedances and all of the numbers into a DMR, which
21  was coming up.  Which the DEQ has a database that we
22  have to put all of our numbers in there.
23     Q.    Okay.  So you would be putting numbers
24  after September 28th in regards to that?
25     A.    Yes.

KIRK MENARD                                                      July 22, 2019
MENARD vs TARGA RESOURCES LLC                                   141—144

Page 141

1    Q.    What if you didn't take any tests with
2    regards to the sewage?
3    A.    You will still have to go in there.  You
4    would have to put the highest number in there.
5    Q.    No.  But what I'm saying is, you're not
6    required -- correct me if I'm wrong.  But you are
7    not required to take a quarterly test until the end
8    of the quarter if you wanted to, right?  You don't
9    have to do it.
10   A.    I want to say September 28th was the last
11   day.  That's why I couldn't take another sample.
12   Q.    Exactly.  And I'm talking about the
13   fourth quarter.  Right?
14   A.    Correct.
15   Q.    If you don't do a test, you could wait
16   all the way until the end of December to technically
17   take a test that you would have to report to the
18   state?
19   A.    Correct.
20   Q.    So based on that, wouldn't you agree with
21   me that you had 90 days, the whole fourth quarter to
22   fix this exceedance that happened on
23   September 28th?
24   A.    Correct.
25   Q.    So it's not a matter of a quick fix,

Page 142

1    which is what you seen Mr. Berthelot was requesting
2    with regards to diluting a water sample.  I mean,
3    you had 90 days to fix the problem.
4    A.    Correct.
5    Q.    All right.  In paragraph 7, you claim
6    "After the conference call, Menard called Berthelot
7    as requested, believing that Berthelot would have
8    ideas and suggestions to handle the TSS exceedances
9    based on Berthelot's long-tenure and experience
10   working at Targa.  Menard had previously been warned
11   by other Targa employees including some of Menard's
12   superiors to be careful around Berthelot as those
13   individuals believe based on their experience that
14   Berthelot could not be trusted."
15        All right.  I want to know all the names
16   of the Targa employees who you claim told you to be
17   careful around Berthelot -- Mr. Berthelot.
18   A.    Well, Ted Keller was one of them.
19   Q.    Okay.
20   A.    Keith Adams.  I gave my attorney an
21   entire list.  I can't remember all of the names.
22   Q.    I think they are in your interrogatory
23   answer, but will only go based on -- let me see if I
24   can find them.  Can you give me a second?  I don't
25   have it.

Page 143

1        To the best of your ability, tell me the
2    names that you recall besides Mr. Adams and Mr.
3    Keller.
4    A.    I'm trying to think of some of the
5    maintenance guy's names.  Brogan was another one.
6    Q.    Did Mr. Smith, David Smith, tell you
7    anything like this?
8    A.    I relayed to him what Ted Keller had told
9    me about not speaking to Mr. Berthelot and he said I
10   would have to agree.
11   Q.    And just to stop you there.  So when we
12   were talking earlier about the fact that Mr. Keller
13   had instructed you to not communicate with Mr.
14   Berthelot, what you're saying is that you also went
15   to Mr. Smith and said, "Hey, Ted said I shouldn't be
16   talking to Perry," and David Smith also told you "I
17   agree with that," correct?
18   A.    Correct.
19   Q.    And Mr. Smith was your direct supervisor,
20   sir?
21   A.    Correct.
22   Q.    And this conversation that you had with
23   Mr. Smith was prior to the conversation with Mr.
24   Berthelot where he told you to commit a criminal
25   act?

Page 144

1    A.    Correct.
2    Q.    So despite the fact that your direct
3    supervisor and then the area manager of the facility
4    both told you to not talk to Perry Berthelot, you
5    defied both of them and ended up calling him on
6    October 5th, correct?
7    A.    Correct.
8    Q.    Correct?
9    A.    Yes.
10   Q.    Now, in regards to -- what did Mr. Keller
11   specifically tell you with regards to Mr. Berthelot
12   and don't trust him or whatever?  Do you recall?
13   A.    That Mr. Berthelot has no reason to speak
14   to me.  If he wants to speak to me, he can talk to
15   him and he will relay the message to me.  He said
16   because he will get me to do things that I shouldn't
17   be doing.  He has no control over the safety portion
18   of the site.  He will relay all messages to me from
19   Berthelot.
20   Q.    Did Mr. Keller ever tell you that Mr.
21   Berthelot should not be trusted?
22   A.    Yes.
23   Q.    What other things did Mr. Keller tell you
24   about Mr. Berthelot other than what you just
25   mentioned?

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
145–148

Page 145

1    A.   That we had a monthly safety meeting and
2    I read an e-mail that Ted wasn't too happy about.
3    That's when Ted came into my office and closed the
4    door and said don't listen to Perry.  He said he
5    will get you in trouble.  And Ted was pretty upset
6    that I read the e-mail in the monthly safety
7    meeting.
8    Q.   Do you recall if Mr. Keller was upset
9    with because he specifically told you before that
10   meeting not to read the e-mail?
11   A.   He did not tell me before that.  He did
12   mention it, but he didn't want the e-mail read,
13   because he didn't want the employees to get the
14   wrong idea.
15   Q.   Okay.  So prior to the safety meeting --
16   and when we say "safety meeting," we're talking
17   about a wholly separate meeting, correct?
18   A.   Yes.
19   Q.   Okay.  And it was a safety meeting?
20   A.   We're talking about a monthly safety with
21   all of the employees.
22   Q.   So prior to that monthly safety meeting
23   where you read the e-mail, and I'll pull it out in a
24   little bit, there was a conversation between you and
25   Ted whereby he had indicated to you guys that he did

Page 146

1    not want this e-mail read?
2    A.   Correct.
3    Q.   And who else was in that meeting other
4    than you and Ted?
5    A.   The monthly meeting?
6    Q.   The meeting where he told you that he
7    didn't want the e-mail read?
8    A.   I'm not sure.  I want to say he came in
9    my office and told me.
10   Q.   Okay.  So it was just a meeting between
11   the two of you?
12   A.   Correct.
13   Q.   And prior to that monthly safety meeting,
14   were all of the employees that Venice attended, he
15   had told you that he didn't want that e-mail read,
16   correct?
17   A.   Correct.
18   Q.   And despite the fact that Mr. Keller told
19   you that he didn't want the e-mail read, you would
20   agree with me that you did read the e-mail during
21   the monthly safety meeting?
22   A.   Yes.
23   Q.   Did you read it word-for-word?
24   A.   Pretty much, yes.
25   Q.   Okay.  And why is it that you read this

Page 147

1    e-mail despite the fact that your area manager
2    specifically told you not to do it?
3    A.   Because there was a miscommunication on
4    our part and then Perry came in after the fact and
5    told me to go over the e-mail.  And Perry is Ted's
6    superior.
7    Q.   Okay.  And so Perry instructed you to
8    read the e-mail during the safety meeting, correct?
9    A.   Correct.
10   Q.   And as a result of you reading that
11   e-mail, your area manager, Mr. Keller, got pretty
12   upset?
13   A.   Yes.
14   Q.   And that's because he told you before the
15   meeting not to read the e-mail, yes?
16   A.   Yes.
17   Q.   And then as a result of that, he said
18   going forward, I don't want you talking to Perry,
19   right?
20   A.   Correct.
21   Q.   And he also said that if Perry needs to
22   talk to you, come to me and I'll handle Perry?
23   A.   Correct.
24   Q.   And despite all of that occurring, after
25   this October 5th safety meeting where you claim Mr.

Page 148

1    Berthelot told you to come, despite the fact that
2    Mr. Keller told you not to talk to him, despite the
3    fact that Mr. Keller said if he asked you to talk to
4    him, send Mr. Berthelot his way, you disregarded all
5    of that, and ended up calling Mr. Berthelot?
6    A.   Yes.
7    Q.   And you lied about the fact that you had
8    a recording of that conversation with Mr. Berthelot
9    to Targa?
10   A.   Yes.
11   Q.   What did Keith Adams tell you about or
12   warned you about with regards to Mr. Berthelot?
13   A.   It was very vague.  Just watch what I say
14   around him.
15   Q.   Did you ask him what do you mean by that
16   Mr. Adams?
17   A.   No.  I just said that I will.  I've
18   already been warned.
19   Q.   Anything else that Mr. Adams said to you
20   with regards to Mr. Berthelot?
21   A.   That was basically it.
22   Q.   Okay.  You also mentioned that Brogan
23   Smith had warned you about Mr. Berthelot.  Can you
24   tell me what warnings he gave you?
25   A.   He told me that he will tell me things

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                             149–152

Page 149

1  that is not accurate and to do things I shouldn't
2  do, and he also told me that he will throw me under
3  the bus quicker than anyone else.
4      Q.   And you would agree with me that these
5  comments that Mr. Brogan Smith told you regarding
6  Perry Berthelot that you also had lied to Targa with
7  the fact that you had a recording of those comments?
8      A.   Correct.
9      Q.   In regards to Mr. Brogan Smith telling
10  you that things are not -- he would tell you to do
11  things that are not accurate.  Did Mr. Brogan ever
12  give you an example of something that Mr. Berthelot
13  asked him to do that wasn't accurate?
14      A.   He never gave an example.
15      Q.   Okay.  Did you ever hear from any of
16  these individuals who warned you about Mr.
17  Berthelot, did any of them ever say that Mr.
18  Berthelot asked them to do something that was
19  illegal and criminal?
20      A.   No.
21      Q.   Okay.  Can you think of anyone else, I
22  know you have others, but sitting here today, your
23  specific recollection, can you think of anyone else
24  who warned you about Mr. Berthelot other than Mr.
25  Keller, Mr. Adams, Brogan Smith, and then Mr. David

Page 150

1  Smith?
2      A.   Al, whatever his name was.  I can't think
3  of his last name.
4      Q.   Okay.  So an individual by the name of Al
5  who was a Targa employee?
6      A.   Yes, sir.
7      Q.   Okay.  What did -- we will call him Mr.
8  Al -- what did Mr. Al tell you about Mr. Berthelot?
9      A.   Tell me to be careful, again, what I say
10  in front of him.
11      Q.   When these people were telling you these
12  things about Mr. Berthelot, were you inquiring
13  about, Hey, tell me about Mr. Berthelot or were
14  these people just spitting out the fact of --
15      A.   Just spitting it out, because I had
16  already been warned by Mr. Keller.
17      Q.   Okay.  So was Mr. Keller the first
18  individual at Targa to warn you about Mr. Berthelot?
19      A.   Yes, sir.
20      Q.   And was this at or near the time with
21  regards to the policy or the e-mail that you read?
22      A.   It was prior to that.
23      Q.   So Mr. Keller had warned you to prior to
24  the e-mail being read during that monthly safety
25  meeting about -- warning you about Mr. Berthelot?

Page 151

1      A.   Yes.
2      Q.   And did he also instruct you prior to
3  that meeting -- the monthly meeting -- did he also
4  give you the warning of, "Hey, I don't want you
5  talking to Perry"?
6      A.   No.
7      Q.   Okay.  That happened after?
8      A.   Correct.
9      Q.   Okay.  So you attend a meeting with Mr.
10  Keller where he told you not to read the e-mail,
11  correct?
12      A.   Correct.
13      Q.   Before you had that meeting with Mr.
14  Keller, he had previously told you not to trust Mr.
15  Berthelot, correct?
16      A.   Correct.
17      Q.   At some point after your meeting with Mr.
18  Keller, but before the monthly safety meeting, it's
19  your contention that Mr. Berthelot came to you and
20  told you that he wanted you to read the e-mail,
21  correct?
22      A.   Correct.
23      Q.   And you never went to Mr. Keller before
24  that monthly safety meeting and asked him, "Hey,
25  Perry Berthelot wants me to read this e-mail.  You

Page 152

1  told me I don't want to -- you don't want me to.
2  What should I do?"  You never had that conversation?
3      A.   No, sir.
4      Q.   And despite the warning that you had
5  about Mr. Berthelot from Mr. Keller and despite the
6  fact that Mr. Keller told you he didn't want you to
7  read the e-mail, you went ahead and read the e-mail
8  almost word-for-word during that monthly safety
9  meeting?
10      A.   Not necessarily.  Mr. Keller had told me
11  that after the fact and from what I understand Mr.
12  Keller spoke to Mr. Berthelot after the fact.  That
13  if he has any questions or wants me to do anything
14  to go through directly through him.
15      Q.   Okay.  But you would agree with me that
16  he warned you before the monthly safety meeting about
17  Mr. Berthelot, right?  Yes.
18      A.   Well, no.
19      Q.   He didn't?
20      A.   No.  He warned me about the e-mail and I
21  wouldn't consider it a warning.  It was a
22  miscommunication.  There's a lot going on.  A lot of
23  people running down the hall.
24      Q.   Sitting here today, other than the
25  individuals that you named for me, is there anyone

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
153–156

Page 153

1  else who warned you about Mr. Berthelot that you can
2  recall?
3      A.  Matt Fitzgerald.
4      Q.  This is your friend?
5      A.  Yes.
6      Q.  And what did Mr. Fitzgerald warn you
7  about?
8      A.  Just be careful of Perry, because Perry
9  will actually do things that's borderline or not on
10  the level of compliance.  And he mentioned something
11  about a pipe that Perry asked him to install at the
12  Egan Plant that wasn't in the pressure rating.  And,
13  of course, they dealt with Perry and did it their
14  own way.
15      Q.  Okay.  So you had been warned by Mr.
16  Fitzgerald, would this warning had been before the
17  call with Mr. Berthelot on October 5th?
18      A.  Oh, yes.  No, this was after the fact.
19      Q.  Okay.  So after the fact Mr. Fitzgerald
20  had warned you about Perry?
21      A.  Yes.
22      Q.  Is there a particular -- was it after
23  your termination?
24      A.  Yes.
25      Q.  Is there a particular reason that Mr.

Page 154

1  Fitzgerald was warning you about Mr. Berthelot when
2  you were no longer even employed?
3      A.  No.
4      Q.  Mr. Fitzgerald ever provide you an
5  example of Mr. Berthelot committing a crime or
6  asking someone to commit a crime?
7      A.  Just about the piping.
8      Q.  Okay.  Is it your understanding that
9  whatever Mr. Berthelot asked with regards to the
10  pipe and Mr. Fitzgerald, was that asking Mr.
11  Fitzgerald to commit a crime?
12      A.  It could have been if the pipe had
13  exploded if it wasn't the right pressure rating.
14      Q.  Do you know -- do you have any personal
15  knowledge that this actually occurred with regards
16  to the pipe or were you relying solely based --
17      A.  No, I was just --
18      Q.  Hold on.  I'm sorry.
19          Do you have any personal knowledge with
20  regards to this piping incident or are you relying
21  100 percent on what Mr. Fitzgerald told you?
22      A.  100 percent on what he told me.
23      Q.  Okay.  I don't mean to keep cutting you
24  off, but she --
25      A.  It's okay.  I'm sorry.  I'm sorry.

Page 155

1      Q.  You don't have to apologize.
2          All right.  I'm going to ask again.
3  Anyone else that warned you about Mr. Berthelot
4  other than who you've mentioned today?
5      A.  No.  Like I said, it's in the
6  interrogatories.
7      Q.  Okay.  When you were calling Mr.
8  Berthelot on October 5th, after that safety meeting,
9  were you either hesitant or nervous to call him
10  based on everything you had learned?
11      A.  Yes, sir.
12      Q.  Is there a particular reason you didn't
13  pick up the phone and call Mr. Keller or call Mr.
14  Smith and say, "Listen, I don't feel comfortable
15  talking to Perry.  He just told me to call him."?
16      A.  No, sir.  The way Perry sounds over the
17  conference call, he was very relaxed, like he was
18  going to guide me the right way, and I wanted to get
19  this resolved as soon as possible.
20      Q.  Is it fair to say then that you never
21  contacted Mr. Smith and told him that you were
22  nervous or hesitant to call Mr. Berthelot on October
23  5, 2018?
24      A.  No, sir.
25      Q.  Is it fair to say then -- well, let me re

Page 156

1  ask that because we did a double negative.
2          At any point in time, did you ever make a
3  call to Mr. Smith and tell him that you were either
4  nervous or hesitant to call Mr. Berthelot on October
5  5th?
6      A.  I want to say I tried to call him before
7  and he didn't answer.
8      Q.  So your phone records should indicate
9  that you attempted to call Mr. Smith before you made
10  that phone call to Mr. Berthelot?
11      A.  It should, yes.
12      Q.  Do you still have those records today?
13      A.  Targa would have them.
14      Q.  So it was on your Targa phone?
15      A.  Yes, sir.
16      Q.  Okay.  Did you ever call Mr. Keller
17  before you made the phone call to Mr. Berthelot to
18  let him know that you are either nervous or hesitant
19  to make that call?
20      A.  No, sir.  I don't know where Mr. Keller
21  was.  I had heard that he would be out of pocket to
22  text him or e-mail or something of that nature.
23      Q.  Okay.  Did you either call him or text
24  him to let him know that you were nervous?
25      A.  No, sir.

Page 157

1    Q.    Had you ever had any issues contacting
2  Mr. Keller when he wasn't at the plant?
3    A.    Yes, sir, I did.
4    Q.    You did?
5    A.    Yes.
6    Q.    Is it your position that Mr. Keller
7  wouldn't answer his phone calls right away?
8    A.    He was out on the water on some place and
9  we had an oil spill and I ended up reporting it.
10  And then he got back, like, hours later with us.
11    Q.    Other than that isolated issue, had you
12  ever had difficulties contacting Mr. Keller?
13    A.    No, sir.
14        By the way, I just thought of the guy's
15  name that was on the conference call with me at his
16  phone, Jasper Harvey.
17    Q.    On the call with who?
18    A.    On the conference call that Friday on
19  October 5th.
20    Q.    Oh, okay.  So the safety meeting, Jasper
21  Harvey, was one of the individuals on the call?
22    A.    He's the maintenance supervisor.
23    Q.    Okay.  I don't think I asked you and I
24  know we're going over it, but I need to know all of
25  the specifics.

Page 158

1        How soon after the safety meeting did you
2  call Mr. Berthelot?
3    A.    I went back to my little house that I
4  stayed in in Venice, packed up my things, got on the
5  road.  The safety meeting -- I think I was out of
6  there about 8:45, quarter to 9:00.  And I want to
7  say I called him between 9:07 and 9:30.
8    Q.    Okay.  So a little less than 30 minutes?
9    A.    Yes.
10    Q.    Now, you said you didn't record this
11  conversation with Perry, correct?
12    A.    Correct.
13    Q.    And why didn't you record it?
14    A.    Because it was on my company phone.
15    Q.    Could you have called them from your
16  personal phone?
17    A.    Yes.  But I don't think, you know, if
18  he's seen a 337 number come through, I don't know if
19  he would have answered it or not.  So that's why I
20  called my -- I thought about calling him from my
21  personal phone.
22    Q.    Okay.  And the reason you thought about
23  calling him from your personal phone was to give you
24  the ability to record, correct?
25    A.    Not necessarily, no.  It's just one that

Page 159

1  I had readily available.
2    Q.    You had told me earlier that using pool
3  chlorine tables was a violation of the EPA, correct?
4    A.    Mm-hmm.
5    Q.    Yes?
6    A.    Yes.
7    Q.    In your experience, have you ever seen
8  the EPA or the DEQ enforce this rule with regards to
9  pool chlorine?
10    A.    No, sir.
11    Q.    Do you know if the EPA gives hefty fines
12  for using pool chlorine tablets?
13    A.    According to what I pulled up on Google,
14  they do.
15    Q.    So would it be under that same search
16  phrase you gave me that that came up and it
17  indicated that EPA gave hefty fines for using pool
18  chlorine tablets?
19    A.    Yes, sir.
20    Q.    Okay.  Did Mr. Berthelot ever tell you to
21  keep using the pool chlorine tablets?
22    A.    No, sir.
23    Q.    You would agree that prior to your
24  conversation with Mr. Berthelot on October 5th, you
25  and Mr. Smith had already discussed the plan of how

Page 160

1  to address the TSS exceedance with regards to the
2  D -- what's the word again?  The Delta --
3    A.    DGS.  It's a gathering station.
4    Q.    Let me ask it again now that I know that
5  acronym.
6        Prior to talking to Mr. Berthelot on
7  October 5th, 2018, you and Mr. Smith had already
8  come up with a plan of how to lower the TSS
9  exceedance with regards to DGS sewage?
10    A.    Correct.
11    Q.    You were going to hire a septic expert to
12  elevate the problem and then come up with a
13  remediation plan?
14    A.    Yes, sir.
15    Q.    Is it fair to say then that you, meaning
16  Mr. Menard, that you are not unable -- you are
17  unable to come up with a plan of how to address the
18  TSS exceedance with regards to the DGS sewage?
19    A.    I did not have that authority.  I had to
20  go through my immediate supervisor who asked me to
21  go through Ted Keller and Ted Keller and David Smith
22  would discuss the cost.
23    Q.    Okay.  Did you personally -- did you ever
24  come up with any kind of remediation plan or ideas
25  of how to assist with the TSS exceedance with

Page 161

1  regards to the DGS sewage?
2      A.   No, sir.
3      Q.   And sitting here today, you have no idea
4  how much it was going to cost to hire this septic
5  expert?
6      A.   No, sir.
7      Q.   Have you ever hired a septic expert at
8  any of your other jobs?
9      A.   No, sir.
10     Q.   Going to page 4 of this document, sir.
11     A.   Page what?
12     Q.   4?
13     A.   4.
14     Q.   Yes.
15     A.   11, 12, 13, 14 --
16     Q.   Right there.
17     A.   Okay.
18     Q.   At the top it said, "Menard knew from his
19  review of Targa's environmental records that Targa
20  had failed water samples because of TSS exceedances
21  and other related issues both before and during
22  Menard's employment."
23          Did you review these records when you
24  worked at Targa?
25     A.   Yes, sir, I did.

Page 162

1      Q.   And why were you reviewing them?
2      A.   To see how to repair our past
3  exceedances.
4      Q.   Was it in the records of what was done in
5  order to repair the TSS exceedances?
6      A.   Yes, sir.
7      Q.   And why was it that you were looking at
8  how TSS exceedances were repaired?
9      A.   To determine the cost that was involved
10  in repairing these TSS's and to see if there is
11  another idea that I could come up with and relay the
12  succession to my immediate supervisor.
13     Q.   But you would agree with me that earlier
14  you had told me that it was not part of your duties
15  and responsibilities to come up with a remediation
16  plan?
17     A.   No.  But it was part of my duty to come
18  up with a suggestion.
19     Q.   Based on your review of the records, how
20  many times did Targa fail water samples -- pond
21  water samples?
22     A.   I want to say I seen six to seven.
23     Q.   And how far back did you look?
24     A.   Back all the way through 2015.
25     Q.   2015 all the way to third quarter 2018?

Page 163

1      A.   Yes, sir.
2      Q.   How many times did Targa fail sewer water
3  samples?
4      A.   I'm not positive.
5      Q.   Did you look at those records, too,
6  though?
7      A.   Yes, sir.
8      Q.   And was there more than one failure?
9      A.   Yes, sir.
10     Q.   And was this in regards to DGS, Venice,
11  or both?
12     A.   I want to say both.  One was at Venice
13  and I want to say two or three was at DGS.  I'm not
14  positive, though, without looking at the records.
15     Q.   Is it unusual for a plant, such as
16  Venice, to have an exceedance?
17     A.   No, it's not.
18     Q.   At what point -- because you've worked at
19  other plants, correct?
20     A.   No, sir, I mostly worked offshore.
21     Q.   Okay.  So this is your first time in a
22  plant like this?
23     A.   Yes, sir.
24     Q.   Have you done any independent research
25  since leaving Targa and determined or learned about

Page 164

1  TSS exceedances of plants like this?
2      A.   Yes, sir.
3      Q.   You have?
4      A.   Yes, sir.
5      Q.   Okay.  And based on your research, would
6  you agree with me that it's not uncommon to have a
7  TSS exceedance in a certain time frame?
8      A.   No, sir, it's not.
9      Q.   And do you know or do you have an opinion
10  at what level does it start becoming unusual?  Like,
11  if you have three exceedances in the air, four
12  exceedances?  Do you have an opinion to that?
13     A.   I would have to draw a conclusion on
14  that, but I would say two a month is excessive.
15     Q.   Okay.  And that's based on pond only,
16  correct?
17     A.   Correct.
18     Q.   Because you're doing those weekly?
19     A.   Correct.
20     Q.   And so according to you if a plant has 24
21  exceedances in a year, that's high?
22     A.   Correct.
23     Q.   What would you consider low based on your
24  opinion and your research?
25     A.   None.  I mean, you always try for the

KIRK MENARD
July 22, 2019
MENARD vs TARGA RESOURCES LLC
165–168

Page 165

1   zero exceedances.
2       Q.   Are you aware of a plant in the country
3   that has gotten zero exceedances in a pond water
4   sample in a year?
5       A.   No, sir.  Rain can have it.  You know,
6   when it rains, you can have exceedances from rain.
7       Q.   You can't control rain, can you?
8       A.   No, you can't.  Runoff from the ditches
9   can have exceedances in it when you draw your
10  sample.  There's a lot of different issues that can
11  cause exceedances.
12      Q.   And a lot of those issues are outside the
13  company's control, correct?
14      A.   Correct.
15      Q.   And so I understand we can't have zero
16  and you said 24 would be considered high.  What
17  would you put as low for exceedances in a pond?
18      A.   I would probably put between six to eight
19  a year.
20      Q.   Okay.  So six to eight a year of pond TSS
21  exceedances, you would consider that to be on the
22  low end and then fair to say that between eight to
23  24 in between would be a medium?
24      A.   Correct.
25      Q.   Correct?  Okay.

Page 166

1       Going halfway down this paragraph 11 that
2   starts with "Additionally."  "Additionally, Menard
3   realized in his review of Targa's water sample
4   records that the TSS levels recorded in those
5   records in some instances uncharacteristically
6   dropped suddenly from one sample to the next without
7   explanation and at a quicker rate than would be
8   expected from typical remedial actions."
9       Did I read that correctly?
10      A.   Correct.
11      Q.   What evidence do you have -- well, first,
12  before I say that.  Tell the ladies and gentlemen of
13  the jury what you mean by that statement.
14      A.   Because when Brogan was training me,
15  sometimes he wouldn't use chemicals and it would
16  just drop from, like, a 28 to a 13, sometimes to a
17  10, sometimes to a 8, and that's awfully low.  We
18  weren't using any filtration on the pond or anything
19  of that nature.
20      Q.   Well, is it possible to do remedial
21  actions and have it drop from a 50 to a 15 if you
22  take the right remedial actions?
23      A.   Yes, it's possible.
24      Q.   Okay.  Wouldn't you also agree with me
25  that if you identify the specific problem that's

Page 167

1   causing the exceedance, if you fix it, it can drop
2   in the very next water sample drastically, right?
3       A.   Not drastically.  I never seen a water
4   sample even offshore drop that much.  Not in a weeks
5   time.
6       Q.   Okay.  So is it your contention in this
7   lawsuit that if we see an exceedance go from a very
8   high level to a very low level in the Targa records
9   that somehow they must have done something improper
10  or illegal?
11      A.   It's possible.
12      Q.   But that's not what I'm asking.  I'm
13  asking you what your contention is in this lawsuit.
14      It is your contention in this lawsuit
15  that if we look from Targa's records and we have
16  a very high exceedance and then the very next sample
17  it's a very low reading, is it your contention that
18  somehow Targa must have done something illegal to
19  get that low exceedance?
20      A.   Yes.
21      Q.   So there is not so there is not an realm
22  of possibility that will explain the exceedance from
23  going very high to a very low amount other than
24  us -- Targa doing something illegal or improper?
25      A.   Correct.

Page 168

1       Q.   Sitting here today, can you tell me all
2   the ways -- strike that.
3       Sitting here today, can you tell me all
4   the illegal or improper ways that Targa could have
5   done in order to get a very high TSS exceedance very
6   low within one weeks time?
7       A.   Ignoring the pond, not taking care of the
8   pond.
9       Q.   I don't think you understood question, so
10  let me stop you.  And I apologize for interrupting
11  you.
12      But what explanations can you give to the
13  jury that Targa did either illegally or improper to
14  cause a very high exceedance to go to a very low
15  exceedance within a weeks time?
16      A.   Diluting water samples.
17      Q.   Anything else?
18      A.   Any type of dilution.
19      Q.   Okay.
20      A.   The lab making a mistake.  That's why we
21  would have them retest it.
22      Q.   Anything else?
23      A.   Just the quality control at the lab and
24  at one time we did question the lab and their
25  quality control measures.  That's why when we would

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                             169–172

Page 169

1  fail one, we would have them retest it.
2     Q.   Anything else you can think of?
3     A.   That's basically it.
4     Q.   So the only two examples that you
5  provided me that Targa could have done other
6  illegally or improperly that would cause a very high
7  TSS exceedance to go to a very low exceedance within
8  a weeks time is:  One, diluting the water sample,
9  correct?
10    A.   Correct.
11    Q.   And then, two, problems at the lab?
12    A.   Correct.
13    Q.   And you would agree with me that Targa
14  does not control what's going on with the lab if the
15  lab makes a mistake or QC in the lab?
16    A.   That's correct.
17    Q.   So you would agree with me that the whole
18  lab mistake is not something illegal or improper
19  that Targa is doing.  It's just a mistake by the
20  lab?
21    A.   Correct.
22    Q.   So essentially we have the only
23  explanation, according to you, to allow a very high
24  exceedance to go to a very low exceedance in a weeks
25  time is dilution of water?

Page 170

1     A.   Correct.
2     Q.   So it's your contention in this case that
3  any time that we see in the records where Targa has
4  a very high exceedance and has a very low exceedance
5  in the next sampling within a weeks time, it had
6  to have been caused by water dilution, right?
7     A.   Yes.
8     Q.   There is no other explanation, correct?
9     A.   Correct.
10    Q.   Other than your -- let me ask you this:
11  Do you have any evidence or direct knowledge that
12  Targa diluted any of its water samples?
13    A.   No, sir.
14    Q.   Would you agree with me that your
15  conclusion or contention with the fact that Targa
16  must have diluted the water samples to cause the
17  exceedance to go very high to very low is based on
18  pure speculation by you?
19    A.   Correct.
20    Q.   When Mr. Berthelot asked you to dilute
21  the water samples, when you got off that phone, did
22  you ever have any intention whatsoever to actually
23  dilute the water samples?
24    A.   No, sir.
25    Q.   And it's because you wouldn't commit a

Page 171

1  crime, correct?
2     A.   Correct.
3     Q.   In fact, during the conversation, isn't
4  it your contention that you told Mr. Berthelot that
5  you were not going to dilute the water samples?
6     A.   Correct.
7     Q.   And you would agree with me that when you
8  were employed at Targa, you were the only one who
9  was getting the water samples?
10    A.   Correct.
11    Q.   And so if there was going to be any
12  dilution of water samples, that would have to have
13  been done by you?
14    A.   Correct.
15    Q.   And you weren't going to do it?
16    A.   No, sir.
17    Q.   And you would agree with me, Mr. Menard,
18  that you never did dilute any water samples at
19  Targa?
20    A.   That's correct.
21    Q.   And you never did what Mr. Berthelot
22  asked you to do?
23    A.   No, sir.
24    Q.   Give me one second, sorry.
25       If you can -- if you can, can you go to

Page 172

1  page 6, paragraph 13.  You know what, I apologize,
2  Mr. Menard.  We are going to unfortunately have to
3  look at paragraph 12 on the page before it to get
4  the context of paragraph 13.
5       It says, "Based on his conversation with
6  Berthelot and his having acquired knowledge of
7  Targa's recent history of environmental violations
8  in its records for previous water samples, Menard
9  reasonably believed and understood Berthelot was
10  suggesting that Menard should dilute the water
11  samples as a continuation of previous and/or ongoing
12  patterns of activities and practices that were not
13  only inappropriate but also illegal and in violation
14  of environmental laws, rules, and regulations
15  including, but not limited to, Louisiana Water
16  Control Law, La R.S. 30:2071 et seq., which imposes
17  criminal and civil liability on individuals or
18  entities that conceal or attempt to conceal
19  discharges, emissions, or disposals of substances
20  into the water of the state which are in violation
21  of discharge limits."  And it cites the statute for
22  that.
23       At the time that Mr. Berthelot asked you
24  to allegedly dilute the water samples, did you know
25  it violated these two statutes or did you discover

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
173–176

Page 173

1   that after the fact?
2       A.   I discovered that after the fact.
3       Q.   It then says, "In response to Berthelot's
4   illegal suggestion, Menard laughed nervously and
5   told Berthelot that they could not dilute the
6   samples.  Menard refused to do so and instead tried
7   to redirect Berthelot to the previously discussed
8   plan to hire a septic expert.  Berthelot responded
9   that Menard's plan would cost money.  At the
10  conclusion of the call, on the next page, it says,
11  Berthelot told Menard they would talk about these
12  issues later."
13      Did Berthelot tell you that at the end of
14  the call?
15      A.   Yes, sir.
16      Q.   And at any point in time, did you ever
17  talk about these issues with Mr. Berthelot later on?
18      A.   No, sir.
19      Q.   And why didn't you ever call them back to
20  discuss these issues?
21      A.   No, sir, I spoke directly with Ted and I
22  spoke with Keith Adams and I spoke with David Smith.
23      Q.   Okay.  Now, on paragraph 14, it says,
24  "Immediately following his call with Berthelot,
25  Menard called his immediate supervisor, David Smith,

Page 174

1   to report the call with Berthelot, including
2   Berthelot's suggestion that Menard dilute the water
3   samples.  Smith told Menard not to worry about
4   Berthelot's instructions and that they would hire a
5   septic expert as they had previously discussed."
6       Did I read that correctly?
7       A.   Correct.
8       Q.   And you would agree with me that you told
9   Elizabeth Hawkins and/or Targa that you had tape
10  recording of this conversation with Mr. Smith?
11      A.   That's correct.
12      Q.   And that was not a true statement when
13  you told it to Targa, was it?
14      A.   No, sir.
15      Q.   And you intentionally lied about that,
16  correct?
17      A.   Yes, sir.
18      Q.   Now, you would agree with me that you had
19  the ability to record your conversation with Mr.
20  Smith, right?
21      A.   Yes, sir.
22      Q.   And you had been recording people at that
23  time, correct?
24      A.   Yes, sir.
25      Q.   And according to you, you had just gotten

Page 175

1   off the phone with Mr. Berthelot and he had just
2   told you to commit a crime, correct?
3       A.   Correct.
4       Q.   And the reason you were calling Mr. Smith
5   was to let him know that Mr. Berthelot just asked
6   you to commit a crime correct?
7       A.   Correct.
8       Q.   And, yet, despite the fact that you had
9   the ability to record and despite the fact that Mr.
10  Berthelot had just told you to commit a crime, you
11  didn't feel it wise to record Mr. Smith about you
12  telling him that Berthelot just asked you to commit
13  a crime?
14      A.   That's correct.
15      Q.   And what you instead did, was you decided
16  to lie to Targa about it and say you did have a
17  recording, correct?
18      A.   Correct.
19      Q.   This call with Mr. Smith is on the same
20  date?
21      A.   Yes, sir.
22      Q.   How soon after the call with Mr.
23  Berthelot did you call Mr. Smith?
24      A.   I called him immediately after the phone
25  call and then he called me back because he didn't

Page 176

1   have the answer.
2       Q.   That's right.  You told me that.
3       How long did it take for him to call you
4   back?
5       A.   Approximately 15 to 20 minutes.
6       Q.   Okay.  So it was pretty quick?
7       A.   Yes.
8       Q.   So during your call with Mr. Smith, you
9   told him what Mr. Berthelot told you to do and he
10  told you not to worry about it?
11      A.   Correct.
12      Q.   What telephone did you use to call Mr.
13  Smith?
14      A.   The 504 phone number.
15      Q.   And did you call Mr. Smith personal or
16  work phone?
17      A.   His work phone.
18      Q.   Did you ever e-mail Mr. Smith and tell
19  him about your conversation with Mr. Berthelot?
20      A.   No, sir, I didn't.
21      Q.   Did you ever e-mail Mr. Keller and tell
22  him about your conversation with Mr. Berthelot?
23      A.   No, sir, I didn't.
24      Q.   Did you ever call Targa's My Safe
25  Workplace and let them know -- strike that.

KIRK MENARD                                                        July 22, 2019
MENARD vs TARGA RESOURCES LLC                                      177–180

Page 177

1       Prior to termination, did you ever call
2   My Safe Workplace and let them know what Mr.
3   Berthelot told you to do?
4       A.   No, sir.
5       Q.   The first time that you decided to call
6   the My Safe Workplace was after you had been
7   terminated, correct?
8       A.   Correct.
9       Q.   And it was after you had already talked
10  to a lawyer, correct?
11      A.   I'm trying to think.  I can't recall.
12      Q.   Looking at paragraph 15, sir.  It says,
13  "On October 10, 2018, only days after Berthelot
14  asked Menard and Menard refused to illegally dilute
15  water samples and Menard reported the same to his
16  supervisor, David Smith.  Menard received a phone
17  call from Harrod Gregg, the safety supervisor over
18  David Smith.  Gregg advised Menard that he had
19  received a complaint of inappropriate comments being
20  made by Menard."
21          Do you recall that telephone call with
22  Mr. Gregg?
23      A.   Yes, sir, I do.
24      Q.   Did Mr. Gregg call you that day?
25      A.   Yes, sir.

Page 178

1       Q.   And what did Mr. Gregg specifically tell
2   you during that telephone call?
3       A.   Tell him that they had -- told me that
4   they had a report of inappropriate comments and it
5   was turned over to human resources and depending on
6   what they say, that not to go to a safety meeting
7   where all of the safety personnel for Targa is in
8   Houston.  Stay and work from home that day and he
9   should hear from human resources within the next day
10  or so.
11      Q.   All right.  So you knew as of October 10,
12  2018, that there were at least allegations made to
13  Mr. Gregg that you had made some inappropriate
14  comments?
15      A.   Correct.
16      Q.   And at the time of October 10, did you
17  have any idea what he was talking about?
18      A.   No, sir.  In fact, I asked him what he
19  was talking about.  He said, "I'm not going to go
20  into that."
21      Q.   And do you know if Mr. Gregg submitted
22  that information to HR?
23      A.   No, sir, I do not.
24      Q.   Sitting here today, are you aware of what
25  Targa is alleging about the inappropriate comments

Page 179

1   that you had made?
2       A.   Only from my attorney.
3       Q.   Okay.  Are you aware that there is an
4   allegation that you showed pictures of hemorrhoids
5   to an employee?
6       A.   Yes, sir.
7       Q.   Did you ever show a picture of either
8   your wife or fiancé's hemorrhoids to another
9   employee?
10      A.   No, sir.
11      Q.   Did you ever show a picture of your wife
12  or your fiancé's hemorrhoids to an independent
13  contractor?
14      A.   No, sir.
15      Q.   And sorry to ask these types of
16  questions.  Does your wife, Jessica, ever suffer
17  from hemorrhoids?
18      A.   No, sir.
19      Q.   Does your fiancé, Brooke Migues, suffer
20  from hemorrhoids?
21      A.   Yes.
22      Q.   Okay.  Is that a condition that is
23  ongoing with her or was that a result of the
24  pregnancy?
25      A.   That was due to the pregnancy.

Page 180

1       Q.   Okay.  And can you tell me,
2   approximately, the months, with the year that she
3   was pregnant?
4       A.   It was in September.
5       Q.   She had the baby in September?
6       A.   Yes, sir.
7       Q.   Okay.  So baby early, on time, late?
8       A.   I think it was two weeks late.  I'm not
9   sure.
10      Q.   Okay.  It was pretty much the whole year
11  of 2018, her pregnancy?
12      A.   Correct.  Yes.
13      Q.   Did she suffer hemorrhoids throughout
14  the --
15      A.   Yes, sir.
16      Q.   She did.  Okay.
17          Did either you or anyone ever take a
18  picture of her hemorrhoid condition at any point in
19  time?
20      A.   She did.  She texted it to me on my
21  personal phone.
22      Q.   Okay.  So Brooke had taken a picture of
23  one of her hemorrhoids and it was sent to your
24  personal phone, correct?
25      A.   Yes, sir.

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
181–184

Page 181

1    Q.   Is that picture still in existence today?
2    A.   Yes, sir.
3    Q.   So it's still on your -- which phone?
4    A.   0933.  I'm not sure if it's on there.  He
5    has a copy of it.  I did send it to him.  Because
6    every so often I clean out my phone and put it back
7    on a hard drive.
8    Q.   Do you know what the time stamped
9    pictures is or when you got the text message?
10   A.   No, sir.  My attorney would have that.
11   Q.   And it's your position in this case that
12   you never shared that picture with anyone at Targa
13   or on Targa premises?
14   A.   That's correct.
15   Q.   Have you ever made an inappropriate
16   comment to another Targa employee?
17   A.   Not that I'm aware of.
18   Q.   Have you ever made an inappropriate
19   comment to a Targa independent contractor?
20   A.   Not that I'm aware of.
21   Q.   Would you agree with me, Mr. Menard, that
22   if you were to share that picture of your fiancé's
23   hemorrhoids to someone at Targa that that would be
24   in violation of the anti-harassment policy I showed
25   you earlier?

Page 182

1    A.   Yes, sir, that's correct.
2    Q.   And would you agree with me that had you
3    shown that picture to an employee and that had you
4    violated the anti-harassment policy that you could
5    be subject to termination?
6    A.   Correct.
7    Q.   At any point in time -- I know you're
8    taking the position that you did not share the
9    picture with anyone.  Did you ever discuss your
10   fiancé's hemorrhoid condition with any employee at
11   Targa?
12   A.   Yes, sir.
13   Q.   Who did you have this discussion with?
14   A.   There was a Nick Richard.  He was sitting
15   across from me.
16   Q.   Okay.  Where did this occur?
17   A.   In the control room.
18   Q.   Do you know if it was before or after the
19   conversation with Perry?
20   A.   This was before.
21   Q.   Okay.  Who else was in the control room?
22   If you remember.
23   A.   I can't remember, but there were several
24   people around there.
25   Q.   Okay.  Did you have a discussion with

Page 183

1    regards to your fiancé's hemorrhoid condition with
2    anyone other than Nick?
3    A.   Not that I can recall.  I mean, other
4    people joined, because when I got the picture, it
5    kind of shocked me.  I said, whoa.  You know, I
6    didn't expect that kind of picture.  But it was the
7    size of an egg.  I'm a first responder.  She wanted
8    to know if she had to go to the hospital or anything
9    else like that.  Asked me what to do if the doctor
10   doesn't, you know, reduce the inflammation or
11   anything else.
12   Q.   Okay.  So you were at work when you got
13   this text message from Brooke?
14   A.   Correct.
15   Q.   And were you sitting next to Mr. Richard
16   like I am with Mr. Ferachi or were you across --
17   A.   I was across the desk and he was across
18   the desk from me and said, "What's wrong?"  And I
19   just said, "My fiancé sent me this picture, she's
20   pregnant, her hemorrhoid is the size of an egg."  I
21   said, "I've got to do something and call the doctor"
22   or something like that.  And then after that, I
23   walked outside.
24   Q.   So at no point in time during your
25   conversation Mr. Richard, did you show him the

Page 184

1    actual picture that you received?
2    A.   No, sir.  It was purely discussion of her
3    medical condition.
4    Q.   Did you talk about your fiance's
5    hemorrhoid condition with anyone else other than Mr.
6    Richard?
7    A.   Not that I recall.
8    Q.   Have you ever made any comments about
9    another employee's wife?
10   A.   No, sir.  The only thing I made, and I
11   forgot this guy's name, but he works in the control
12   room.  Never actually seen his wife.  I just said,
13   "What is she doing with someone like you?"
14   Q.   And you don't know who this was?
15   A.   No.  It was joking between me and him.
16   He was actually a Targa employee.
17   Q.   Does Jordi Ancalade --
18   A.   Yes.
19   Q.   So you believe that while you were
20   working at Targa and you were in the control room,
21   you said something to the effect with Jordi "What is
22   she doing with a guy like you?"
23   A.   Correct.
24   Q.   And was that your way of being funny?
25   A.   Yeah.  And he laughed about it, too.  And

KIRK MENARD                                                     July 22, 2019
MENARD vs TARGA RESOURCES LLC                                  185–188

Page 185

1  other people joked with him about the same thing.
2      Q.   And you have no idea what his wife looks
3  like?
4      A.   No, sir.
5      Q.   Did you think that that was an appropriate
6  comment to make at the workplace?
7      A.   I mean, other people had started it, too,
8  and was talking about it.
9      Q.   Did you ever hear another employee joke
10 with Mr. Ancalade saying "What is your wife doing
11 with a guy like you?"
12     A.   Pretty much, yeah.
13     Q.   Who else did it?  Who else did that?
14     A.   A guy named Duncan that is there.
15     Q.   Anyone else?
16     A.   No.  I mean, they would joke about him
17 the way he looked, because he looked like an Arab,
18 too, you know.
19     Q.   Any other comments that you made about
20 another person's wife or something in that genre
21 other than what you did with Jordi?
22     A.   Not that I can recall.
23     Q.   Now, on October 11th, the next day after
24 Mr. Gregg had called you, you received a call from
25 someone by the name of Trisha with human resources,

Page 186

1  Jarrod Gregg, and David Smith, and a woman by the
2  name of Donna Strickland on the phone and they
3  advised that your employment was ending at Targa,
4  correct?
5      A.   Correct.
6      Q.   And you recorded this conversation,
7  correct?
8      A.   Yes, sir.
9      Q.   Why is it that you decided to record
10 this -- well, let me ask you this:  Before you
11 received the call -- did they call you?
12     A.   Yes, sir.
13     Q.   Okay.  And so were you expecting the
14 call?
15     A.   Yes, sir.
16     Q.   And were you expecting to be terminated?
17     A.   Yes, sir.
18     Q.   And why were you expecting to be
19 terminated if --
20     A.   Because --
21     Q.   Hold on.  Hold on.
22     A.   Oh, I'm sorry.
23     Q.   Why were you expecting to be terminated
24 when you contend that you've never made an
25 appropriate conduct and you've had no performance

Page 187

1  issues?
2      A.   Because when you get a call from human
3  resources, it's been my experience that it's never
4  good.
5      Q.   Finish.  I'm sorry.
6      A.   I knew of other people that have gotten
7  calls from human resources, and it's never good when
8  you get those type of calls.
9      Q.   Have you ever had experience with human
10 resources calling you and terminating you?
11     A.   No, sir.
12     Q.   Okay.  And did they tell you they were
13 calling you at a set time or did they just call out
14 of the blue?
15     A.   They told me that it would be about 11:00
16 or so.
17     Q.   And do you know what number they called?
18     A.   They called my personal phone I want to
19 say.
20     Q.   Okay.  Do you know for sure if they
21 called your personal phone?
22     A.   Yes, sir.
23     Q.   And you decided to record that
24 conversation, correct?
25     A.   Yes, sir.

Page 188

1      Q.   And you would agree with me that you did
2  not decide to call the conversation with Mr.
3  Berthelot or the conversation with Mr. Smith where
4  you were telling Mr. Smith Mr. Berthelot told you to
5  commit crime, right?
6      A.   Correct.
7      Q.   So why is it that you decided to record
8  this termination call as opposed to a call where you
9  are making a formal complaint with regards to
10 someone telling you to commit a crime?
11     A.   Just the phone that they called me on.
12     Q.   Okay.  And you were aware that the day
13 before on October 10th that there had been at least
14 allegations that you made inappropriate comments or
15 there was inappropriate conduct with regards to --
16     A.   Correct.
17     Q.   Okay.
18     A.   Can I step out and use the restroom real
19 quick.
20     Q.   Sure.  Absolutely.
21         THE VIDEOGRAPHER:
22             We're going off the record.  The
23     time is 2:03 p.m.
24             (Recess taken.)
25         THE VIDEOGRAPHER:

KIRK MENARD                                           July 22, 2019
MENARD vs TARGA RESOURCES LLC                        189—192

Page 189

1        We are going back on the record.
2     The time is 2:15 p.m.
3  BY MR. PATTON:
4     Q.   All right.  Mr. Menard, I'm going back to
5  the termination meeting that you recorded.
6     A.   Correct.
7     Q.   All right.  So you would agree with me
8  that prior to entering into this teleconference you
9  were concerned that it may end up into, like, a he
10  said, she said situation, correct?
11     A.   Not necessarily.
12     Q.   Okay.  Why is it that you recorded the
13  conversation then?
14     A.   My phone had got back on record.
15     Q.   Oh, were you aware that you were
16  recording the conversation?
17     A.   Yes, sir, was.
18     Q.   Okay.  And you would agree with me that a
19  recorded conversation is the best evidence of what
20  occurred in the conversation, correct?
21     A.   Correct.
22     Q.   And you learned this from you experience
23  as an investigator?
24     A.   Correct.
25     Q.   And is that why you wanted to record the

Page 190

1  conversation?
2     A.   Yes, sir.
3     Q.   Do you know if anyone had any issues with
4  your performance as an ES&H specialist at Targa?
5     A.   If they did, I was never told about it.
6     Q.   Okay.  Did anyone have any issues with
7  your conduct at the Targa Venice facility?
8     A.   If it was, I was never told about it.
9     Q.   After you had made you're my Targa Safe
10  Workplace complaint, did you feel that that Joe Bob
11  Perkins took your complaint serious?
12     A.   I feel he did, yes.
13     Q.   Do you feel Ms. Hawkins took your
14  complaint serious?
15     A.   No, sir, I don't.
16     Q.   You don't?
17     A.   No, sir.
18     Q.   What do you think Mr. Hawkins should have
19  done that she didn't do?
20     A.   I think that she should have told me the
21  veracity of the complaint and let me explain what
22  exactly went on and what happened.
23     Q.   Okay.  Do you think -- you had a lengthy
24  conversation with her on October 31st, did you not?
25     A.   Yes, sir.

Page 191

1     Q.   And she went point by point with regards
2  to what you were complaining about, right?
3     A.   Yes, sir.
4     Q.   Did you feel that she fully understood
5  that the complaint you were making on My Safe
6  Workplace?
7     A.   Regarding Perry Berthelot, I felt she had
8  a good understanding, but towards the end, she said,
9  "Well, I'll have to get with human resources and see
10  what happened."
11     Q.   Okay.  Is there anything else that you
12  feel that Ms. Hawkins did wrong with regards to the
13  investigation of you're my Safe Workplace complaint?
14     A.   I just feel because of Perry's tenure
15  that he was given priority over what I said.
16     Q.   Okay.  But at the end of the day, you
17  would agree with me in this situation, it really
18  came down to your word versus his word about what
19  happened during that phone call on October 5th?
20     A.   Correct.
21     Q.   And you would agree with me that the best
22  way to handle that would to have been record the
23  conversation, right?
24     A.   Correct.
25     Q.   And you also had the ability when you

Page 192

1  were calling Mr. Smith to tell him what happened in
2  that conversation.  You had the ability to record
3  that one, too?
4     A.   Correct.
5     Q.   And you would agree with me that your
6  entire case is based on your sole testimony with the
7  fact of what happened during that conversation on
8  October 5th?
9     A.   Correct.
10     Q.   Let's go to page 9 of the complaint, sir.
11  I'm looking at paragraph 21.  It says, "On
12  December 20, 2018, Menard submitted a citizen
13  complaint to the Louisiana Department of
14  Environmental Equality regarding the request by
15  Berthelot to dilute water samples as well as
16  regarding the use of improper chlorine tablets in
17  order to allow the agency to investigate those
18  violations."
19        Did I read that correctly?
20     A.   Correct.
21     Q.   And you would agree with me that that's
22  almost -- well, that's over two months from your
23  termination, correct?
24     A.   Correct.
25     Q.   It's after you hired a lawyer, correct?

KIRK MENARD                                                  July 22, 2019
MENARD vs TARGA RESOURCES LLC                               193—196

Page 193

1    A.    Correct.

2    Q.    Is there a particular reason after Mr.
3  Berthelot asked you to dilute the water samples --
4  strike that.

5          You would agree with me that as of
6  October 5th you were aware of Mr. Berthelot asking
7  you to dilute water samples?

8    A.    Correct.

9    Q.    You would also agree with me that you
10  were aware on October 5th of Targa's use of improper
11  chlorine tablets?

12    A.    Correct.

13    Q.    It took you over two months from the date
14  of your conversation with Mr. Berthelot full well
15  knowing him asking you to dilute water samples and
16  Targa using improper chlorine tablets, you waited
17  two months to file a report with the DEQ?

18    A.    Correct.

19    Q.    What is the particular reason you waited
20  two months to file a report with the DEQ?

21    A.    I was following the advice of my
22  attorney.

23    Q.    Okay.  Is it fair to say then that the
24  only reason that you filed a complaint on December
25  20th, 2018, is because your attorneys advised you

Page 194

1  to?

2    A.    No.  I was waiting for my attorney to
3  speak to Ms. Hawkins to get the full details of what
4  exactly happened.

5    Q.    Okay.  But you don't dispute the fact
6  that you believe Mr. Berthelot asked you to dilute
7  the water samples, right?

8    A.    Rephrase that, please.

9    Q.    Sure.  It's you contention that Mr.
10  Berthelot asked you to dilute the water samples?

11    A.    Correct.

12    Q.    It's your contention that Targa used
13  improper chlorine tablets?

14    A.    Correct.

15    Q.    None of that was going to change as a
16  result of whatever investigation that Ms. Hawkins
17  did, right?

18    A.    Correct.

19    Q.    So why did you wait two months to report
20  both the fact that Perry asked you to dilute water
21  samples, essentially commit a crime, and the fact
22  that Targa was using improper chlorine tablets?

23    A.    Like I said, under the advice of my
24  attorney.

25    Q.    Okay.  So the only reason you waited was

Page 195

1  because your attorneys told you to?

2    A.    Correct.  They were trying to figure out
3  the correct strategy, because there was also some
4  health and environmental -- health and safety
5  questions as well.

6    Q.    How did you make the report to the DEQ?

7    A.    E-mail.  It was online.

8    Q.    E-mail.  And you can go to the website
9  and make a report?

10    A.    Yes, sir.

11    Q.    Does it get assigned, like, a case number
12  or file number?

13    A.    Yes, sir.

14    Q.    And do you know where that is in the
15  process now?

16    A.    No, sir, I don't.  I did receive a call
17  from some lady, and I can't remember her name.  I
18  know the next question is going to ask probably our
19  conversation, but I'll let you ask it.

20    Q.    Well, if you want to do the whole depo, I
21  can just sit here and listen.

22          All right.  It was an e-mail complaint
23  that you filed on approximately December 20th, 2018,
24  correct?

25    A.    Correct.

Page 196

1    Q.    And did you write the e-mail or did your
2  attorneys write the e-mail or did you guys do it
3  together?

4    A.    My attorney wrote the e-mail.

5    Q.    And you submitted it with the DEQ?

6    A.    Correct.

7    Q.    And then after that you received a call
8  from someone with the DEQ?

9    A.    Correct.

10    Q.    Do you recall anything about the
11  conversation with the DEQ?

12    A.    Yes, sir, I did.

13    Q.    Tell me about that.

14    A.    Ms. -- I can't remember her name.  It's a
15  very long name.  She explained to me that she
16  believed me.  She said it is something difficult to
17  prove, but because of Targa's past record she
18  believed me.  But she's just going to pass it on for
19  an investigation without a complaint being listed.
20  And she did explain that they had arrested some
21  people in Cameron Parish for basically the same
22  thing.

23    Q.    Same what thing?  Diluting water samples
24  or the chlorine tablets?

25    A.    The diluting water samples.

KIRK MENARD
MENARD vs TARGA RESOURCES LLC

July 22, 2019
197—200

Page 197

1    Q.    And do you recall the name of the
2  individual that you spoke with at the DEQ?
3    A.    I can't -- my attorney would have that
4  information.  It's a very odd name.
5    Q.    When you received a call from the DEQ,
6  was your attorney on the line with you?
7    A.    No, sir.
8    Q.    It was just the two of you?
9    A.    Yes, sir.
10   Q.    And this individual told you that she
11  believed you, correct?
12   A.    Yes, sir.
13   Q.    Was that in regards to the water samples
14  or chlorine or both?
15   A.    It was believable what my superior, which
16  was Perry Berthelot had told me.
17   Q.    Okay.  And she said she believed you
18  because of all of the violations Targa had?
19   A.    Their past record was the way she worded
20  it.
21   Q.    Okay.
22   A.    She also mentioned notice of proposed
23  penalty as well.
24   Q.    Okay.  Do you know if Targa has been
25  cited for any kind of violation or enforcement as a

Page 198

1  result of your complaint?
2    A.    No, sir, I don't.
3    Q.    You would agree with me that there was
4  nothing preventing you from calling the DEQ back in
5  October 2018?
6    A.    Correct.
7    Q.    In fact, it was part of your duties and
8  responsibilities to make those types of reports to
9  the DEQ, was it not?
10   A.    No, sir it was not.  It was to go to my
11  supervisor.
12   Q.    So is it your position that if you are
13  aware of a crime that is going on at Targa, your
14  only responsibility as an ES&H specialist is just
15  simply to report it to David Smith?
16   A.    Or Ted Keller.
17   Q.    Okay.  You don't feel there's an
18  obligation as an ES&H specialist for Targa if Targa
19  was committing a crime for you to actually go to a
20  state or federal agency?
21   A.    No, sir.  It's to allow them to know
22  about it.
23   Q.    During your six months -- did you work
24  for Targa for six months or four months?
25   A.    No, sir.  Right at three-and-a-half

Page 199

1  months, I believe.
2    Q.    Okay.  Let me just ask you this.  During
3  you tenure at Targa, did anyone ever ask you not to
4  report a TSS exceedance?
5    A.    No, sir.
6    Q.    I'm showing you what's been marked as
7  Exhibit 7 to your deposition.  I'll represent to you
8  that this is a pleading that was filed on your
9  behalf in this case.  It's entitled "Plaintiff's
10  Opposition to Defense Motion to Dismiss Plaintiff's
11  Amended Complaint."  And let me know when you're
12  ready to discuss it.
13   A.    Okay.  Let's go ahead.
14   Q.    Looking at page 3, let me see if I can
15  find it.  Give me one second.  Give me one second,
16  sir.  Sorry.
17   A.    It's okay.  Take your time.
18   Q.    It's on page 2 that's why.  Look at page
19  2 on the bottom.  It says, "Based on the
20  circumstances," you with me?
21   A.    Okay.
22   Q.    "Based on the circumstances surrounding
23  Berthelot's request, Menard reasonably believed that
24  Berthelot's proposal was not an isolated event, but
25  rather was a pattern of conduct to hide

Page 200

1  environmental violations.  As alleged, that belief
2  was substantiated by past water sample patterns."
3         Did I read that correctly?
4    A.    Correct.
5    Q.    And you remember earlier we were talking
6  about that the only explanation of a high TSS
7  exceedance to drop drastically to a low one within a
8  weeks time its your contention it had to have been a
9  water dilution, correct?
10   A.    Correct.
11   Q.    Mr. Menard, who is the person at Targa
12  who retaliated against you and got you fired?
13   A.    I believe it was Perry Berthelot.
14   Q.    So it's your contention in this lawsuit
15  that Mr. Berthelot went to someone and said fire
16  this man?
17   A.    Or find something to get rid of him for.
18   Q.    Okay.  So, and correct me if I'm wrong,
19  but your contention in this lawsuit is that Mr.
20  Berthelot either told someone to terminate you or
21  said find a reason to get this guy terminated?
22   A.    Yes, sir.
23   Q.    Is there anyone else at Targa that you
24  believe retaliated against you?
25   A.    Not that I'm sure of.  Mr. Berthelot has

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                                    201–204

Page 201

1   a lot of loyal employees that he still speaks to on
2   a daily basis.
3      Q.   Well, is it your contention that any of
4   these loyal employees participated in his attempt to
5   get you terminated?
6      A.   It's very possible.
7      Q.   Okay.  Can you give me the names of any
8   of these loyal employees that went along with Mr.
9   Berthelot's request?
10     A.   There may be some independent
11  contractors.  There is definitely some Targa
12  employees that's very loyal to Perry.
13     Q.   Who?  Give me names.
14     A.   If I had a list of all the maintenance
15  guys or operators.  Some of the operators as well.
16  I just can't think of the name without the list of
17  the employees.
18     Q.   Well, let me ask you this.  Are any of
19  the maintenance people or operators at Targa
20  involved in terminations at Targa?
21     A.   No.
22     Q.   Okay.  So you would agree with me that a
23  maintenance person or an operator does not have the
24  ability to get an ES&H specialist terminated?
25     A.   No.

Page 202

1      Q.   That decision is not with them, correct?
2      A.   Correct.
3      Q.   All right.  So tell me, other than Mr.
4   Berthelot, is there anyone else at Targa that you
5   believe retaliated against you and got you
6   terminated?
7      A.   It's possible Keith Adams could have been
8   involved.
9      Q.   Anyone else?
10     A.   If I can think of some of the operators
11  names.  There is one at DGS, and I can't think of
12  his name right now.
13     Q.   Let me ask you this, sir.  I don't
14  want -- I don't want guesses.  This is your lawsuit,
15  you've made these allegations.  And I want to know
16  who specifically who you are contending in this
17  lawsuit retaliated against you.  And so far I've
18  heard Perry Berthelot and Keith Adams.  Is there
19  anyone else?
20     A.   Possibly Keith Adams.  I just can't think
21  of anyone's name that might have been in the control
22  room at that time.
23     Q.   What evidence do you have that Mr.
24  Berthelot retaliated against you and got you fired?
25  Or is it just based on your speculation?

Page 203

1      A.   It's based on speculation from the time
2   of the call of what he asked me to do, letting him
3   know that I was contacting David Smith, and then a
4   week later termination.
5      Q.   Okay.  Other than what I would call your
6   temporal proximity, which the timing of the alleged
7   illegal act to the timing of the termination.  Do
8   you have any evidence, whatsoever, other than that
9   temporal proximity as a reason of why you believe
10  Mr. Berthelot had you terminated?
11     A.   No, sir.  Just totality of the
12  circumstances.
13     Q.   Okay.  But what are the totality of the
14  circumstances that you believe that Mr. Berthelot is
15  the one who retaliated against you?
16     A.   The asking of the illegal act and the
17  termination -- the two different reasons given for
18  termination.
19     Q.   Okay.  But you are aware that there were
20  two reasons for termination.  I understand you say
21  there were two different.  But you are aware that
22  inappropriate comments and conduct and your
23  performance were both put out there, correct?
24     A.   Mm-hmm.
25     Q.   Yes?

Page 204

1      A.   Yes.
2      Q.   Okay.  And with regards to direct
3   evidence, do you have any direct evidence that Mr.
4   Berthelot retaliated against you?
5      A.   No, sir.
6      Q.   Okay.  Do you have any evidence that Mr.
7   Berthelot was involved in the decision to terminate
8   you?
9      A.   No, sir.
10     Q.   Would you agree with me that if there
11  were several people involved in your decision to
12  terminate, if Mr. Berthelot was the one who was
13  retaliating against you, he would have to convince
14  all those other people to terminate you, correct?
15     A.   Correct.
16     Q.   Now, what, if anything, or what evidence
17  do you have that Mr. Adams played any role in your
18  termination?
19     A.   All I have is a letter that my attorney
20  showed me that he wrote that's unsigned, and then
21  David.
22     Q.   Okay.  And did you review that letter --
23     A.   Yes.
24     Q.   -- or notes?  And did you find them to be
25  truthful or untruthful?

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                              205–208

Page 205

1    A.   Partially true.
2    Q.   Okay.  Was there anything sitting here
3  today that sticks out to you out of those notes that
4  you can tell me that you find to be untruthful?
5    A.   About me changing my story of checking
6  the chlorine and what have you.
7    Q.   Okay.  Anything else?
8    A.   No, that's about it.
9    Q.   Other than him having these notes that
10 you said were unsigned and undated, is there any
11 other evidence that you have to suggest that Mr.
12 Adams somehow played a role in your termination?
13   A.   No, sir.  Just, you know, his attitude
14 towards the end after Perry asked me to do what I
15 did towards me that, you know, he can't hold my hand
16 to do this and he's never done that before.
17   Q.   Okay.  I'm showing you what's marked as
18 Exhibit 8 to your deposition, Mr. Menard.  Going to
19 the last page of this Exhibit A, which is Targa
20 0080, it says, "10/12/2018, background, recently
21 terminated employee, e-mailed Targa CEO indicating
22 that he was terminated for failing to follow the
23 instruction of the supervisor and performing an
24 improper water sample test.  CEO responded to
25 terminate employee and sent to legal as a My Safe

Page 206

1  Workplace matter.  Investigation is beginning."
2         Did you call the My Safe Workplace on
3  October 12, 2018?
4    A.   Yes.  But Targa had not paid their bill
5  and it was sent back to the CEO.  The CEO called me
6  later that night apologizing.
7    Q.   Okay.  Is any of this that's contained in
8  Targa's 0080 to be untrue?
9    A.   Not that I can see as the matter was sent
10 to My Safe Workplace because Targa hadn't paid his
11 bill.
12   Q.   But your complaint was received by Targa,
13 correct?
14   A.   Mm-hmm.
15   Q.   Yes?
16   A.   Correct.
17   Q.   And you're my Safe Workplace complaint
18 was also investigated, correct?
19   A.   Correct.
20   Q.   And if you look at the first page, Targa
21 0076, you can see the conclusion is that the
22 investigation has revealed no facts to support the
23 terminated employees allegations?
24   A.   Mm-hmm.
25   Q.   Did I read that correctly?

Page 207

1    A.   Correct.
2    Q.   And you disagree with that conclusion,
3  fair?
4    A.   Correct.
5    Q.   Mr. Menard, I will represent to you that
6  I received five audio files that I had transcribed.
7  Are you aware of any audio files in addition to the
8  six that I've received?
9    A.   I'm not aware of it.
10   Q.   I'm showing you what's marked as Exhibit
11 9.  I'll let you know -- represent to you that this
12 is a conversation between you and Mr. Fitzgerald.
13 Let me know when you are ready to talk about it.
14   A.   You can go ahead.
15   Q.   Okay.  All right.  Going to -- if you
16 can, turn to page 8.  If you look at -- do you see
17 where the pages are, sir?
18   A.   Yeah.
19   Q.   So if you look at page 7, I believe
20 you're talking about a conversation --
21   A.   7 or 8?
22   Q.   7.  Right down here.
23   A.   Okay.
24   Q.   I believe you are talking about your
25 conversation that you had with Ms. Hawkins?

Page 208

1    A.   Correct.
2    Q.   Because at the top you say, "Yeah, she's
3  a general VP and the general counsel."  And in it is
4  says if you go to the page 8 it says, "And she knows
5  that Perry isn't going to admit to it because I said
6  'You don't expect him to admit to it.'  She goes,
7  'Oh, no, of course not.'"
8         Was that during your telephone
9  conversation with Ms. Hawkins on October 31st?
10   A.   I'm not sure.
11   Q.   Do you know if that is in the
12 conversation that you recorded Ms. Hawkins?
13   A.   I'm not sure.
14   Q.   Is there a particular reason you recorded
15 one conversation with Ms. Hawkins and not the other?
16   A.   I'm not sure with that either.
17   Q.   Okay.  Well, then tell me why it is that
18 you recorded Ms. Hawkins on any of the
19 conversations.
20   A.   On the one on October 31st, because that
21 would be used for my attorney.
22   Q.   Oh, okay.  So the purposes of recording
23 Ms. Hawkins on October 31st was for your attorneys?
24   A.   Correct.
25   Q.   Okay.  I'm done with that one.  You can

KIRK MENARD                                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                                              209–212

Page 209

1  put it away.
2      A.  Okay.
3      Q.  You work number was (504) 717-3864; is
4  that correct?
5      A.  If you say so.  I can't remember.
6      Q.  Okay.  But it was a 504 number?
7      A.  Yes, sir?
8      Q.  And then (337) 246-0933, that is your
9  personal number, correct?
10     A.  Correct.
11     Q.  And you did not have the ability to --
12  well, let me ask you this:  How did you record the
13  termination?  Was that with your personal phone?
14     A.  Yes, sir.
15     Q.  Same way you record your other things on
16  your personal phone with the 6:00 to 6:00 recording
17  or did you, like, press a button on this one?
18     A.  No, sir.  You don't have to press a
19  button.  You can.  There are programs out there where
20  you can press a button.  There are some programs
21  that just does it automatically.
22     Q.  Okay.  And so how is it that you recorded
23  the termination meeting?
24     A.  They called on my personal phone.
25     Q.  And then as a result of you picking up,

Page 210

1  it just starts recording?
2      A.  Yes, sir.
3      Q.  And it's your contention that you never
4  recorded any conversations on your work phone?
5      A.  No, sir.
6      Q.  Did your work phone have the ability to
7  record conversations?
8      A.  I'm not sure.  If you tried to download
9  something from the play store, it locks it for some
10  reason.
11     Q.  Okay.  Well, let me ask you this:  You
12  didn't have any programs, software, or apps that
13  allowed you to record on your work phone?
14     A.  No, sir.  You can plug in a tape recorder
15  to it.
16     Q.  Okay.  Did you ever do that?
17     A.  Not that I recall, no, sir.
18     Q.  And is that something that you learned
19  from your time as being an investigator?
20     A.  Yes, sir.
21     Q.  I'm showing you what's been marked as
22  Exhibit 10.
23         (Witness reviews document.)
24     Q.  Okay.  You ready?
25     A.  Mm-hmm.

Page 211

1      Q.  All right.  Turning to page 2 and page 2
2  on the document, this is a conversation between you
3  and Ms. Hawkins, correct?
4      A.  Mm-hmm.
5      Q.  And right at the top it says, "The letter
6  had said with that you basically, I guess, have some
7  recordings and things like that, so we can talk
8  about that in a minute.  But I want to be clear,
9  you're not recording me now, are you?"
10     A.  No, sir.
11     Q.  So I'm talking about Ms. Hawkins saying,
12  she says, "So we can talk about that in a minute.
13  But I want to be clear, you're not recording me now,
14  are you?"  And your response is, "No, ma'am, I'm
15  not."  Correct?
16     A.  Correct.
17     Q.  And so you'd agree with me that you lied
18  to Ms. Hawkins during that telephone conversation?
19     A.  Correct.
20     Q.  And why is it that you -- why didn't you
21  tell Ms. Hawkins that you were recording her?
22     A.  Because I'm not required to, and she
23  probably wouldn't have continued with the
24  conversation.
25     Q.  Okay.  So your thought in that situation

Page 212

1  was better to lie than tell the truth, correct?
2      A.  Correct.
3      Q.  If you would, can you turn to page 13.
4  And when I say "the pages," I'm meaning those.  All
5  right.  Looking at page 13 going to line 12, Ms.
6  Hawkins says, "Okay.  So let's just say -- so you're
7  probably saying around the 28th is when there was a
8  failure?"  Your answer is "Correct."  She then says,
9  "And around July 15th was a failure?"  Your answer
10 is "Correct."  "Okay.  And so what happened before that
11 that you were talking about some clearing out?"  You
12 say, "Yes."  "This is probably about a year or two
13 before Brogan was in charge.  They were failing
14 samples continuously so the DEQ was going to enforce
15 and give them a $300,000 fine."
16     A.  That's correct.
17     Q.  Is that what happened?
18     A.  No, sir.
19     Q.  Okay.  So Targa did not receive a
20 $300,000 fine as a result of continuous failed
21 samples?
22     A.  No, sir.  What they did was dig up the
23 pond and they made an agreement with the DEQ to dig
24 out the pond and I think the fine ended up being,
25 like, $30,000.  They have the invoices in their

KIRK MENARD                                           July 22, 2019
MENARD vs TARGA RESOURCES LLC                        213—216

Page 213
1  files.
2      Q.   So what did you mean when you said, "So
3  the DEQ was going to enforce and give them a
4  $300,000 fine"?
5      A.   Because that's what was the original fine
6  until Targa responded back and proposed a $30,000
7  fine if they would clean out the pond.
8      Q.   And how did you learn about that
9  information?
10     A.   That's in the files at Targa.
11     Q.   At Targa?
12     A.   Yes, sir.
13     Q.   So you saw some kind of formal document
14  from the DEQ that says "As a result of having these
15  continuous failed samples, you are going to have a
16  $300,000 fine"?
17     A.   That initially came from Brogan Smith who
18  was there at the time.
19     Q.   So you don't know about the actual
20  monetary amount?
21     A.   Just from Brogan and other people talking
22  about it.
23     Q.   Okay.  So when you say --
24     A.   In fact, I want to say Ted Keller had
25  told me about it, too, as well.

Page 214
1      Q.   So when you say, "So the DEQ is going to
2  enforce and give them a $300,000 fine," that's based
3  on something that you were told to by Brogan, not
4  anything you actually saw?
5      A.   Correct.  I wasn't there at that time.  I
6  was also told the same thing by Jasper Harvey.
7      Q.   Did Mr. Berthelot ever tell you to
8  continue to use the pool chlorine tablets?
9      A.   No.
10     Q.   Going to page 42, sir.  Looking at the
11  bottom, line 24 it says, "It just records
12  everything.  I mean, I have over 3,000 recordings in
13  my cloud box, and I didn't even realize they were
14  there.  You know, so I don't know what I have, you
15  know.  I just haven't gone threw a lot of them, you
16  know."
17         At the time you made this call to Ms.
18  Hawkins, did you have over 3,000 recordings in your
19  iCloud box or cloud box?
20     A.   It's not an iCloud.  I have an Android.
21  It stores it on your phone.
22     Q.   Well, is there a particular reason you
23  chose the phrase "my cloud box"?
24     A.   I don't know why I said "cloud box."
25  I've never had a cloud box.  That would be

Page 215
1  inaccurate.  I don't believe I said that.
2      Q.   Okay.
3      A.   Because it doesn't go to any place but
4  stores on your phone and then it sinks to your gmail
5  account.  I don't believe in any online storage
6  database.
7      Q.   All right.  Looking at Exhibit 12, sir.
8  This is a conversation between you and Matt
9  Fitzgerald.  Looking at page 4, looking at page --
10  line 17.  You say, "And I have no objective because
11  I don't plan ongoing back to Targa to begin with, so
12  what would be my motive, you know.  I mean, I
13  careless about Perry because my pretense was I'll
14  get another job some place else."
15         Did I read that correctly?
16     A.   Correct.
17     Q.   And you would agree with me that you have
18  no intention of never going back to Targa, correct?
19     A.   Correct.
20     Q.   If Targa was to offer you your job back,
21  you wouldn't take it?
22     A.   Correct.
23     Q.   Right above that on line 13, it says,
24  "Exactly.  And you know me Matt.  I mean, I'm
25  generally honestly.  I mean, I'm not going to make

Page 216
1  this up.  I mean, this is -- "
2          Did I read that correctly?
3      A.   Correct.
4      Q.   And you would agree with me that you're
5  admitting that you're not always honest?
6      A.   Correct.
7      Q.   And you would agree with me during today
8  that you're not always honest?
9      A.   Right.  That's why I said "generally."
10         Finished with this one?
11     Q.   Yes, sir.  Was that 10?
12     A.   Yes -- 12.
13     Q.   Oh, I messed up.  That's all right.  I
14  have 11 coming.
15         Why are you recording conversations
16  between you and your friend Matt Fitzgerald?
17     A.   It's just something that I put back on my
18  phone.
19     Q.   This is a result of that 6:00 to 6:00
20  thing?
21     A.   Correct.
22     Q.   Was Matt aware that you were tape
23  recording or recording, I should say?
24     A.   No.
25     Q.   Was it fair to say you weren't even aware

KIRK MENARD                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                      217—220

Page 217

1  that you were recording?
2      A.   Not that I know of.  I had actually
3  worked a case for Matt.  I had an investigator work
4  the case for Matt.  And he knew that everything was
5  recorded.  I mean, all of my investigators have it.
6      Q.   Take a look at Exhibit 11.  I'll
7  represent to you, Mr. Menard, that these are some
8  discovery answers that your counsel has filed or
9  submitted to us in this case.
10     A.   (Witness reviews document.)  Okay.
11     Q.   Looking at interrogatory -- well, let me
12 ask you this: Go to the last page.  So this is a
13 verification by you.  It says, "I, Kirk Menard,
14 believe based on reasonable inquiry and
15 investigation that the foregoing supplemental
16 answers to defendants for the first set of
17 interrogatories are true and correct to the best of
18 my knowledge information and believe I verify under
19 penalty of perjury that the foregoing to true and
20 correct."  And you signed this on June 2016, 2019;
21 is that correct?
22     A.   That's correct.
23     Q.   Do you agree with that that these answers
24 contained in Exhibit 11 are based on your personal
25 knowledge and they are true and correct to the best

Page 218

1  of your ability?
2      A.   Yes, sir.
3      Q.   All right.  Looking at the first page it
4  says, "Interrogatory No. 3."  It says, "List all
5  damages claimed by plaintiff as a result of the
6  claims based the basis of the lawsuit.  For each
7  type of damage listed, please state in detail the
8  elements use to calculate such damage, the basis of
9  the calculations, and the amount of the damages
10 claimed."
11         Did I read that correctly?
12     A.   Yes, sir.
13     Q.   All right.  In your answer, which is the
14 next page, I guess will be page 2.  It says, if we
15 go halfway down, we got "Plaintiff's benefits
16 included" -- well, let's go above that.  First, it
17 says, "You'll be seeking lost wages, correct?
18     A.   Mm-hmm.
19     Q.   And do you understand that you're seeking
20 those?
21     A.   Yes, sir.
22     Q.   And do you know how much you're seeking
23 in lost wages?
24     A.   No, sir, I don't.  My attorney calculated
25 that.

Page 219

1      Q.   Okay.  And it's your contention that you
2  never worked at anywhere else between Targa's
3  termination and your job at Tulsa, correct?
4      A.   That's correct.
5      Q.   And how did you -- how were making income
6  during that time?  Were you receiving any income
7  from anyone or anything?
8      A.   I was on unemployment and we had two
9  families living with us that would help with the
10 bills.
11     Q.   Okay.  Who were the families living with
12 you?
13     A.   Kay and Beth Lacombe.
14     Q.   Who are they?
15     A.   They are my wife's sisters.
16     Q.   Kay and Beth Macomb?
17     A.   Lacombe.
18     Q.   Lacombe?
19     A.   Yes, sir.  And another family name,
20 Lance, I'm not sure of his last name.
21     Q.   How long did Lance live with you?
22     A.   Lance has been living with me since I was
23 with Targa.  Kay and Beth have been living with us
24 for about three or four years.
25     Q.   So Lance is still living with you today?

Page 220

1      A.   Correct.  And so is Kay and Beth.
2      Q.   Does Lance have anyone else with him
3  other than himself?
4      A.   He has two sons.
5      Q.   How old are they?
6      A.   One is nine and one is 15.
7      Q.   And you don't know Lance's last name?
8      A.   No, sir.
9      Q.   He's been living with you for --
10     A.   He's a friend of my wife's -- ex-wife's.
11     Q.   Jessica?
12     A.   Yes.
13     Q.   Okay.  And how much does Lance pay a
14 month?
15     A.   Lance pays the utilities.  Probably about
16 $470-something.
17     Q.   Does he provide you with checks, cash, or
18 how is that paid?
19     A.   He pays my ex-wife.
20     Q.   So he pays Jessica?
21     A.   Yes.
22     Q.   Does he pay anything other than this
23 approximately $477?
24     A.   Not that I know of.
25     Q.   All right.  How much do Kay and Beth

Page 221

1  Lacombe make?
2    A.   Kay and Beth pay right around the same
3  amount.
4    Q.   About 477 or 500?
5    A.   Yes, sir, 500 I would say.
6    Q.   All right.  And this has been going on
7  for the entire time that Kay and Beth have been,
8  right?
9    A.   Yes, sir.
10   Q.   So at least three to four years, right?
11   A.   Correct.
12   Q.   So they were doing this even before
13  Targa?
14   A.   Yes, sir.
15   Q.   And then Lance, who we don't know his
16  last name who has two sons, he's been paying about
17  $477 a month to Jessica?
18   A.   Correct.
19   Q.   Do Kay and Beth also pay Jessica?
20   A.   Yes.
21   Q.   Is this check?
22   A.   I'm not sure.
23   Q.   Okay.  And that's approximately $977; is
24  that correct?
25   A.   Roughly.  I want to say 376 goes to Kay

Page 222

1  and Beth's truck that is under our name.  They
2  agreed to pick up the notes under our name.  That's
3  all in our bankruptcy petition.
4    Q.   All right.  So $376 of the 477 goes
5  towards your truck?
6    A.   Correct.
7    Q.   And that truck was in your name?
8    A.   Yes, sir.
9    Q.   Why do you have a truck in your name that
10  Kay and Beth pay for?
11   A.   Because I ended up getting me another
12  truck.
13   Q.   What's the make and model of the truck
14  that Kay and Beth pay for?
15   A.   It's a 1997 Dodge Ram.
16   Q.   Okay.  Is there anyone else that
17  contributes -- and all of these people live in the
18  same house, the 510 3rd Street?
19   A.   Correct.  And we were also getting food
20  stamps and Medicaid during that time as well.
21   Q.   Anyone else contribute to the household
22  other than Kay, Beth, and Lance?
23   A.   Jessica's dad helps out once in a while.
24  His name is Terry Lacombe.
25   Q.   Do you know how much approximately Terry

Page 223

1  Lacombe has given you since your termination from
2  Targa?
3    A.   No, sir, I don't.
4    Q.   Is it more than 10,000?
5    A.   No, sir.
6    Q.   Less than five?
7    A.   Yes, sir.
8    Q.   More than one?
9    A.   No, it would be less than one.
10   Q.   Does Jessica have a job?
11   A.   No, sir.
12   Q.   Had she ever had a job since you left
13  Targa in October 2018?
14   A.   No, sir.
15   Q.   Going to "Plaintiff Seeks General
16  Damages" right there.  It says, "Plaintiff further
17  seeks general damages for emotional distress and
18  mental anguish caused by his termination."
19        What mental anguish have you sustained as
20  a result of your terminations?
21   A.   Can't sleep at night, worried about
22  finding another job, worried that, you know, if they
23  do check Targa, then I'm going to be given a bad
24  review, panic attacks.  It's gotten worse.  I've
25  been having that since I was 15 years old.  And

Page 224

1  they've got worse where it was under control and I
2  started having more.  It's called panic disorder.
3    Q.   Anything else?
4    A.   It caused friction between me and my
5  fiancé.
6    Q.   Where does your fiancé live?
7    A.   Duson, Louisiana.
8    Q.   Is there any friction between your fiancé
9  and you with regards to your ex-wife?
10   A.   There is some.  Also, I'm ten hours away
11  from my kids, which I only get to see every four or
12  five months.
13   Q.   Okay.
14   A.   Filing Chapter 13 bankruptcy.  You know,
15  before I was terminated from Targa, I was just about
16  getting on track.
17   Q.   Okay.  Anything else?
18   A.   That's about all I can see.  Other than
19  the embarrassment.  Saying I did something wrong
20  when I really don't believe I did.
21   Q.   Well, who knows.  You said that you've
22  been embarrassed.  How have you been -- well, let me
23  ask you this:  Have you told anyone as to why you
24  were terminated?
25   A.   Other than Matt, my wife, my fiancé.  I

KIRK MENARD                                                        July 22, 2019
MENARD vs TARGA RESOURCES LLC                                        225–228

Page 225

1  don't know if anyone at Targa knows.
2      Q.   You had mentioned something to the fact
3  that you were afraid that Targa may give you a bad
4  reference, correct?
5      A.   Correct.
6      Q.   Do you have any evidence of Targa ever
7  doing that?
8      A.   No, sir. In fact, just to protect
9  myself, my current boss, I told him everything.
10     Q.   Okay. You said that you can't sleep as a
11  result of this?
12     A.   Yes, sir.
13     Q.   Are you still having that difficulty
14  today?
15     A.   Yes, sir.
16     Q.   And do you take any medications for that?
17     A.   No, sir, I don't. I just take my anxiety
18  medicine, and even with that I can't sleep.
19     Q.   You would agree with me that after your
20  termination from Targa, you were dealing with some
21  other things that may have contributed to issues in
22  your life at that time, correct?
23     A.   My pregnant fiancé. Me and my wife was
24  talking about divorce, but we hadn't filed yet, but
25  that wasn't really bothering me.

Page 226

1      Q.   Okay. So at the time that you were
2  terminated from Targa, you had just had a newborn,
3  correct?
4      A.   Mm-hmm.
5      Q.   Yes?
6      A.   Yes, sir.
7      Q.   This is your seventh child?
8      A.   Mm-hm.
9      Q.   Correct?
10     A.   Correct.
11     Q.   And was she your fiancé at the time?
12     A.   Yes.
13     Q.   And at that point in time you and your
14  wife hadn't even decided to file for divorce?
15     A.   We weren't filing, no, sir.
16     Q.   So you would agree that contributed
17  to some of the mental anguish that you have in your
18  life, right?
19     A.   It's possible, yes.
20     Q.   Okay. You also, obviously, were having
21  some money issues, right?
22     A.   Not necessarily. I mean, when I was
23  working with Targa, I wasn't.
24     Q.   Okay. Well, you would agree with me that
25  you filed a bankruptcy -- let me see here.

Page 227

1      A.   December 10, 2018.
2      Q.   Yeah. So less than two months after you
3  were terminated from Targa, correct?
4      A.   Correct.
5      Q.   And you would agree with me that
6  according to your bankruptcy petition, you estimated
7  your liabilities were between 100 and $500,000?
8      A.   Mm-hmm.
9      Q.   Correct?
10     A.   Correct.
11     Q.   And you would agree with me that you did
12  not rack up 100 to $500,000 in debt during that
13  two-month time period, do you?
14     A.   No, sir. That was total with my house.
15     Q.   That's not I asked, though. You would
16  agree with me that between October 11, 2018, to
17  December 10, 2018, you did not rack up 100 to
18  $500,000 in liabilities?
19     A.   I'm not sure.
20     Q.   Okay. Would you agree with me that if
21  you had lost your job, you would be a little bit
22  more cost-conscious about things?
23     A.   Yes.
24     Q.   And you would agree with me that prior to
25  October 11, 2018, that you did have some substantial

Page 228

1  debt to your name?
2      A.   Correct.
3      Q.   And according to your bankruptcy
4  petition, you owed between 55 and 99 creditors,
5  correct?
6      A.   Correct.
7      Q.   And you would agree with me that you
8  didn't rack up 55 to 99 creditors in the two months
9  between termination and filing the bankruptcy, did
10  you?
11     A.   A lot of it was owed before I even
12  started with Targa.
13     Q.   So it's your contention in this case,
14  though, that Targa somehow caused this bankruptcy,
15  right?
16     A.   Because of my house.
17     Q.   What do you mean because of your house?
18     A.   Because they were about ready to
19  foreclose on my home, so I had to take action pretty
20  quickly.
21     Q.   Well, how much was your mortgage?
22     A.   It was 894.
23     Q.   Okay. Well, what you told me was Kay,
24  Beth, and Lance were giving you $977 a month, right?
25     A.   Correct.

KIRK MENARD                                                       July 22, 2019
MENARD vs TARGA RESOURCES LLC                                    229–232

Page 229

1    Q.   You would agree with me that would cover
2  the mortgage, wouldn't it?
3    A.   Well, we also had utilities to pay.
4    Q.   You would agree with me also that you had
5  indicated that a lot of this debt had been incurred
6  before even starting at Targa?
7    A.   Correct.
8    Q.   Would you at least agree with me that
9  some of the cause of your bankruptcy that you filed
10 in December of 2018 did not have anything to do with
11 Targa?
12   A.   I wouldn't say so because of my house.
13 My main objective was to save my home.
14   Q.   So when you filed your Chapter 13
15 bankruptcy on December 10, 2018, the sole reason was
16 to save your house, correct?
17   A.   Correct.
18   Q.   You also filed a bankruptcy in December
19 23, 2010, correct?
20   A.   Correct.
21   Q.   And that was a Chapter 7?
22   A.   Correct.
23   Q.   And according to that bankruptcy
24 petition, you had between 100 to 199 creditors?
25   A.   Mm-hmm.

Page 230

1    Q.   Is that what you recall?
2    A.   Correct.
3    Q.   And according to your bankruptcy
4  petition, you estimated liabilities between 100 and
5  $500,000?
6    A.   Correct.
7    Q.   In fact, your total liabilities in that
8  bankruptcy petition was $433,467.57.
9    A.   That was my business included.
10   Q.   Okay.  And can you tell me what you think
11 caused that bankruptcy to be filed?
12   A.   Overextending on my business.  It's
13 business credit.
14   Q.   So bankruptcy number one is overextending
15 your business, correct?
16   A.   Correct.
17   Q.   And bankruptcy number two is Targa?
18   A.   Correct.
19   Q.   Would you agree with me that Targa did
20 not make you incur 55 to 99 creditors, right?
21   A.   I agree with that.
22   Q.   And you would also agree with me that
23 Targa didn't make you incur 100 to $500,000 in debt?
24   A.   A lot of that was before Targa.
25   Q.   Since your date of employment with Targa

Page 231

1  ended, have you ever missed any work as a result of
2  your mental injury or illness?
3    A.   No, sir.
4    Q.   Have you ever seen a mental professional
5  to treat you for your mental anguish?
6    A.   Yes.
7    Q.   For in this case?
8    A.   Yes.
9    Q.   For what happened with Targa?
10   A.   Yes, sir.
11   Q.   Who have you seen?
12   A.   Dr. Beth Collins.
13   Q.   Beth who?
14   A.   Collins.
15   Q.   Okay.  Have you seen anyone else other
16 than Dr. Collins?
17   A.   Dr. Ryan Edwards.
18   Q.   And what is Dr. Collins a doctor in?
19   A.   Dr. Collins is a nurse practitioner for
20 psychiatry.
21   Q.   Is she a doctor or is she a nurse
22 practitioner?
23   A.   She is a nurse practitioner for
24 psychiatry.
25   Q.   Is she a doctor, though?

Page 232

1    A.   No.
2    Q.   Okay.  So it's just Beth Collins?
3    A.   Yes.
4    Q.   Nurse practitioner.  Okay.  Other than
5  the nurse practitioner, you saw Mr. Edwards?
6    A.   Yes, sir.  And he's a doctor.
7    Q.   And what kind of doctor is he?
8    A.   He's a general practitioner.
9    Q.   Okay.  Does Beth Collins work for a
10 mental health professional?
11   A.   Yes.
12   Q.   Who?
13   A.   I'm not sure.
14   Q.   How long have you been seeing Ms.
15 Collins?
16   A.   Probably about two months before Targa.
17   Q.   So you would agree with me that you were
18 suffering from mental anguish or mental health prior
19 to anything that happened at Targa, correct?
20   A.   I had anxiety, but it was under control.
21   Q.   Can you say that last part again?
22   A.   I had anxiety, but it was under control.
23   Q.   Okay.  And you also suffer from
24 depression, correct?  Well, let me ask it this way:
25 Have you ever suffered from depression?

KIRK MENARD                                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                                  233–236

Page 233

1    A.   No, sir.  Not recently, no.
2    Q.   Have you ever taken any medicine for
3  depression?
4    A.   She gives me medicine that's labeled for
5  depression, but it works with my anxiety medicine.
6  Something about my serotonin in my brain.
7    Q.   You're on Clonazepam, correct?
8    A.   Correct.
9    Q.   And what is the depression drug that
10  you're on as well?
11    A.   Trintellix.
12    Q.   When did you start that?
13    A.   I started that while I was at Targa.
14    Q.   Okay.  But that was before any incident
15  with Mr. Berthelot, correct?
16    A.   Correct.
17    Q.   Also, how long have you been on
18  Clonazepam or an anxiety medicine?
19    A.   Since around 2009, 2010.  Before then, I
20  was on Xanax.
21    Q.   Are you still going to Ms. Collins or Dr.
22  Edwards today?
23    A.   Dr. Edwards.  I have an appointment with
24  him tomorrow.
25    Q.   And do you see Mr. Edwards for your

Page 234

1  mental health issues?
2    A.   Yes, sir.  Because he can prescribe my
3  medication.
4    Q.   Can the nurse practitioner not prescribe
5  it?
6    A.   She can still prescribe it.  She's the
7  one that upped it to 1 milligram.  I'm not seeing
8  her anymore, because I had missed an appointment.
9  So I just started seeing Dr. Edwards.  He was more
10  convenient.  Said he can prescribe me anything I
11  needed.
12    Q.   Okay.  And you would agree with me that
13  Dr. Edwards is just a general practitioner?
14    A.   Correct.
15    Q.   He doesn't have a mental health
16  background?
17    A.   Not that I know of.
18    Q.   Where is Tulsa?  What is it?
19    A.   Inspections.
20    Q.   Where are they located?  Don't say Tulsa,
21  Oklahoma.  Can I have an addresses?
22    A.   I actually think they are in Tulsa,
23  Oklahoma.
24    Q.   Do you know what the address is?
25    A.   I would have it in my phone.

Page 235

1    Q.   Do you know who Cypress Energy
2  Management, TIR, LLC?
3    A.   That's the same thing.
4    Q.   That's them?
5    A.   Yes, sir.
6    Q.   Okay.  Did you ever work as an
7  independent contractor for them?  Or is that what
8  you are doing now?
9    A.   That's what I'm doing now.
10    Q.   Are you seeking attorney's fees in this
11  case?
12    A.   It's up to my attorney.
13    Q.   Okay.  It says in here this
14  interrogatory it says that you are seeking lost
15  bonuses.  Do you know how much in bonuses you would
16  have received at Targa?
17    A.   No, sir, I do not.
18    Q.   Do you have any idea how that number
19  should be calculated?
20    A.   No, sir, I do not.
21    Q.   Would you agree with me that at Targa
22  you're not guaranteed a bonus?
23    A.   I'm not sure of that either.
24    Q.   Have you ever heard the term
25  "discretionary bonus"?

Page 236

1    A.   Yes.
2    Q.   And is it your contention that you are
3  unaware of whether or not the bonus structure at
4  Targa was discretionary?
5    A.   I'm not sure.
6    Q.   So explain to me why you think it is that
7  Targa caused you to have to file a bankruptcy?
8    A.   Because at that time I was working and
9  Bank of America had agreed to work with me because I
10  had an income.  And when I lost my income, they
11  agreed to stop working with me.
12    Q.   Okay.  Have you suffered any damage to
13  your representation?
14    A.   I have no proof that Targa, you know,
15  gave me a bad reputation or if they were even called
16  for a reference.  I'm not sure of that.
17    Q.   Okay.  So you have no evidence that
18  suggest that your reputation had been damaged in
19  anyway by Targa, correct?
20    A.   Correct.
21    Q.   Were you actively seeking employment
22  after your job with Targa ended?
23    A.   Yes.
24    Q.   And I believe you provided a list in
25  discovery answers?

KIRK MENARD                                                                                          July 22, 2019
MENARD vs TARGA RESOURCES LLC                                                                        237—240

Page 237

1    A.   Correct.
2    Q.   And did you apply to all of those places?
3    A.   Yes, sir.
4    Q.   Would that be online?
5    A.   Yes, sir.
6    Q.   Do you recall, sitting here today, of all
7    the places that you applied, did you interview at
8    any of these places?
9    A.   A couple of places called me to
10   interview, and I went for my interview and I've
11   never heard back from him.
12   Q.   Okay.  Fair to also say that you never
13   received any kind of job offer?
14   A.   Correct.
15   Q.   From any of those places?
16   A.   Until I got the call from TIR.
17   Q.   Okay.  Do you think anyone from Targa
18   acted with any kind of ill-will in regards to your
19   termination?
20   A.   Other than Perry, no.
21   Q.   What evidence do you have that Perry
22   acted with ill-will?
23   A.   Just asking me to do what he did and
24   maybe contacting some of the other employees that
25   was loyal to him or close to him.

Page 238

1    Q.   But you would agree with me that you have
2    no direct evidence that he actually ended up doing
3    any of those things, correct?
4    A.   Not at this time, no, sir.
5    Q.   You would also agree that everything that
6    you are saying with regards to Perry involving your
7    termination is based on speculation?
8    A.   Correct.
9    Q.   Do you have any evidence that anyone at
10   Targa acted with a specific intent to cause you some
11   kind of harm other than Perry?
12   A.   The only other person I know of was an
13   independent contractor that they are on-site using
14   asbestos and his supervisor came to me and he
15   complained to me about -- he was scared about
16   messing with the asbestos.  So being that he
17   complained to me, they moved him offshore and got
18   him away from site.  I think he blames me for that
19   move according to his supervisor.  And I said, "You
20   came to me -- he came to me with a legitimate
21   complaint, I went to you."  That's the only other
22   person.  I can't remember his name.  But he was an
23   independent contractor there.
24   Q.   Well, do you think that this independent
25   contractor had anything to do with your termination

Page 239

1    or the end of your employment at Targa?
2    A.   I'm not sure.  I haven't seen him since
3    they moved him offshore.
4    Q.   Do you have any evidence that he had any
5    influence into your termination?
6    A.   No, sir.  Other than his supervisor
7    telling me that he was pretty mad at me, that's
8    about it.
9    Q.   Do you remember his name at all?
10   A.   No, sir I don't.
11       MR. PATTON:
12       Let's do this.  Let's take break and
13   let me go through and get organized.  I should
14   be close.
15       THE VIDEOGRAPHER:
16       We're going off the record.  The
17   time is 3:23 p.m.
18       (Recess taken.)
19       THE VIDEOGRAPHER:
20       We are going back on the record.  Th
21   time is 3:33 p.m.
22   BY MR. PATTON:
23   Q.   I'm showing you what's marked as
24   Exhibit 13 to your deposition.  And I'll represent
25   to, Mr. Menard, that these are some text messages

Page 240

1    that have been produced in this case, and I believe
2    the text messages are between you and Ted.
3    Unfortunately, we don't have a really good copy of
4    your end of the conversation.
5        But what I would like to talk to you
6    about is looking on page 2, which is Targa 53.  In
7    there you say, "I enjoyed working for Targa and
8    while I was laxed in environmental I was learning."
9        You enjoyed working for Targa?
10   A.   Correct.
11   Q.   And when you -- what did you mean by the
12   fact that you say you were "laxed in environmental"?
13   A.   There's -- and they knew this upon
14   employment that I was not familiar or too familiar
15   with the air permitting system.  And they actually
16   sent me to school for air permitting to learn more
17   about how to calculate the air and draft the permits
18   for the regulatory agencies.
19   Q.   In this -- if you look at the text
20   message on the day before, if you look at the time
21   stamp at the top on Targa 52, that is October 11,
22   5:34 p.m.  That was the day of termination, correct?
23   A.   Yes.
24   Q.   And on this text message that you had
25   sent to Mr. Keller, nowhere in this message on

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                              241–244

Page 241
1  October 11 at 5:34 p.m., do you mentioned a thing
2  that Perry asked you to commit a crime or -- well,
3  let me ask you this:  Anywhere in this text message
4  on October 11 at 5:34 p.m. do you mention anything
5  where Perry asked you to commit a crime?
6      A.   Correct.
7      Q.   Do you mention anywhere in this text
8  message that Perry asked you to commit a crime?
9      A.   No.
10     Q.   Do you mention anywhere in the text
11 message on the date of your termination that you
12 felt that you were retaliated against?
13     A.   No.
14     Q.   Okay.  Let's turn to --
15     A.   Can we go back to that?
16     Q.   Let's look at October 11 at 8:54 p.m.
17     A.   Where I put "Knew I shouldn't have spoke
18 to Perry that day"?
19     Q.   Yep.  On Targa 56 at 8:54 p.m. you say,
20 "Thanks, Ted.  Enjoyed working with you and the rest
21 of the team.  Knew I shouldn't have spoke to Perry
22 that day.  I appreciate everything and you giving me
23 a chance.  Good luck with everything.  You have my
24 greatest respect."
25         You agree me saying "Knew I shouldn't

Page 242
1  have spoke to Perry that day is a little vague,
2  right?
3      A.   Correct.
4      Q.   Is there a particular reason you didn't
5  say, "Man, I knew I shouldn't have spoken with Perry
6  that day where he told me to commit a crime"?
7      A.   Because I knew Ted wouldn't go into it.
8  I knew that he wouldn't, you know, discuss that,
9  because he represents Targa.
10     Q.   You didn't think it would be wise to
11 maybe have some kind of written form saying at least
12 you can rely on here in this case and say, "Hey,
13 look, I got it in writing"?
14     A.   It wouldn't have did any good.  I mean,
15 if you read the response back from Ted, I mean, it
16 was very vague where he didn't really want to get
17 into it.
18     Q.   Okay.  All right.  Taking a look at
19 Exhibit 14.  Take a look at this.  This is a series
20 of e-mails.  And I don't want to prevent you from
21 looking at the whole thing, but I'm really focusing
22 on 0351, but you can certainly look at the whole
23 document.
24     A.   (Witness reviews document.)  Okay.
25     Q.   Okay.  Looking at Targa 351, and I'm

Page 243
1  looking at the e-mail from Francis.  This is dated
2  July 24, 2018.  Is this the e-mail that we spoke
3  about earlier that you read that Mr. Keller told you
4  not to read during that monthly safety meeting?
5      A.   Correct.
6      Q.   Okay.  Do you recall what month that
7  safety meeting was approximately?
8      A.   I'm not sure.
9      Q.   It was before the Perry call, though,
10 correct, on October 5th?
11     A.   Correct.
12     Q.   All right.  Showing you what's marked as
13 Exhibit 15.  I'll represent to you, Mr. Menard, that
14 this is a document produced by you in this lawsuit.
15     A.   Okay.
16     Q.   On the first page, which is Menard 5, the
17 (504) 722-8156 is that Mr. Berthelot's number?
18     A.   Yes.
19     Q.   And you talked to him for eight minutes
20 and 59 seconds?
21     A.   Correct.
22     Q.   And then approximately an hour and
23 20 minutes later -- hold on.  You have an outgoing
24 call, I believe, to David Smith at 10:08 a.m.,
25 correct?

Page 244
1      A.   Correct.
2      Q.   And then did you try to call him again at
3  10:40?
4      A.   I want to say I did, yes.
5      Q.   And then he called you back at 10:42?
6      A.   Correct.
7      Q.   And that phone call lasted 11 minutes,
8  correct?
9      A.   Correct.
10     Q.   And where did you get this document?  How
11 did you get it?
12     A.   That came from the phone before I sent it
13 back to Targa.  I copied and pasted it.  Like, a
14 screen shot.
15     Q.   Did you copy and paste anything else?
16     A.   No.  Other than e-mails, which I
17 forwarded to him -- to my attorney.
18     Q.   Now, you had indicated earlier that
19 Jess-- not Jessica -- Brooke had been recording
20 similar to you, the 6:00 to 6:00 setting on her
21 phone, fair?
22     A.   Mm-hmm.
23     Q.   Yes?
24     A.   Yes, sir.
25     Q.   Have all of the recordings from Brooke's

Page 245

1   phone been provided to your counsel?
2       A.   No, sir.
3       Q.   Okay.  Have you provided any recordings
4   from Brooke's phone in regard to your counsel?
5       A.   I want to say there was a couple.  Most
6   of it is me and her talking about her pregnancy.
7   That's about it.
8       Q.   Okay.  You understand that I told you we
9   have six recordings in here?
10      A.   Mm-hmm.
11      Q.    Are any of the six recordings ones that
12  came from Jessica's phones?
13      A.   Brooke's phone.
14      Q.   Brooke's phone?
15      A.   I'm not sure.
16      Q.    Well, I will represent to you that in all
17  six recordings, there was a person identified as you
18  and then there is a person identified as someone
19  else.  If it came from Brooke's phone, you would
20  agree with me that it would only have your side of
21  the conversation, right?
22      A.   Correct.
23      Q.   Okay.  And I'll represent to you that I
24  have had none of those recordings?
25      A.   Right.

Page 246

1       Q.    And have you produced all that
2   information from Brooke's phone to your counsel?
3       A.   No.
4       Q.   Okay.  What investigation have you done
5   and to Brooke's phone to determine if there is any
6   recordings that are responsive to our discovery
7   request in this case?
8       A.   We went to what was relevant and listened
9   to several recordings.  It's mostly just me and her
10  when I was at the camp or on my lunch break, and we
11  really don't discuss Targa.
12      Q.    Have you instructed Brooke not to destroy
13  any of those recordings?
14      A.   Yes, I have.  And he was out there when I
15  did that.  She still has them on her phone.
16      Q.    Have you understood all of my questions
17  today?
18      A.   Yes, sir.
19          MR. PATTON:
20             I'll pass the witness.
21             EXAMINATION
22  BY MR. BERGERON:
23      Q.    Mr. Menard, I'm just going to ask you a
24  couple of questions.
25          You've got a stack of paper in front of

Page 247

1   your right now.  Let's go back to what I think was
2   Exhibit 1.  The very first thing was the Targa Code
3   of Conduct.  And I am specifically looking at Targa
4   69 as the Bates label as page 6 of the document.
5       A.   Okay.
6       Q.   Okay.  And this is under what's labeled
7   as Section 14:  "Ethics Questions and Reporting
8   Violations of Targa Policies."  I'm going to read
9   one, two -- the third sentence of the first
10  paragraph and tell me if I read it correctly.  It
11  says, "If you observe illegally or unethical
12  behavior or have a genuine reason to believe in good
13  faith that such behavior has happened or is going to
14  happen, you have the responsibility of bringing it t
15  to the attention of your supervisor or manager or
16  other appropriate personnel."
17          Did I read that correctly?
18      A.   Yes, sir.
19      Q.   Is this what you did?
20      A.   Yes, sir.
21      Q.    And then if we also go to the third
22  bullet point, it says -- and, again, tell me if I
23  read this correctly -- "Discuss the issue or
24  question with a supervisor.  Supervisors will be
25  more knowledgeable about the question or issue and

Page 248

1   should be brought into the inquiry and/or decision
2   process.  This applies to all situations."  Remember
3   that supervisors are responsible for solving
4   problems and ensuring compliance with the code."
5          Did I read that correctly?
6       A.   Yes, sir.
7       Q.   Again, is this what you did?
8       A.   Yes, sir.
9       Q.   When you spoke to David Smith?
10      A.   Yes, sir.
11      Q.    Going back earlier we had some
12  discussions about statements made in letters and
13  different circumstances about recordings that you
14  may or may not have had.  And I believe it was
15  represented at times that those were lies.  Is it
16  true that when you made those statements, you
17  believed you had more recordings than you actually
18  did?
19      A.   Yes, sir, I did.
20      Q.    And that whenever you investigated it
21  later, maybe you found some recordings that you did
22  not know about?
23      A.   Correct.
24      Q.    I mean, you found that you did not have
25  recordings that you thought you had?

KIRK MENARD                                                July 22, 2019
MENARD vs TARGA RESOURCES LLC                             249–252

Page 249

1    A.    Yes, sir.
2    Q.    There was also a discussion about in one
3  of the telephone conversations, I believe it was
4  with Matt Fitzgerald.  There was a statement about
5  being generally honest.  You understand today that
6  you are under oath?
7    A.    Yes, sir.
8    Q.    When you spoke to Ms. Hawkins, were you
9  under oath at that time?
10    A.    No, sir.
11    Q.    Were you under oath in any of the
12  conversations you had with anyone else?
13    A.    No, sir.
14    Q.    You understand the difference between
15  being under oath and not being under oath?
16    A.    Yes, sir.
17    Q.    When you spoke with -- let me go back.
18        After the telephone call with Perry, you
19  testified earlier that you called David Smith?
20    A.    Yes, sir.
21    Q.    What was your intention at that time when
22  calling Mr. Smith?
23    A.    To explain to him that I spoke to Perry
24  about the sewage problem to tell him that -- I
25  explained to him about the sewage expert to get

Page 250

1  others to find out what the problem was and then I
2  reiterated what Perry had asked me to do.
3    Q.    What did you expect him to do with that
4  information?
5    A.    I expected him to carry it on higher than
6  Perry or actually higher than Ted, even, or a vice
7  president of environmental.
8    Q.    Did you have any reason to think he
9  wouldn't do that?
10    A.    I mean, Davis is pretty laxed.  He does
11  work for Perry, too.  We all do.  Yeah, I mean, he
12  just brushed it off like it was nothing.
13    Q.    When you made that call, did you think
14  there was any reason you had to record it?
15    A.    No, sir.  I expected David to do the
16  right thing.  He had always done the right thing in
17  the past.  But, I mean, based on the seriousness of
18  the nature, I think that, you know, he didn't want
19  to make any waves.
20    Q.    Did you intend at any point during that
21  conversation to file a lawsuit against Targa?
22    A.    No, sir, I didn't.  I wanted it handled
23  internally.  I wanted it corrected, because the next
24  safety guy may run into the same problem.  That is
25  the reason why I contacted Ms. Hawkins and Mr. Joe

Page 251

1  Bob Perkins so much.  I had no intention of filing
2  suit at all.
3    Q.    So you wouldn't have had to record a
4  phone call to create a record?
5    A.    No, sir.  A lawsuit never crossed my mind
6  when I spoke to Perry or David Smith.  But then
7  whenever I was terminated and I was given the reason
8  for performance, then, you know, I felt that because
9  of my -- I'm getting my certified safety
10  professional that it was affect my job -- you know,
11  my job search elsewhere, so.
12    Q.    I believe there was some testimony about
13  this earlier, but what was Perry's -- Mr.
14  Berthelot's title or relationship to you?
15    A.    He was the regional manager.
16    Q.    And where was that in relation to where
17  you stood as an ES&H --
18    A.    Lake Charles, Louisiana, all the way to
19  Hattiesburg, and while he was over Ted, he was also
20  over the entire complexes.  He received e-mails
21  about everything that went on.  If we had
22  exceedances, any safety violations, any injuries,
23  accidents, incidents, he received a call on
24  everything.
25    Q.    So what was his degree of oversight over

Page 252

1  the things that you were doing?  If any.
2    A.    If we had oil spills, exceedances, safety
3  violations, accidents, injuries, he would be
4  notified.  He was part of the notification tree
5  chain.
6    Q.    So let me make sure I understand
7  correctly.  So Mr. Berthelot was over Ted Keller?
8    A.    Correct.
9    Q.    And Ted Keller was over David Smith?
10    A.    Not necessarily.  Jarrod Gregg was over
11  David Smith.  But David would not do anything
12  without consulting with Ted or Perry.
13    Q.    And where was Ted Keller in relation to
14  you?
15    A.    He was -- we were in the same office
16  building.  He was, I think, three or four doors down
17  from me and he was someone that I would talk to, you
18  know, so I wouldn't have to call David.
19    Q.    And so --
20    A.    Ted was mostly over operations.
21    Q.    If Perry asked you to do something, did
22  you feel like you can tell him no?
23    A.    Yes.
24    Q.    You did?
25    A.    I mean, if Ted would ask me to do

KIRK MENARD                                                    July 22, 2019
MENARD vs TARGA RESOURCES LLC                                   253–256

Page 253

1  something illegal, I felt like I could tell him no.
2      Q.   I understand as it relates to something
3  illegal.  But in day-to-day operations, if Parry
4  came to you and said, you needed to do something,
5  did you feel like you could ignore what he was
6  asking you to do?
7      A.   Not exactly, no.  Unless it was something
8  illegal.  You know, if Perry called me and asked me
9  to go check the chlorine at the sewage, you know,
10  then I would do it.
11      Q.   We also discussed -- you discussed
12  earlier one of the allegations in the complaint is
13  that you believed that being asked to dilute water
14  samples was illegal?
15      A.   Yes, sir.
16      Q.   Do you know the exact statutory reference
17  for why that is illegal?
18      A.   No, sir.
19      Q.   But you still believe it's illegal?
20      A.   Yes, sir.
21      Q.   Even though you don't know the exact
22  statute that says it's illegal, you still have a
23  belief?
24      A.   Yes, sir.  I did make a call to DEQ.  I
25  didn't list the company name or my name.  I spoke to

Page 254

1  the regional director, asked her, and she said even
2  asking to do something like that is illegal.
3      MR. BERGERON:
4          That's all of the questions I have.
5      Thank you.
6          RE-EXAMINATION
7  BY MR. PATTON:
8      Q.   Mr. Menard, when you were discussing with
9  your attorney, you said that you knew the difference
10  between being under oath and not being under oath.
11  Do you remember that?
12      A.   Yes, sir.
13      Q.   Explain to the ladies and gentlemen of
14  the jury what the difference is?
15      A.   Being under oath is a sworn statement
16  that you agree to tell the truth as best to the
17  information and belief that you have and knowledge.
18  Not being under oath is a written document just
19  venting, ranting, what have you.  I mean, you're not
20  under oath.  You're not sworn to tell the truth.
21      Q.   Okay.  Would you agree with me that it's
22  your belief that if you're not under oath, you don't
23  have to tell the truth?
24      A.   It depends on the circumstances.
25      Q.   Okay.  But you would agree that there are

Page 255

1  circumstances that you believe if you're not under
2  oath, you're allowed to lie, correct?
3      A.   Depends on the circumstances again.
4      Q.   Well, you would agree that we've provided
5  several examples throughout this deposition and
6  documents where you weren't under oath and you did
7  lie, correct?
8      A.   Yes.
9      MR. PATTON:
10          I pass the witness.
11      THE VIDEOGRAPHER:
12          This concludes the videotaped
13      deposition of Kirk Menard.  Going off the
14      video record on July 22, 2019 at 3:54 p.m.
15      COURT REPORTER:
16          Did you want a copy?
17      MR. BERGERON:
18          Yes, please.
19      (Deposition concluded on/or about 3:54 p.m.)
20
21
22
23
24
25

Page 256

1          REPORTER'S PAGE
2
3      I, KRISTIE GARRISON, Certified Court
4  Reporter in and for the State of Louisiana, the
5  officer as defined in Rule 28 of the Federal Rules
6  of Civil Procedure and Article 1434(B) of the
7  Louisiana Code of Civil Procedure, before whom this
8  proceeding was taken, do hereby state on the Record:
9      That due to the interaction in the
10  spontaneous discourse of this proceeding, dashes
11  (--) have been used to indicate pauses, changes in
12  thought, and/or talkovers; that same is the proper
13  method for a Court Reporter's transcription of
14  proceeding, and that the dashes (--) do not indicate
15  that words or phrases have been left out of this
16  transcript;
17      That any words and/or names which could not
18  be verified through reference material have been
19  denoted with the phrase "(spelled phonetically)."
20
21
22
23
24
25

KIRK MENARD                                              July 22, 2019
MENARD vs TARGA RESOURCES LLC                                    257

Page 257

```
1          REPORTER'S CERTIFICATE
2      This certification is valid only for a
   transcript accompanied by my original seal on this
3  page.
4      I, KRISTIE GARRISON, Certified Court
   Reporter, in and for the State of Louisiana, as the
5  officer before whom this testimony was taken, do
   hereby certify that KIRK MENARD, to whom the oath
6  was administered, after having been duly sworn by me
   upon authority of R.S. 37:2554, did testify as
7  hereinbefore set forth in the foregoing 256 pages;
8      That this testimony was reported by me in
   the steno mask reporting method, was prepared and
9  transcribed by me or under my personal direction and
   supervision, and is a true and correct transcript to
10 the best of my ability and understanding;
11     That the transcript has been prepared in
   compliance with transcript format guidelines
12 required by statute or by rules of the board;
13       That I have acted in compliance with the
   prohibition on contractual relationships, as defined
14 by Louisiana Code of Civil Procedure Article 1434
   and in rules and advisory opinions of the board;
15
       That I am not related to counsel or the
16 parties herein, nor am I otherwise interested in the
   outcome of this matter.
17
       August 1, 2019, Baton Rouge, Louisiana.
18
19
20
21
22     _____
23     KRISTIE GARRISON, CCR
24     CERTIFIED COURT REPORTER
25
```