**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT COURT OF LOUISIANA**

KIRK MENARD                              CIVIL ACTION NO. 19-cv-00050

VERSUS                                   JUDGE BRIAN JACKSON

TARGA RESOURCES, LLC                     MAG. JUDGE SCOTT D. JOHNSON

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kirk Menard respectfully submits this memorandum in response to the Motion for

Summary Judgment filed by defendant Targa Resources, LLC ("Targa") (Doc. 55). For the reasons

set forth below, Targa's motion should be denied.

**I.      Introduction**

This case involves Menard's wrongful and retaliatory termination by Targa in violation of

the Louisiana Environmental Whistleblower Statute, La. R.S. 30:2027. In short, Menard, an

Environmental Safety & Health Specialist at Targa's Venice, Louisiana facility, was asked by

Perry Berthelot, a Targa District Manager, to illegally dilute water samples. Menard refused to do

so and subsequently notified his immediate supervisor, David Smith. Only six days later, Menard

was terminated.

Targa asks this Court to grant summary judgment and dismiss Menard's case in its entirety.

However, as set forth below, there are numerous discrepancies, inconsistencies, and conflicting

statements throughout the testimony and records in this case, including disagreements about the

facts among Targa's own witnesses. In light of these issues of material fact, summary judgment is

not appropriate. The Court should deny this motion and instead resolve those factual disputes, in

addition to determinations related to potential witness bias and credibility, at trial, where the Court

will have the benefit of live witness testimony.

## II.    Law Applicable on a Motion for Summary Judgment

This Court, Judge Jackson presiding, recently articulated the standard applicable to a

motion for summary judgment:

> Summary judgment is appropriate "if the movant shows that there is no genuine
> dispute as to any material fact and that the movant is entitled to a judgment as a
> matter of law." Fed. R. Civ. P. 56(a). "[W]hen a properly supported motion
> for summary judgment is made, the adverse party must set forth specific facts
> showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477
> U.S. 242, 250 (1986) (quotation marks and footnote omitted).
>
> In determining whether the movant is entitled to summary judgment, the Court
> "view[s] facts in the light most favorable to the non-movant and draw[s] all
> reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d
> 528, 533 (5th Cir. 1997) (citing *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th
> Cir. 1994)). **At this stage, the Court does not evaluate the credibility of
> witnesses, weigh the evidence, or resolve factual disputes.** *Int'l Shortstop, Inc. v.
> Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, if the evidence in the
> record is such that a reasonable jury, **drawing all inferences in favor of the non-
> moving party**, could arrive at a verdict in that party's favor, the motion
> for summary judgment must be denied. *Int'l Shortstop, Inc.*, 939 F.2d at 1263. On
> the other hand, the non-movant's burden is not satisfied merely upon a showing of
> "some metaphysical doubt as to the material facts, by conclusory allegations, by
> unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air
> Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

*Loupe v. O'Bannon*, 2018 WL 343850, at *3 (M.D. La. Jan. 8, 2018) (emphasis added).

Particularly important for Targa's motion, "[i]t is not the function of the trial judge, in

ruling on a motion for summary judgment, to . . . assess credibility . . . ." *Honore v. Douglas*, 833

F.2d 565, 567 (5th Cir. 1987). *See also id.* at 569 ("[S]ummary judgment is ill-suited for credibility

determinations. It is likewise an inadequate procedure for sorting out nebulous questions of

motivation.").[1] "The party opposing a motion for summary judgment, with evidence competent

under Rule 56, is to be believed; it is for the [fact finder] at trial, not for the judge on a pretrial

motion, to decide whose evidence is more credible." *Leonard v. Dixie Well Serv. & Supply, Inc.*,

---

[1] As this Court is aware, in a retaliatory discharge case, the heart of the case turns on the very question of motivation for the actions.

828 F.2d 291, 294 (5th Cir. 1987).

The rule against making credibility determinations at the summary judgment stage also applies even when the case will not be decided by a jury, as in this case. In ruling on a motion for summary judgment, the Court may draw inferences from the evidence but it still may not make credibility determinations. *Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir. 1991) (emphasis added) ("[I]t makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, **unless those inferences involve issues of witness credibility or disputed material facts**."). *See also Hunters Run Gun Club, LLC v. Baker*, 2019 WL 2996916, at *2 (M.D. La. July 9, 2019) (denying summary judgment when case was to proceed to bench trial where "there is stark disagreement between the Parties as to the facts of this case, and witness credibility is best be determined by the Court during live testimony at trial and after cross-examination."). Therefore, to the extent Targa seeks to make Menard's credibility an issue in this motion, or to the extent there are questions about the credibility of the witnesses, the Court cannot make such credibility determinations and should instead deny summary judgment to allow the witnesses to present their testimony at trial so that the Court can properly evaluate the credibility of each such witness at that time.

**III.    Targa's Motion for Summary Judgement Should be Denied**

    **A.    The LEWS Must Be Applied Broadly to Protect the Environment, and Menard's Refusal to Participate in Berthelot's Proposed Criminal Activity was Not Part of Menard's Job Duties**

As its first basis for summary judgment, Targa's recycles arguments that were already rejected by this Court in denying Targa's motion to dismiss. (Doc. 37.) Therefore, to the extent not stated herein, Menard adopts all of the same legal arguments previously asserted in his opposition to that motion to dismiss. (Doc. 20.) Essentially, Targa argues that because Menard's job duties required him to report environmental violations, Menard cannot establish a prima facie

case for retaliation under the LEWS.[2] First, there is nothing in the statutory language of the LEWS, La. R.S. 30:2027, to support such a limitation of the protections provided by that law. Nor has the Louisiana Supreme Court ever endorsed the limitation proposed by Targa. However, even if the Supreme Court were to adopt such a rule, based on its previous opinions, any such limitation would necessarily have to be interpreted and applied narrowly to advance the purpose of the LEWS. The LEWS must be given a "broad interpretation"[3] that "furthers the constitutional directive and statutory purpose of the [Louisiana Environmental Quality Act]."[4] "[T]he statute **should not be construed** to contravene its purpose or **to provide a disincentive for reporting violations**."[5] Targa's reading of the statute would be contrary to its purpose as it would disincentivize an entire class of employees from reporting violations, even in situations like Menard's where an employer directs an employee to do something illegal.

Targa's proposed interpretation is based on a handful of cases which are factually distinguishable and demonstrate how narrow and fact-specific any purported limitation of the statute must be in order to ensure that it still fulfills its purpose of protecting the environment.[6] In the more recent of the two state appellate court decisions cited by Targa, *Stone v. Entergy Servs., Inc.*,[7] the court, without citing any authority in support, ruled narrowly and based on a specific set of facts that the LEWS "does not afford protection to an employee who generates reports regarding environmental issues when reporting environmental issues, concerns, and potential violations is a part of one's normal job responsibilities, and part and parcel of what one is hired and/or required

---

[2] For reasons discussed below, the defendant's legal position is wrong. Even assuming, as defendant arguments, that a person would not have a claim under LEWS when retaliated against for reporting a violation he had a duty to report, the basis of the claims in this case are not that Menard was retaliated against for reporting the violations. Instead, the basis of his claim is that he was retaliated against for refusing to violate the law and dilute samples.

[3] *Borcik*, 222 So. 3d at 677

[4] *Id.* at 676.

[5] *Id.* at 679 (emphasis added).

[6] As this is a fact specific inquiry, it is not one appropriate for determination in a motion for summary judgment.

[7] 2008-0651 (La. App. 4 Cir. 2/4/09), 9 So. 3d 193, *writ denied*, 2009-0511 (La. 4/17/09), 6 So. 3d 797.

to do."[8] However, this statement was made after the court had already determined that the plaintiff's claims should be dismissed, and therefore that statement was dicta and not necessary to the court's ruling. In any event, that narrowly crafted "exception" to the LEWS would only apply in specific circumstances, like in *Stone*, where an employee who was required to prepare a report to his customers attempted to use that report as the basis for a protected activity, and did not report the alleged wrongful conduct to his supervisor until after he had already reported it to his customers. That case is factually distinguishable and does not govern here, where Menard testified that he immediately refused Berthelot's request for him to dilute water samples and then reported that same request to his direct supervisor. In fact, it was his reporting of the request to his direct supervisor that led to his termination. Similarly, in the other Louisiana state court case cited by Targa, *Matthews v. Military Dep't ex rel. State*,[9] the court's only statement regarding this issue was that the LEWS does not apply "insofar as the [plaintiff's] reports were required as part of his normal duties,"[10] but the court still concluded that the plaintiff could proceed with his other "whistleblower claims relative to the State's mishandling of hurricane funds,"[11] suggesting that even when there might be a narrow set of facts upon which the statute might not apply, that would not absolutely prohibit an employee from asserting the protections of the statute under all circumstances, particularly when the protected act involved refusing a manager's request to perform an illegal act, which is not part of Menard's job duties.

Targa also cites the unreported federal case of *English v. Wood Grp. PSN, Inc*,[12] in which the Eastern District of Louisiana correctly recognized that "the Louisiana Supreme Court has not

---

[8] *Id.* at 200.

[9] 2007-1337 (La. App. 1 Cir. 9/24/07), 970 So. 2d 1089, *writ denied sub nom. Matthews v. Military Dep't for State*, 2007-2316 (La. 2/15/08), 976 So. 2d 177.

[10] *Id.* at 1090.

[11] *Id.*

[12] 2015 WL 5061164 (E.D. La. Aug. 25, 2015).

ruled on this point," but nevertheless cited *Stone* (which in turn cites no authority for its position) in support of the dismissal of the plaintiff's LEWS claim.[13] However, in doing so, the court noted that the plaintiff had explicitly alleged that one of his "primary duties" was the inspection and reporting on issues that he alleged gave rise to his LEWS claim. Again, it was not one of Menard's "primary duties" to disclose and report fraudulent and unscrupulous conduct by Targa's management, such as a request by Berthelot to circumvent the law by diluting water samples.

The cases cited by Targa do not support summary judgment. Rather, these cases—which pursuant to Louisiana Supreme Court precedent must be interpreted narrowly to avoid limiting the scope of the LEWS and to ensure protection of the environment—simply suggest that an employee cannot allege that actions taken as part of his day-to-day job duties provide him with complete immunity from termination. There is no support for Targa's claim that the actions taken by Menard were simply part of his normal job duties. Just because Menard discussed with Smith, his supervisor, aspects of Targa's operations that posed environmental concerns as well as potential solutions to those concerns (such as his report regarding TSS exceedances and their discussions regarding solutions to that matter), that does not mean that every conversation Menard had with Smith was part of his normal job duties, and that therefore Menard could never obtain whistleblower protection under the LEWS if he disclosed an illegal act to Smith and Menard was retaliated against as a result of his refusal to engage in the illegal conduct.

Finally, even if the Court were to so strictly interpret the protection of the LEWS that Menard would not be protected for telling Smith about the illegal act he was asked to participate in, Menard would still be protected for his <u>refusal</u> to participate in that illegal act. Therefore, at the very least, even if Targa's proposed strict construction of the LEWS were valid, Menard would

---

[13] *Id.* at *13-14.

6

still be entitled to protection under the statute for his refusal to do an illegal act proposed by his employer. *See Cheramie v. J. Wayne Plaisance, Inc.*, 595 So. 2d 619, 624 (La. 1992) (refusal to participate in illegal act is protected under the LEWS); *Borcik v. Crosby Tugs, L.L.C.*, 2016-1372, p. 8 (La. 5/3/17), 222 So. 3d 672, 677 (reaffirming its ruling in *Cheramie*).

**B.    Temporal Proximity, Conflicting Testimony, and Lack of Documentation to Support Targa's Pretext for Termination Require Denial of Targa's Motion**

Targa next contends that Menard cannot establish a prima facie case under the LEWS because he cannot show that his termination was connected to the protected acts of refusing Berthelot's request to participate in illegal activity and reporting that request to Menard's supervisor. Despite Targa's argument to the contrary, the temporal proximity of Menard's termination a mere **six days** after he refused Berthelot's request is sufficient as a matter of law to satisfy his burden to establish a prima facie case. The Fifth Circuit has held that it is "not only binding circuit law, but it also makes good sense" that such temporal proximity satisfies a plaintiff's burden for a prima facie case of retaliation. *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019). Therefore, "[a]t the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Id.* at 243. Because the Fifth Circuit has held that a temporal proximity of anywhere from two to four months is close enough to support a prima facie case of retaliation, Menard's termination only six days after he refused Berthelot's advances to dilute water samples is certainly sufficient to establish a prima facie case for retaliation here. *Id.* at 243.

The cases cited by Targa for its argument that "temporal proximity" may not be sufficient are not directed toward the burden of establishing a prima facie case, but rather those cases address a plaintiff's later burden of showing that an employer's proposed reasons for termination are in fact pretext. *Id.* at 243-244. However, even at that later stage, "[t]he combination of suspicious

7

timing with other significant evidence of pretext can be sufficient to survive summary judgment."

*Id.* at 244 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)). As

demonstrated below, there are significant disputes of fact and contradictions in Targa's purported

reasons for terminating Menard that call into question its proposed justifications and make this

case wholly inappropriate for summary judgment.

      **C.**      **Targa's Proposed Reasons for Menard's Termination are Pretext**

Targa next argues that it is entitled to summary judgment because it had two purportedly

legitimate justifications for Menard's termination. However, conflicting testimony in the record

and admissions by Targa's own witnesses regarding the facts related to Menard's termination

create significant disputes of fact that make summary judgment inappropriate and which call into

question Targa's asserted reasons for termination. These contradictions, combined with the close

temporal proximity of Menard's termination to the protected act and the factual circumstances

surrounding Menard's termination, require that Targa's motion for summary judgment be denied.

      **1.**      **Targa Admits that Alleged "Performance Issues" Were Not the Reason for Menard's Termination**

Targa first claims that Menard was terminated for performance issues. However, Targa's

corporate representative admitted that those alleged "performance issues" were not alone sufficient

to justify Menard's termination.[14] Instead, Targa testified that "the reason for [Menard's]

termination was the inappropriate conduct"[15] (the allegations of which are discussed more fully in

the next section). Menard's direct supervisor, David Smith,[16] also had no issues with Menard's

performance.[17] In fact, Smith testified that he told Menard that it would take him a very long time,

---

[14] **Ex. B**, 132:22-25.
[15] **Ex. B**, 133:1-3.
[16] **Ex. D**, 6:11-14
[17] **Ex. D**, 22:9-23:4.

"six months to a year before you can completely wrap your arms around everything.[18] Until then, Smith "was going to continue to work with him" and "was going to be patient."[19] At the time of his termination, Menard had only been in his position at Targa for four months.

Targa's witnesses who were involved in Menard's hiring also testified that they "understood that [Menard] would need to learn some things on the environmental side" of Targa's business.[20] However, Targa recognized that Menard "had a strong safety background"[21] and thought that this "made up for . . . his lack of knowledge in environmental."[22] This lack of experience in environmental matters was apparently never an issue for Targa, because Menard's immediate predecessor, Brogan Smith did not have environmental or safety experience when he took the job.[23]

Targa's corporate representative further admitted that many of the alleged "performance issues" were never even discussed as part of Menard's termination decision and therefore could not be the basis for Menard's termination. For example, although Targa claims that Menard's involvement in Phillips 66's permit issues was a performance issue, David Smith did not agree,[24] and Ted Keller admits that this event was neither discussed with Human Resources nor was it a reason for Menard's termination.[25] In fact, Targa's Human Resources director, Trisha Dodson, only vaguely recalls a single issue related to Menard's work performance, which she understood to be that "he was to have tested a sample and I don't believe that that was done," but she was "not a hundred-percent sure exactly all the details."[26] Targa's corporate representative also admitted

---

[18] **Ex. D**, 16:12-17:16, 68:3-6.
[19] **Ex. D**, 25:13-26:4.
[20] **Ex. G**, 34:10-15
[21] **Ex. B**, 73:13-14
[22] **Ex. G**, 32:15-33:9
[23] **Ex. I**, 10:17-11.
[24] **Ex. D**, 32:22-34:8
[25] **Ex. F**, 107:12-108:3.
[26] **Ex. N**, 24:6-13, 25:12-16.

that during the telephone call with Targa's Human Resources regarding Menard's termination, Ted Keller did not go into any details regarding the alleged "performance issues" that are now alleged as the basis for Menard's termination.[27] Additionally, during her investigation of Menard's My Safe Workplace complaint regarding his wrongful termination, Elizabeth Hawkins "thought that HR had terminated him just for the inappropriate comments," which is Targa's other alleged basis for his termination, and not for work performance.[28]

Further, Targa claims that Menard's purported "trustworthiness" was a basis for his termination. However, Menard's direct supervisor David Smith admitted that he did not have any personal knowledge about Menard being untrustworthy.[29] Further, for many of the statements and events that Targa advances as evidence of Menard's purported untrustworthiness, Targa acknowledges that those could have been either inadvertent mistakes or misunderstandings by Menard related to his lack of experience in environmental matters (which Targa was well aware of and did not believe was an issue at the time he was hired).[30]

Additionally, the timing of some of the evidence introduced in support the Menard's alleged "performance issues" is suspect. Menard was terminated on October 11, 2018, and made his first attempt to submit a complaint to Targa regarding Berthelot's conduct the very next day, on October 12, 2018.[31] However, it was not until three days later, on October 15, 2018, that Keith Adams created a document that Targa now attempts to introduce as evidence of purported "performance issues" that Adams apparently knew about Menard.[32] Ted Keller acknowledges that

---

[27] **Ex. B**, 109:20-110:11, 113:7-11, 119:14-24, 124:13-20, 125:16-18
[28] **Ex. H**, 61:15-19.
[29] **Ex. D**, 27:9-15.
[30] **Ex. B**, 100:8-7 (regarding Menard's understanding from Brogan Smith on how to place the recirculation hose in one of the ponds); **Ex. B**, 103:23-104:4 (regarding Menard's mistaken belief that he understood two variables involved in the water injection ratio for the Venice facility's LM2500 turbine).
[31] **Ex. G**, 84:3-5; **Ex. H**, 55:2-16, 104:17-105:9.
[32] **Ex. E**, 57:17-24.

10

it was only after Menard was terminated that he told Keith Adams to create a document of purported issues related to Menard's work performance.[33] The timing of the creation of this document four days <u>after</u> Menard's termination calls into question the veracity of those allegations and at the very least creates an issue of fact as to whether Targa's asserted reasons for Menard's termination are pretext.

Targa also claims that Menard's lack of knowledge of the appropriate hold time for a sample to be retested is evidence of a "performance issue." However, as stated above, Targa knew when it hired Menard that he did not have as much knowledge of environmental matters and would need time to learn that part of the job. Targa cannot claim that it terminated Menard because he lacked environmental experience, when Targa was well aware of that fact at the time Menard was hired. More importantly, David Smith, Menard's supervisor, admitted that he does not know all of the sample hold times, and the ones that he does know, he learned through "years of experience."[34] Even Targa's ES&H Senior Director admitted that he does not know many sample hold times (for example, TSS, fecal coliform, TOC, or COD) off the top of his head, and he would instead have to either contact a laboratory for that information or do an internet search.[35] Certainly Targa cannot assert as a basis for Menard's termination his lack of knowledge on a matter that his own supervisor and even one of Targa's head environmental employees also admit they did not know.

### 2. Menard Denies Any Alleged Inappropriate Conduct, About Which There is Significant Conflicting Testimony

Targa's second asserted basis for Menard's termination are alleged inappropriate comments that Menard made regarding other employees' wives, as well as an allegation that Menard showed a co-worker a picture of his fiancée's, Brook Migues, hemorrhoids. Menard

---

[33] **Ex. F**, 12:6-12.
[34] **Ex. J,** 79:7-81:1.
[35] **Ex. R**, 32:18-33:13.

testified that no one ever told him that there were any issues with his conduct at the Targa Venice facility.[36] Neither Brogan Smith nor David Smith ever witnessed Menard making inappropriate comments to anyone.[37]

With regards to the alleged comments, Menard denies that he made any such "inappropriate comments," including comments about anyone's wives.[38] Menard testified that he did at some point make a joke to Jordie Ancalade regarding his wife, which was something along the lines of "What is she doing with someone like you."[39] Menard testified that this was a joke because he does even not know what Ancalade's wife looks like.[40] Further, Menard testified that other people were joking with Ancalade about that same thing, and that he had also heard David Duncan make similar comments.[41]

Besides the fact that Menard denies making the comments, which creates an issue of fact for summary judgment, the testimony provided by Targa's witnesses regarding the comments that Menard was alleged to have made is inconsistent and even without Menard's denial would create disputes of fact that preclude summary judgment. For example, David Duncan claims that Menard made comments about Jordie Ancalade's wife "five to ten times."[42] This directly contradicts the testimony of Jordie Ancalade, who said that Menard did not make any such comments in his presence, with the exception of a single instance referenced in Ancalade's testimony (which, as Menard testified, was a joke made in the context of many other people making the same type of joke).[43] Further calling into question the claim that these comments formed the basis for Menard's

---

[36] **Ex. A**, 190:6-8.
[37] **Ex. I**, 36:11-13; **Ex. D**, 40:1-5.
[38] **Ex. A**, 181:15-22.
[39] **Ex. A**, 184:8-24.
[40] **Ex. A**, 185:2-4.
[41] **Ex. A**, 184:25-185:14.
[42] **Ex. M**, 19:8-19.
[43] **Ex. L**, 34:2-7.

termination, Jordie Ancalade never reported to anyone that Menard had allegedly made comments about Ancalade's wife.[44] Nor did David Duncan believe that the alleged comments were serious or offensive such that they merited a report.[45]

Targa alleges another incident with another Targa employee, Nick Richard. Targa's corporate representative claimed that Menard said to Richard, "'When you going to hook me up with your wife,' or something to that effect."[46] This is in contrast to the much tamer allegation by Richard, who instead said only that Menard told him that his wife was "cute."[47] As stated above, Menard denies making any inappropriate comments to or about anyone's wife. However, besides the contradictions between Targa's testimony and Richard's testimony regarding what was said, Nick Richard does not even recall the context in which Menard allegedly made this comment.[48] Further, Richard did not tell anyone about Menard's alleged comment,[49] and in fact testified that "it did not bother me at all."[50]

Further discrepancies regarding this alleged incident are found in the testimony of other purported witnesses. Jordie Ancalade claimed that he was present when Menard allegedly made the comment about Richard's wife being "cute."[51] Jasper Harvey also claimed that he was in the control room when Menard allegedly made a comment about Richard's wife.[52] However, contradicting their testimony, Richard, the person to whom the comment was made and who would be presumed to have the best knowledge of the events, said that **nobody else was present** when

---

[44] **Ex. L**, 32:9-11, 47:18-20.
[45] **Ex. M**, 20:18-20.
[46] **Ex. B**, 87:19-88:2.
[47] **Ex. K**, 41:2-6.
[48] **Ex. K**, 41:2-6.
[49] **Ex. K**, 43:23-24.
[50] **Ex. K**, 43:8-16.
[51] **Ex. L**, 24:2-18.
[52] **Ex. C**, 34:2-17.

Menard allegedly told Richard that his wife was "cute."[53] Further complicating Targa's story, Jordie Ancalade claimed that David Duncan was present at the time Menard allegedly made the comment to Richard.[54] However, Duncan said that other than the comment Menard allegedly made to Ancalade (which, again, Menard testified was a joke made in the context of others who were similarly joking around), Duncan did not hear Menard make inappropriate comments to anyone else.[55] At the very least, this contradictory testimony regarding who said what, when it was said, and who was even a witness to those events, creates a dispute of fact that would best be left for resolution after the presentation of live testimony and credibility determinations at trial.

Finally, Jasper Harvey, who claims to have been present for various incidents (even though no one else places him there), never talked to Menard about the comments he allegedly made about others' wives.[56] He also was never asked about nor did he talk to anyone else about the comments that Menard allegedly made, despite his claims that he was a witness to these alleged events.[57] Again, his suspect and contradictory testimony at least create a dispute of fact that should be deferred to trial, and cannot be decided on summary judgment.

Targa also claims that it terminated Menard because he intentionally showed a picture of his fiancée's hemorrhoids to one or more employees. Menard denies doing so.[58] Menard does admit that he received a picture of Ms. Migues' hemorrhoids, which were a medical condition related to her pregnancy at the time, and that upon receiving the picture, he expressed surprise, made a comment to Nick Richard about it, and said that he needed to do something and call a

---

[53] **Ex. K**, 44:6-18.
[54] **Ex. L**, 24:10-18.
[55] **Ex. M**, 20:3-17.
[56] **Ex. C**, 37:24-38:7.
[57] **Ex. C**, 45:4-10.
[58] **Ex. A**, 179:7-14.

doctor.[59] Richard claims that Menard showed him the picture.[60] Because there is a direct contradiction and dispute of fact over what happened between the only two people who could possibly have knowledge of the events that transpired, this is an issue that cannot be decided on summary judgment.

It is undisputed that no one else has testified that they saw the picture of Ms. Migues' hemorrhoids, either at the time of the alleged incident or since. Richard, the only person to claim to have seen the picture, testified that he along with Jordie Ancalade and David Duncan were "the only two people in the control room."[61] However, just as he did with regards to the alleged inappropriate comments, Jasper Harvey finds a way to place himself into the center of these events as well, even though no one else testified that he was there.[62]

Other factual inconstancies and discrepancies prevent summary judgment. First, none of the people who claim to have been present (Richard, Ancalade, Duncan, and even Harvey) ever reported this issue to anyone at Targa.[63] Richard even said he did not talk to anyone about the picture until he was asked about it in passing by Keller.[64] Surprisingly, Richard never talked about the picture to Ted Keller until "a couple of weeks" after Menard was terminated.[65] This directly contradicts the testimony of Targa's corporate representative, who testified that Keller spoke with Richard about the picture before making the decision to terminate Menard.[66] Somehow, despite Richard never talking to anyone about this alleged incident, Targa's corporate representative testified that Richard told Keith Adams and/or Tony Williams about the picture, one of whom in

---

[59] **Ex. A**, 183:17-184:3.
[60] **Ex. K**, depo 18:7-13.
[61] **Ex. K**, 17:14-18:3.
[62] **Ex. C**, 31:18-32:18.
[63] **Ex. L**, 40:21-41:12; **Ex. M**, 27:6-21; **Ex. C**, 45:4-10.
[64] **Ex. K**, 35:10-36:3.
[65] **Ex. K**, 35:20-36:3.
[66] **Ex. B**, 86:25-87:6, 95:8-13.

15

turn told Keller.[67] These stories are all inconsistent and call into question Targa's asserted rationales for Menard's termination. Because of these disputes of fact, Targa should not be granted summary judgment.

### 3.    Targa's Inconsistent Treatment of Employee Misconduct

Targa's termination of Menard for his alleged "inappropriate behavior" is inconsistent with Targa's treatment of other employee misconduct. For example, Brogan Smith testified that he would occasionally hear people telling dirty jokes at Targa.[68] He even admitted to making what might be considered inappropriate race-related jokes with David Duncan, who is African American.[69] He had even shown a video with what he called "foul language" in it at work.[70] After the offended employees complained about it (which none of the purported witnesses to Menard's alleged "inappropriate conduct" ever complained), it was communicated to Brogan Smith, he apologized, and nothing else came of it.[71] (Of course, Menard was never told why he was being terminated, nor if he had done anything wrong was he given the opportunity to apologize, give his side of the story, or even discuss the allegations against him with Human Resources or anyone else.) Despite the conduct that Smith admits to having engaged in, he is still employed by Targa.

Matthew Fitzgerald also testified that in workplaces in the oil and gas industry like Targa, it is common for employees to joke around with one another and for those jokes to be "off-color."[72] Fitzgerald has never reported anyone for making an off-color a joke,[73] nor has he heard of someone being terminated for making such a joke.[74] In fact, Fitzgerald is only aware of one person other

---

[67] **Ex. B**, 86:25-87:6, 95:8-13.
[68] **Ex. I**, 30:3-31:3.
[69] **Ex. I**, 33:24-18.
[70] **Ex. I**, 33:2-10.
[71] **Ex. I**, 33:11-18.
[72] **Ex. S**, 35:9-4.
[73] **Ex. S**, 36:5-7
[74] **Ex. S**, 36:8-17.

than Menard who was terminated from Targa without warning, and Fitzgerald testified that it is possible that that person may have actually quit instead of being fired, but he cannot be sure.[75]

David Duncan testified that he has heard other Targa employees making comments like "Your wife look nice," which is similar to the comments that Menard is alleged to have made.[76] Despite that, Duncan is not aware of anyone during his 35 years at Targa being terminated for making inappropriate comments or showing inappropriate pictures.[77]

Finally, Dawn Strickland testified that over the course of her entire career in human resources, she had received reports about employees making comments of a sexual nature, but she could not recall any instances of any employees being terminated for making sexual comments.[78]

Based on the above, Menard's sudden termination for what it later alleged to be "inappropriate conduct," without warning and without even being told why he was being terminated, is suspicious based on its inconsistency with Targa's practices in other cases in which employees engage in what would be considered "inappropriate conduct."

### 4. Menard's Personnel Files Contradict Targa's Claims

Further calling into question Targa's story are Menard's personnel files. Menard's entire personnel file, consisting of 51 pages in total, was produced by Targa.[79] Targa testified that an employee's personnel file would contain notes of any written discipline regarding that employee.[80] However, it is undisputed that Menard's personnel file contains not a single notation, document, or reference to alleged "inappropriate comments," alleged comments about anyone's wife or girlfriend, showing pictures to employees, or any alleged inappropriate behavior at all.[81] To the

---

[75] **Ex. S**, 44:19-48:7.
[76] **Ex. M**, 26:18-19.
[77] **Ex. M**, 28:22-29:4.
[78] **Ex. P**, 26:4-11, 27:11-15.
[79] **Ex. N**, 37:19-39:6; **Ex. T**.
[80] **Ex. B**, 54:23-25.
[81] **Ex. T**.

contrary, Menard's personnel file states simply that he was terminated for "performance."[82] (Again, as Targa testified, the asserted "performance issues" would not have alone served as a basis for Menard's termination.) There is not a single document or notation in Menard's personnel file or otherwise in Targa's possession that supports Targa's claims that Menard was terminated for inappropriate comments or for showing an inappropriate picture to another employee.[83] This lack of documentation in Menard's personnel file, which according to Targa should contain all records regarding an employee's discipline, supports Menard's claim that the alleged "inappropriate conduct" is a pretext for retaliatory termination.

### 5. Targa's Failure to Investigate the Allegations Against Menard Before Terminating Him is Suspect and Further Establishes that Targa's Reasons for Termination Were Pretext

Targa's failure to investigate the allegations against Menard are also suspicious and support Menard's position that those allegations are a pretext for retaliation. It is undisputed that none of the people who made the decision to terminate Menard had personal knowledge of the allegations related to his "inappropriate behavior."[84] The only person who claims to have spoken with any of the employees about those matters was Ted Keller,[85] and his testimony is called into question by the inherent contradiction between his claim that he spoke to Richard before Menard's termination, versus Richard's claim that he only spoke to Keller a couple of weeks after Menard's termination. None of the other people involved in the termination decision spoke with any of the employees to whom inappropriate comments were allegedly made or to whom an inappropriate picture was allegedly shown.[86] They all relied upon Ted Keller, whose testimony is called into question by the

---

[82] **Ex. B**, 59:17-61:9, 64:2-65:5.
[83] **Ex. P**, 21:6-22:2.
[84] *See, e.g.*, **Ex. D**, 41:6-18, 66:6-14; **Ex. H**, 17:13-39:7, 52:1-22; **Ex. G**, 69:19-21.
[85] **Ex. G**, 79:19-22.
[86] *See, e.g.*, **Ex. G**, 75:1-10; **Ex. H**, 50:18-51:21; **Ex. P**, 9:1-3.

above contradiction. Nor did anyone even speak to Menard to get his side of the story.[87] The "investigation" conducted by Targa is suspect and calls into question their purported reasons for termination.

**6.    All of the "Witnesses" Are Biased and Have a Motive to Deny Menard's Allegations, as They Report to Perry Berthelot and Are Within His Chain of Command**

The testimony of Keller, who initiated Menard's termination by going to Human Resources even though no one had complained about alleged inappropriate comments or the showing of a picture, is called into question by his close connection to Berthelot. Keller reports directly to Berthelot, who is the center of Menard's allegations.[88] Not only that, but every single "witness" to alleged inappropriate conduct and/or alleged performance issues is in Berthelot's chain of command—including Keith Adams,[89] Jasper Harvey,[90] Nick Richard,[91] Jordie Ancalade,[92] David Duncan,[93] and even Tony Williams,[94] who is an independent contractor but who answers to Keith Adams and Jasper Harvey. Ancalade even acknowledged that Berthelot may be involved in the decision to promote Ancalade once he has enough experience.[95] Therefore, every single person who claims to have information regarding Menard—none of whom were independently contacted for verification before Menard's termination—had a motive not to defy Berthelot's efforts to terminate Menard. Such motivation cannot be evaluated on summary judgment, and the Court should deny summary judgment so that it can make those findings and credibility determinations with regards to those witnesses at trial.

---

[87] *See, e.g.*, **Ex. P**, 5:3-7, **Ex. G**, 69:20-21, 71:11-17.
[88] **Ex. B**, 131:7-13; **Ex. K**, 10:20-21.
[89] **Ex. K**, 10:16-19; **Ex. E**, 9:22-23; **Ex. B**, 139:3-7.
[90] **Ex. C**, 12:12-15; **Ex. B**, 141:10-13.
[91] **Ex. K**, 10:14-15; **Ex. B**, 138:24-7.
[92] **Ex. L**, 47:21-48:2; **Ex. B**, 139:8-12.
[93] **Ex. M**, 11:10-12.
[94] **Ex. O**, 12:5-13:3.
[95] **Ex. L**, 12:17-14:12.

### 7.    Menard's Post-Termination Conduct Supports His Allegations

Menard's post-termination actions also support his claim that Berthelot asked him to dilute water samples and that Targa's other purported reasons for termination are pretext. First, on October 11, 2018, the day that Menard was terminated, he sent a text message to Keller indicating that he did not understand the reason for his termination, but that he "[k]new I shouldn't have spoke to Perry that day."[96] This statement made in the immediate aftermath of Menard's termination supports his claim that his termination was related to Berthelot's conversation and request to illegally dilute water samples. Additionally, the very next day after Menard's termination, he attempted to submit a claim to Targa's My Safe Workplace hotline indicating that he was wrongfully terminated for refusing to do something illegal.[97] This also supports Menard's claim that Targa's later revealed reasons for his termination are pretext, and that there is at least a dispute of fact that should preclude summary judgment.

### 8.    Menard's Claim that Berthelot is Responsible for His Termination is Supported by Evidence Regarding Berthelot's Reputation

Finally, Menard's belief that Berthelot was behind his termination is supported by testimony regarding Berthelot's reputation. For example, it is undisputed that Keller, who reports directly to Berthelot, told Menard that "if you make Perry look bad, he'll throw you under the bus."[98] Brogan Smith had also told Menard to be careful around Berthelot, which is something that Smith said "everyone" in Venice had warned him about.[99] Menard also testified that Brogan Smith had told him that Berthelot "taught him how to stab someone in the back and not give it a second thought."[100] In fact, Matthew Fitzgerald testified that Menard had told him that Brogan Smith

---

[96] **Ex. A**, 241:19-24.
[97] **Ex. G**, 84:3-5; **Ex. H**, 55:2-16, 104:17-105:9.
[98] **Ex. F**, 24:9-11.
[99] **Ex. I**, 40:5-22.
[100] **Ex. A**, 121:23-122:2.

wanted to leave Venice because he did not want to deal with Perry Berthelot anymore.[101] Fitzgerald also had nothing good to say about Berthelot, referring to him as a "son of a b---h," someone who was "looking out for his own a--," a "vindictive a-- wipe," and also referring to another individual pejoratively as "a Perry Jr." and "a Perry want to be."[102]

Combined with the fact that every single person who claims to have witnessed some alleged bad action by Menard falls under Perry Berthelot's chain of comment, this evidence regarding Berthelot's reputation supports Menard's claim that Berthelot was responsible for his termination, and at the very least creates an issue of fact that must be decided at trial after presentation of live witness testimony and an evaluation of witness credibility by the Court.

## IV. The Court Should Disregard Targa's Efforts to Improperly Introduce Issues of Credibility into Its Motion for Summary Judgment

Finally, Targa attempts to introduce into its motion for summary judgment allegations regarding Menard's credibility. This is clearly an issue that is not appropriate for summary judgment. For this reason, Menard has filed a separate motion to strike all such arguments. Without restating that motion in full here, Menard simply notes that the Court, whether the case will proceed to trial by jury or a bench trial, cannot make credibility determinations on summary judgment. *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). *See also id.* at 569 ("[S]ummary judgment is ill-suited for credibility determinations. It is likewise an inadequate procedure for sorting out nebulous questions of motivation."); *Hunters Run Gun Club, LLC v. Baker*, 2019 WL 2996916, at *2 (M.D. La. July 9, 2019) (denying summary judgment when case was to proceed to bench trial where "there is stark disagreement between the Parties as to the facts of this case, and witness credibility is best be determined by the Court during live testimony at trial and after cross-

---

[101] **Ex. S**, 53:12-15.
[102] **Ex. S**,55:24-25, 56:13-18, 57:10-17, 57:19-58:3, 59:22-60:14.

21

examination."). Where, as in this case, there are significant disputes of fact and issues of witness credibility and motive, the Court should deny summary judgment and instead allow the matter to proceed to trial, where the Court can then evaluate live witness testimony and properly make those credibility determinations.

With regards to the specific factual allegations that Targa contends should weigh against Menard's credibility, Menard disputes each and every one of those allegations, and provides a response to them in the accompanying response to Targa's statements of fact, in accordance with the Local Rules.

**VII.    Conclusion**

For the reasons set forth above, and based on the contradictory allegations and disputes of fact set forth in Menard's accompanying statements of fact, Menard respectfully requests that the Court deny Targa's Motion for Summary Judgment (Doc. 55), and allow this case involving significant factual disputes, contradictions, and issues of credibility to proceed to trial.

Respectfully submitted:

Simien & Simien, L.L.C.
Attorneys and Counselors At Law
7908 Wrenwood Boulevard
Baton Rouge, Louisiana 70809
(225) 932-9221; (225) 932-9286 (fax)

_____*s/Roy Bergeron, Jr.*_____
By:    Eulis Simien, Jr., Bar # 12077
       Jimmy Simien, Bar # 1598
       Mark W. Simien, Bar # 23303
       Roy L. Bergeron, Jr., Bar # 33726

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2020, a copy of this pleading has been served on all known counsel of record via the Court's CM/ECF filing system and/or via email.

_____*s/Roy Bergeron, Jr.*_____
Roy Bergeron, Jr.