UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KIRK MENARD | * | CIVIL ACTION NO. 19-cv-00050 |
| | * | |
| Plaintiff, | * | |
| | * | |
| VERSUS | * | JUDGE BRIAN JACKSON |
| | * | |
| TARGA RESOURCES LLC | * | |
| | * | |
| Defendant. | * | |
| ********************************************* | * | |

### DEFENDANT'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

Defendant Targa Resources LLC ("Targa") respectfully submits the following findings of fact and conclusions of law subject to its Motion for Judgment on Partial Findings.

This case was called to trial on Tuesday, April 27, 2021.[1]

On Wednesday, April 28, 2021, Plaintiff concluded his case.[2]

Targa filed its Motion for Judgment on Partial Findings immediately after the conclusion of Plaintiff's case.[3] The Court stated it was taking Targa's Motion for Judgment on Partial Findings under advisement.[4]

Targa concluded its case on Wednesday, April 28, 2021.[5]

---

[1] Court Record (hereinafter referred to as "C.R.") Vol 1 at Pg. 6, Lines 15-17.

[2] C.R. Vol 2 at Pg. 253, Lines 3-6.

[3] C.R. Vol 2 at Pg. 253, Lines 9-13; *see also* Document No. 118.

[4] C.R. Vol 2 at Pg. 254, Lines 10-16.

[5] C.R. Vol 2 at Pg. 283, Lines 8-10.

To date, the Court has not made a ruling on Targa's Motion for Judgment on Partial Findings.

## I. FINDINGS OF FACT

1.  Plaintiff was an at-will employee of Targa.[6]

2.  Plaintiff began working as an Environmental, Safety and Health ("ES&H") Specialist at Targa on June 11, 2018.[7]

3.  Plaintiff reported to the ES&H Department at Targa.[8]

4.  Plaintiff did not report to Targa's Operations Department, Ted Keller, or Perry Berthelot.[9]

5.  On October 9, 2018, a Targa employee reported to Mr. Keller that Plaintiff showed a picture of his wife's hemorrhoids to a Targa employee.[10]

6.  An independent contractor for Targa reported to Mr. Keller that Plaintiff made a comment about hooking up with his wife.[11]

7.  Mr. Keller had a reasonable, good faith belief in the employee and independent contractor's report about Plaintiff showing a picture of his wife's hemorrhoids to a Targa employee and Plaintiff making a comment about hooking up with one of Targa's independent contractor's wife.[12]

8.  After learning about this information, Mr. Keller made a report to David Smith, Plaintiff's Supervisor, and then to Mr. Smith's Supervisor, Jarrod Gregg.[13]

---

[6] Joint Exhibit No. 2.

[7] C.R. Vol 1 at Pg. 261, Lines 6-16.

[8] C.R. Vol 1 at Pg. 98, Lines 13-22; and Joint Exhibit 21.

[9] C.R. Vol 1 at Pg. 99, Line 25 to Pg. 100, Line 6; C.R. Vol 2 at Pg. 163, at Lines 8-12; and Joint Exhibit 21.

[10] C.R. Vol 1 at Pg. 58, Lines 13-17; C.R. Vol 1 at Pg. 127, Line 23 to Pg. 129, Line 13; and C.R. Vol 2 at Pg. 193, Lines 12-16.

[11] C.R. Vol 1 at Pg. 58, Lines 13-17; and C.R. Vol 1 at Pg. 144, Lines 17-21.

[12] C.R. Vol 1 at Pg. 129, Lines 14-21.

[13] C.R. Vol 1 at Pg. 58, Lines 4-9; C.R. Vol 1 at Pg. 127, Line 23 to Pg. 129, Line 13; and Jarrod Gregg Deposition at Pg. 68, Line 11 to Pg. 69, Line 11.

9.   Mr. Smith had a good faith belief in the report that was provided by Mr. Keller regarding Plaintiff showing a picture of his wife's hemorrhoids to a Targa employee and Plaintiff making comments about other employees' wives.[14]

10.  Mr. Gregg had a good faith belief in the report that was provided by Mr. Keller regarding Plaintiff showing a picture of his wife's hemorrhoids to a Targa employee and Plaintiff making comments about other employees' wives.[15]

11.  On the following day, October 10, 2018, Mr. Keller went to Nick Richard to confirm Plaintiff showed Mr. Richard a picture of his wife's hemorrhoids.[16]

12.  Mr. Richard confirmed Plaintiff showed him a picture of Plaintiff's wife's hemorrhoids.[17]

13.  Mr. Richard thought it was inappropriate for Plaintiff to show him a picture of his wife's hemorrhoids at work.[18]

14.  Plaintiff made a comment about Mr. Richard's wife that Mr. Richard thought was inappropriate.[19]

15.  On that same day, October 10, 2018, Mr. Keller learned that Plaintiff made a comment about Jordie Ancalade's (a Targa employee) wife.[20]

16.  Plaintiff admitted that he made a comment about Mr. Ancalade's wife in the Targa control room during business hours.[21]

---

[14]  C.R. Vol 1 at Pg. 208, Lines 14-18; C.R. Vol 1 at Pg. 209, Lines 1-15; and C.R. Vol 1 at Pg. 240, Lines 8-10.

[15]  Jarrod Gregg Deposition at Pg. 69, Lines 12-19; Jarrod Gregg Deposition at Pg. 74, Lines 1-19; and Jarrod Gregg Deposition at Pg. 75, Lines 1-10.

[16]  C.R. Vol 1 at Pg. 62, Lines 16-18; C.R. Vol 1 at Pg. 65, Lines 7-16; and C.R. Vol 1 at Pg. 130, Line 19 to Pg. 131, Line 8.

[17]  C.R. Vol 1 at Pg. 62, Lines 16-18; C.R. Vol 1 at Pg. 65, Lines 7-16; C.R. Vol 1 at Pg. 130, Line 19 to Pg. 131, Line 8; and C.R. Vol 1 at Pg. 178, Lines 7-10.

[18]  C.R. Vol 1 at Pg. 184, Line 25 to Pg. 185, Line 2.

[19]  C.R. Vol 1 at Pg. 185, Lines 14-17.

[20]  C.R. Vol 1 at Pg. 157, Lines 2-11; C.R. Vol 1 at Pg. 157, Line 22 to Pg. 158, Line 5; and Jordie Ancalade Deposition at Pg. 32, Line 9 to Pg. 33, Line 13.

[21]  C.R. Vol 2 at Pg. 88, Lines 16-18; and C.R. Vol 2 at Pg. 88, Line 25 to Pg. 89, Line 4.

17.    Plaintiff admitted that he said the following about Mr. Ancalade's wife: "What is she doing with someone like you?"[22]

18.    Later that evening, Mr. Keller reported to Targa's Human Resources Department about Plaintiff showing a picture of his wife's hemorrhoids to a Targa employee and the inappropriate wife comments.[23]

19.    Mr. Keller also reported he was having issues with Plaintiff's work performance.[24]

20.    Mr. Keller reported that he was having trustworthiness issues with Plaintiff.[25]

21.    Tricia Dodson had a good faith belief regarding the report made by Mr. Keller to Targa's Human Resources.[26]

22.    David Duncan, who is a Control Board Operator at Targa, heard Plaintiff say things that were inappropriate.[27]

23.    Mr. Duncan heard Plaintiff make inappropriate comments about Mr. Ancalade's wife.[28]

24.    Mr. Richard told Mr. Duncan and Mr. Ancalade that Plaintiff showed him a picture of Plaintiff's wife's hemorrhoids in the control room.[29]

25.    Mr. Ancalade, Operations Technician 1 at Targa, heard Plaintiff make a comment about Mr. Richard's wife ("I heard you got a cute wife") and his wife ("You see that waitress over there at Changes, the waitress at the restaurant over there? That I better not mess up or he's going to get her).[30]

26.    Mr. Ancalade did not think Plaintiff was joking and took it personally.[31]

---

[22]  C.R. Vol 2 at Pg. 88, Lines 19-21.

[23]  C.R. Vol 1 at Pg. 131, Line 20 to Pg. 132, Line 8.

[24]  C.R. Vol 1 at Pg. 67, Lines 13-18; and Pg. 135, Lines 10-14.

[25]  C.R. Vol 1 at Pg. 135, Lines 10-14.

[26]  C.R. Vol 2 at Pg. 224, Lines 12-19.

[27]  David Duncan Deposition at Pg. 8, Lines 13-15 and Pg. 18, Lines 8-10.

[28]  David Duncan Deposition at Pg. 18, Line 11-16 and Pg. 20, Line 3-17.

[29]  David Duncan Deposition at Pg. 22, Lines 5-25; and Jordie Ancalade Deposition at Pg. 39, Lines 17-23.

[30]  Jordie Ancalade Deposition at Pg. 23, Line 16 to Pg. 24, Line 23.

[31]  Jordie Ancalade Deposition at Pg. 31, Lines 15-20.

27.    Mr. Keller subsequently asked Mr. Ancalade about the comments and Mr. Ancalade told Mr. Keller what Plaintiff said about his wife.[32]

28.    Jasper Harvey, Maintenance Supervisor at Targa, on one occasion saw Plaintiff giving another employee a massage at a safety meeting and he told Plaintiff he should not be doing that.[33]

29.    Some Targa employees in the control room told Mr. Harvey that Plaintiff showed a picture of his Plaintiff's hemorrhoids to Mr. Richard.[34]

30.    Mr. Harvey heard Plaintiff make comments about other employees' wives.[35]

31.    Keith Adams, Operations Supervisor at Targa, had issues with Plaintiff's performance and trustworthiness.[36]

32.    Mr. Adams learned that Plaintiff made comments about Mr. Ancalade's wife and showed a picture of Plaintiff's wife's hemorrhoids to Mr. Richard.[37]

33.    Mr. Adams spoke to Mr. Keller about the inappropriate comments and picture.[38]

34.    Tony Williams, Independent Contractor for Targa, indicated that Plaintiff asked him "Why don't you hook me up with her?" when Mr. Williams showed a picture of his wife to Plaintiff.[39]

35.    Mr. Williams did not think Plaintiff was joking when he made the comment about Mr. Williams's wife.[40]

36.    Mr. Williams told Mr. Adams and Mr. Keller about Plaintiff's comment.[41]

---

[32] Jordie Ancalade Deposition at Pg. 32, Line 9 to Pg. 33, Line 13.

[33] Jasper Harvey Deposition at Pg. 9, Lines 6-8; and Pg. 25, Line 13 to Pg. 26, Line 5.

[34] Jasper Harvey Deposition at Pg. 30, Line 5 to Pg. 31, Line 13.

[35] Jasper Harvey Deposition at Pg. 30, Line 5 to Pg. 31, Line 13 and Pg. 33, Line 25 to Pg. 34, Line 19.

[36] Keith Adams Deposition at Pg. 8, Line 22-23; Pg. 36, Line 9 to Pg. 37, Line 6; and Pg. 37, Line 23 to Pg. 38, Line 18.

[37] Keith Adams Deposition at Pg. 41, Lines 10-19.

[38] Keith Adams Deposition at Pg. 52, Lines 3-15.

[39] Tony Williams Deposition at Pg. 15, Line 21 to Pg. 16, Line 16.

[40] Tony Williams Deposition at Pg. 18, Lines 2-5.

[41] Tony Williams Deposition at Pg. 20, Lines 7-13 and Pg. 21, Line 19 to Pg. 22, Line 10.

37. Plaintiff knew as an employee of Targa that he was required to follow Targa's Anti-Harassment Policy.[42]

38. Plaintiff understood that if he did not follow Targa's Anti-Harassment Policy he could be subject to disciplinary action, up to and including termination.[43]

39. Plaintiff was aware that he could be terminated for a single offense of Targa's Anti-Harassment Policy.[44]

40. Plaintiff agrees that if he were to show a picture of his wife's hemorrhoids to another employee, that would be a violation of Targa's Anti-Harassment Policy and he could be terminated.[45]

41. Plaintiff received a picture of Brooke Migues's hemorrhoids in September 2018 at 9:27 a.m. (work hours) while he was working at Targa.[46]

42. Plaintiff discussed the picture of Ms. Migues's hemorrhoids with Mr. Richard in the control room at Targa.[47]

43. Plaintiff showed the picture of Ms. Migues's hemorrhoids to Mr. Richard in the control room at Targa.[48]

44. Plaintiff's showing the photograph of his wife's hemorrhoids was enough to move forward with termination.[49]

45. Matthew Fitzgerald is an Operator at Targa's Lowry Plant.[50]

---

[42] C.R. Vol 2 at Pg. 80, Lines 21-24.

[43] C.R. Vol 2 at Pg. 80, Line 25 to Pg. 81, Line 5.

[44] C.R. Vol 2 at Pg. 81, Lines 6-9; and C.R. Vol 2 at Pg. 214, Lines 8-10.

[45] C.R. Vol 2 at Pg. 87, Line 25 to Pg. 88, Line 5; and C.R. Vol 1 at Pg. 88, Lines 10-12.

[46] C.R. Vol 2 at Pg. 86, Lines 1-17.

[47] C.R. Vol 2 at Pg. 86, Line 22 to Pg. 87, Line 2.

[48] C.R. Vol 1 at Pg. 173, Line 19 to Pg. 174, Line 4; and C.R. Vol 1 at Pg. 183, Lines 21-24.

[49] C.R. Vol 2 at Pg. 87, Line 25 to Pg. 88, Line 5; and C.R. Vol 1 at Pg. 88, Lines 10-12; and Pg. 193, Lines 2-8.

[50] Matthew Fitzgerald Deposition at Pg. 8, Lines 5-7 and Pg. 8, Lines 11-13.

46.    Mr. Fitzgerald's opinion of Plaintiff is that he does not think much of him, believes
       Plaintiff is trying to misrepresent conversations they had, and did not appreciate being
       recorded to give false impressions of his opinions or knowledge.[51]

47.    Mr. Fitzgerald never worked with Plaintiff while Plaintiff was at Targa.[52]

48.    Mr. Fitzgerald has no first-hand knowledge of Plaintiff's termination from Targa.[53]

49.    Mr. Fitzgerald never spoke to Mr. Berthelot, Mr. Keller, or Mr. Smith about Plaintiff.[54]

*Findings Regarding Plaintiff's Termination*

50.    Mr. Keller, made a recommendation to terminate Plaintiff's employment at Targa based
       on Plaintiff's inappropriate conduct and performance.[55]

51.    Mr. Berthelot did not influence, coerce, persuade, or pressure Mr. Keller into making
       a recommendation to terminate Plaintiff's employment at Targa.[56]

52.    Mr. Smith did not influence, coerce, persuade, or pressure Mr. Keller into making a
       recommendation to terminate Plaintiff's employment at Targa.[57]

53.    Mr. Smith made his own recommendation to terminate Plaintiff's employment at Targa
       based on Plaintiff's inappropriate conduct.[58]

54.    Mr. Smith was not aware that Plaintiff was alleging that Mr. Berthelot asked him to
       commit a crime before his recommendation to terminate Plaintiff's employment was
       made.[59]

55.    Mr. Smith never spoke to Mr. Berthelot about terminating Plaintiff.[60]

---

[51]  Matthew Fitzgerald Deposition at Pg. 15, Lines 6-13.

[52]  Matthew Fitzgerald Deposition at Pg. 23, Line 25 to Pg. 24, Line 2.

[53]  Matthew Fitzgerald Deposition at Pg. 68, Lines 12-20.

[54]  Matthew Fitzgerald Deposition at Pg. 68, Line 21 to Pg. 69, Line 7.

[55]  C.R. Vol 1 at Pg. 132, Lines 4-10.

[56]  C.R. Vol 1 at Pg. 135, Lines 15-19.

[57]  C.R. Vol 1 at Pg. 135, Lines 20-23.

[58]  C.R. Vol 1 at Pg. 242, Lines 1-3.

[59]  C.R. Vol 1 at Pg. 242, Lines 17-21.

[60]  C.R. Vol 1 at Pg. 241, Lines 5-11.

56.    Mr. Smith was not influenced, coerced, persuaded, or pressured into making a recommendation to terminate Plaintiff's employment at Targa.[61]

57.    Mr. Gregg, ES&H Manager at Targa, made a recommendation to terminate Plaintiff's employment at Targa based on Plaintiff's inappropriate conduct and performance.[62]

58.    Tricia Dodson, Human Resources Representative at Targa, supported the recommendation of termination.[63]

59.    Ms. Dodson never spoke to Mr. Berthelot about terminating Plaintiff.[64]

60.    Ms. Dodson was not influenced, coerced, persuaded, or pressured into making a recommendation to terminate Plaintiff's employment at Targa.[65]

61.    Dawn Strickland, Human Resources Director at Targa, supported the recommendation of termination.[66]

62.    Elizabeth Hawkins, In-House Legal Counsel at Targa, supported the recommendation of termination.[67]

63.    Karla Roberts-Miller, Vice President of Human Resources at Targa, supported the recommendation of termination.[68]

64.    Jessica Keiser, Senior Vice President of the ES&H Group, made the final decision to terminate because she was the ultimate decisionmaker with regards to Plaintiff's termination.[69]

---

[61]  C.R. Vol 1 at Pg. 242, Line 22 to Pg. 243, Line 2.

[62]  C.R. Vol 1 at Pg. 132, Lines 4-15; Jarrod Gregg Deposition at Pg. 15, Lines 23-25; Jarrod Gregg Deposition at Pg. 67, Lines 1-7; and Jarrod Gregg Deposition at Pg. 73, Lines 20-22.

[63]  C.R. Vol. 2 at Pg. 181, Lines 20-21; C.R. Vol 2 at Pg. 204, Line 25 to Pg. 205, Line 6; and C.R. Vol. 2 at Pg. 227, Lines 22-24.

[64]  C.R. Vol 2 at Pg. 228, Lines 18-20; C.R. Vol 2 at Pg. 262, Lines 15-23; and C.R. Vol. 2 at Pg. 263, Lines 4-13.

[65]  C.R. Vol 2 at Pg. 228, Line 21 to Pg. 229, Line 1.

[66]  Dawn Strickland Deposition (Corporate Rep.) at Pg. 16, Lines 6-7; Dawn Strickland Deposition (Individually) at Pg. 13, Line 20 to Pg. 14, Line 9; and C.R. Vol. 2 at Pg. 227, Lines 22-24.

[67]  Elizabeth Hawkins Deposition at Pg. 37, Lines 16-21 and Pg. 41, Lines 10-13; Dawn Strickland Deposition (Individually) at Pg. 13, Line 20 to Pg. 14, Line 9; and C.R. Vol. 2 at Pg. 227, Lines 22-24.

[68]  Dawn Strickland Deposition (Individually)at Pg. 13, Line 20 to Pg. 14, Line 9; and C.R. Vol. 2 at Pg. 227, Lines 22-24.

[69]  C.R. Vol 1 at Pg. 135, Line 24 to Pg. 136, Line 5; Pg. 240, Lines 1-4; C.R. Vol. 2 at Pg. 226, Line 19 to Pg. 227, Line 2; C.R. Vol. 2 at Pg. 257, Lines 21-23; and C.R. Vol. 2 at Pg. 260, Lines 10-14.

65.   Ms. Keiser had a reasonable, good faith belief in Targa's Human Resources Department's report of Plaintiff's inappropriate conduct.[70]

66.   Ms. Keiser independently considered the information that was presented to her by Targa's Human Resources Department before making the decision to terminate Plaintiff.[71]

67.   Ms. Keiser did not treat Plaintiff's termination as a rubber stamp situation.[72]

68.   Ms. Keiser did not speak to Mr. Gregg, Ms. Hawkins, Ms. Roberts-Miller, Matthew Fitzgerald, Mr. Smith, Mr. Keller, or Mr. Berthelot about terminating Plaintiff's employment.[73]

69.   At the time Ms. Keiser made the decision to terminate Plaintiff she was not aware that Plaintiff was claiming that Mr. Berthelot asked him to dilute water or sewage samples.[74]

70.   Ms. Keiser was not influenced, coerced, persuaded, or pressured into making a recommendation to terminate Plaintiff's employment at Targa.[75]

71.   Plaintiff admits he was terminated from Targa on October 11, 2018, for two reasons: (1) inappropriate conduct, and (2) performance.[76]

72.   During his termination meeting, Plaintiff never mentioned he felt he was being retaliated against, that Mr. Berthelot told him to commit a crime, or even brought up the name "Perry Berthelot."[77]

*Findings On Plaintiff's Alleged Retaliation*

73.   Plaintiff originally testified that Mr. Berthelot specifically told Plaintiff to call him on October 5, 2018.[78]

---

[70] C.R. Vol 2 at Pg. 260, Lines 15-22; and C.R. Vol. 2 at Pg. 261, Lines 10-18.

[71] C.R. Vol 2 at Pg. 261, Line 19 to Pg. 262, Line 3.

[72] C.R. Vol 2 at Pg. 262, Lines 2-3.

[73] C.R. Vol 1 at Pg. 240, Lines 5-7; C.R. Vol 2 at Pg. 262, Lines 15-21; and C.R. Vol. 2 at Pg. 271, Lines 17-25.

[74] C.R. Vol 2 at Pg. 263, Lines 18-22.

[75] C.R. Vol 2 at Pg. 263, Line 23 to Pg. 264, Line 2.

[76] C.R. Vol 1 at Pg. 47, Lines 10-12; C.R. Vol. 2 at Pg. 113, Lines 1-6; and C.R. Vol. 2 at Pg. 216, Line 23 to Pg. 217, Line 5; *see also* Defendant's Exhibit No. 45.

[77] C.R. Vol 2 at Pg. 113, Lines 7-16.

[78] C.R. Vol 2 at Pg. 63, Lines 19-22.

74.    During Plaintiff's recorded conversation with Ms. Hawkins on October 31, 2018, Plaintiff told Ms. Hawkins the following:

- Mr. Berthelot told me: "If you want to call me after the conference call, you know, call me";

- Mr. Berthelot told me: "If you want to call me, I can tell you what we've done in the past to correct the issue"; and

- Mr. Berthelot told me: "hey, if you want to call me, I will tell you what we did in the past to correct the problem."[79]

75.    Plaintiff admitted that Mr. Berthelot did not specifically tell him to call him on October 5, 2018.[80]

76.    Plaintiff never told Mr. Keller that Mr. Berthelot asked him to dilute the water or sewage samples or that he refused to dilute the water or sewage samples.[81]

77.    Mr. Keller was not aware that Plaintiff allegedly refused to dilute the water or sewage samples before Mr. Keller gave a recommendation to terminate Plaintiff's employment at Targa.[82]

78.    Plaintiff never told Mr. Smith that he refused to dilute the water or sewage samples.[83]

79.    Mr. Smith denied Plaintiff telling him that Mr. Berthelot asked him to dilute water samples.[84]

80.    Mr. Berthelot  did not tell Plaintiff to dilute the water or sewage samples.[85]

---

[79] C.R. Vol 2 at Pg. 65, Line 16 to Pg. 68, Line 10; *see also* Defendant's Exhibit No. 4 at Pg. 23, Lines 18-22; Pg. 24, Lines 2-6; and Pg. 24, Lines 16-19.

[80] C.R. Vol 2 at Pg. 68, Lines 11-17.

[81] C.R. Vol 1 at Pg. 139, Lines 18-21; Pg. 139, Line 25 to Pg. 140, Line 2; C.R. Vol 1 at Pg. 291, Lines 12-21; and C.R. Vol. 2 at Pg. 144, Lines 9-15.

[82] C.R. Vol 1 at Pg. 140, Lines 8-12.

[83] C.R. Vol 1 at Pg. 290, Line 2 to Pg. 291, Line 11; and C.R. Vol 2 at Pg. 107, Line 11 to Pg. 108, Line 3.

[84] C.R. Vol 1 at Pg. 206, Lines 12-25.

[85] C.R. Vol 2 at Pg. 152, Lines 14-17.

81. As an ES&H Specialist, Plaintiff was responsible for identifying violations of environmental and safety standards under state and federal law, which would include reporting someone who asked Plaintiff to commit a crime.[86]

82. Plaintiff stated that if he discovered a violation of law, he would report it to Mr. Smith and Mr. Keller.[87]

83. Plaintiff never told Mr. Keller that Mr. Berthelot allegedly asked Plaintiff to commit a violation of a state environmental law.[88]

84. Plaintiff believes that Mr. Keller is a honest person.[89]

85. Plaintiff believes that Mr. Smith is an honest person.[90]

86. Plaintiff does not believe that Mr. Keller retaliated against him or acted with ill will regarding his termination.[91]

87. Plaintiff does not believe that Mr. Smith retaliated against him or acted with ill will regarding his termination.[92]

88. Plaintiff does not believe that Ms. Keiser retaliated against him or acted with ill will regarding his termination.[93]

89. Plaintiff believes that Mr. Berthelot is the only person at Targa who retaliated against him and the person who acted with ill will regarding his termination.[94]

90. Plaintiff admitted that he does not have any direct evidence that Mr. Berthelot retaliated against him.[95]

---

[86] C.R. Vol 2 at Pg. 105, Lines 2-9.

[87] C.R. Vol 2 at Pg. 105, Line 10 to Pg. 106, Line 6.

[88] C.R. Vol 2 at Pg. 106, Line 25 to Pg. 107, Line 3.

[89] C.R. Vol 2 at Pg. 83, Lines 2-4.

[90] C.R. Vol 2 at Pg. 83, Lines 5-7.

[91] C.R. Vol 2 at Pg. 114, Lines 17-19; and C.R. Vol. 2 at Pg. 115, Lines 12-15.

[92] C.R. Vol 2 at Pg. 114, Lines 20-22; and C.R. Vol. 2 at Pg. 115, Lines 5-11.

[93] C.R. Vol 2 at Pg. 114, Lines 23-25; and C.R. Vol. 2 at Pg. 115, Lines 16-20.

[94] C.R. Vol 2 at Pg. 114, Lines 11-13; and C.R. Vol. 2 at Pg. 115, Lines 1-4.

[95] C.R. Vol 2 at Pg. 116, Lines 11-13.

91.    Plaintiff admitted that everything he is saying with regard to Mr. Berthelot involving his termination is based on pure speculation.[96]

92.    Plaintiff has no evidence that Mr. Berthelot was involved in the decision to terminate him or that Mr. Berthelot even had anything to do with his termination.[97]

93.    The only reason Plaintiff believes that Mr. Berthelot terminated him is the timing of the alleged request to commit the illegal act and the timing of his termination (i.e., temporal proximity).[98]

94.    Mr. Berthelot had no involvement in Plaintiff's termination from Targa.[99]

95.    Mr. Berthelot did not ask anyone at Targa to terminate Plaintiff.[100]

96.    Mr. Berthelot did not influence, coerce, persuade, or pressure anyone at Targa to terminate Plaintiff's employment.[101]

97.    Plaintiff agrees that if there were several people involved in the decision to terminate, Mr. Berthelot would have to convince all those people to terminate him.[102]

98.    Plaintiff admitted he has no evidence that Mr. Berthelot was even involved in the decision to terminate him.[103]

99.    Plaintiff admitted he has no evidence that Mr. Berthelot spoke to Ms. Keiser about having Plaintiff terminated.[104]

100.    Plaintiff admitted he has no evidence that Mr. Berthelot spoke to Mr. Smith about having him terminated.[105]

---

[96] C.R. Vol 2 at Pg. 116, Lines 7-10.

[97] C.R. Vol 2 at Pg. 116, Lines 14-19.

[98] C.R. Vol 2 at Pg. 116, Lines 20-24.

[99] C.R. Vol 2 at Pg. 164, Line 21 to Pg. 165, Line 5.

[100] C.R. Vol 2 at Pg. 165, Lines 3-5.

[101] C.R. Vol 2 at Pg. 166, Lines 8-11.

[102] C.R. Vol 2 at Pg. 116, Line 25 to Pg. 117, Line 4.

[103] C.R. Vol 2 at Pg. 116, Lines 14-16.

[104] C.R. Vol 2 at Pg. 117, Lines 15-17.

[105] C.R. Vol 2 at Pg. 117, Lines 9-14.

101. Plaintiff admitted he has no evidence that Mr. Keller spoke to Ms. Keiser about having Plaintiff terminated.[106]

102. Plaintiff admitted he has no evidence that Mr. Smith spoke to Ms. Keiser about having Plaintiff terminated.[107]

103. Plaintiff admitted he has no evidence that Mr. Fitzgerald spoke to Ms. Keiser about having Plaintiff terminated.[108]

104. Mr. Berthelot never worked with Plaintiff when he visited Targa's Venice, Louisiana facility.[109]

105. At the time of Plaintiff's termination, Mr. Keller, Mr. Smith, Mr. Gregg, Ms. Dodson, Ms. Strickland, Ms. Hawkins, Ms. Roberts-Miller, and Ms. Keiser were not aware that Plaintiff allegedly refused to dilute the water or sewage samples.

106. There was no evidence Mr. Berthelot influenced the decision to terminate Plaintiff's employment.

107. There was no evidence Ms. Keiser was unduly influenced by anyone with respect to the termination.

108. There was no evidence Plaintiff was retaliated against for allegedly refusing to dilute the sewage or water samples.

109. There is no evidence that Mr. Berthelot discussed Plaintiff's alleged refusal to dilute the water samples with anyone at Targa.

110. There is no evidence that Mr. Keller, Mr. Smith, Mr. Gregg, Ms. Dodson, Ms. Strickland, Ms. Hawkins, Ms. Roberts-Miller, and Ms. Keiser had any retaliatory animus towards Plaintiff.

111. There is no evidence that anyone influenced, coerced, persuaded, or pressured Keiser's final decision to terminate Plaintiff.

---

[106] C.R. Vol 2 at Pg. 118, Lines 1-3.

[107] C.R. Vol 2 at Pg. 118, Lines 4-7.

[108] C.R. Vol 2 at Pg. 117, Lines 18-20.

[109] C.R. Vol 2 at Pg. 161, Lines 11-15.

*Findings On Plaintiff's Credibility*

112.    Plaintiff agrees that it is his word versus Mr. Berthelot's word on what happened during the phone call on October 5, 2018.[110]

113.    Plaintiff agrees that he is not always honest.[111]

114.    In his October 23, 2018 letter, Plaintiff stated he considers himself to be an honest person, however, he admits he lied about a couple of things in the letter.[112]

115.    Plaintiff was impeached nineteen (19) times at trial.[113]

116.    Plaintiff intentionally lied to Ms. Hawkins, In-House Counsel for Targa, in an email dated October 17, 2018.[114]

117.    Plaintiff represented to Ms. Hawkins in an email dated October 17, 2018, he had a recording of "other issues around the Venice Gas Plant;" but, he did not have the recording.[115]

118.    Plaintiff represented to Ms. Hawkins in an email dated October 17, 2018, he had a recording "that would substantiate his credibility;" but, he did not have the recording.[116]

119.    Plaintiff intentionally lied to Targa's Chief Executive Officer, Joe Bob Perkins, and Ms. Hawkins in a letter dated October 23, 2018.[117]

---

[110]  C.R. Vol 2 at Pg. 7, Lines 2-4.

[111]  C.R. Vol 2 at Pg. 8, Lines 10-13.

[112]  C.R. Vol 2 at Pg. 23, Line 23 to 24, Line 24; *see also* Defendant's Exhibit No. 45.

[113]  C.R. Vol 2 at Pg. 7, Lines 8 to Pg. 8, Line 13; C.R. Vol. 2 at Pg. 11, Lines 4-21; C.R Vol 2 at Pg. 16, Line 9 to Pg. 18, Line 20; C.R. Vol 2 at Pg. 23, Line 23 to Pg. 24, Line 24; C.R. Vol. 2 at Pg. 26, Lines 2-21; C.R. Vol. 2 at Pg. 26, Line 22 to Pg. 27, Line 9; C.R. Vol. 2 at Pg. 27, Lines 10-24; C.R. Vol. 2 at Pg. 28, Line 13 to Pg. 29, Line 12; C.R. Vol. 2 at Pg. 29, Line 17 to Pg. 30, Line 8; C.R. Vol. 2 at Pg. 31, Line 15 to Pg. 32, Line 3; C.R. Vol 2 at Pg. 33, Line 21 to Pg. 34, Line 20; C.R. Vol. 2 at Pg. 41, Line 23 to Pg. 42, Line 14; C.R. Vol. 2 at Pg. 69, Lines 1-17; C.R. Vol. 2 at Pg. 72, Line 21 to Pg. 73, Line 21; C.R. Vol. 2 at Pg. 85, Lines 1-25; Pg. 87, Line 11 to Pg. 88, Line 5; C.R. Vol. 2 at Pg. 103, Line 15 to Pg. 104, Line 4; C.R. Vol. 2 at Pg. 105, Line 10 to Pg. 106, Line 6; and C.R. Vol. 2 at Pg. 106, Line 7 to Pg. 107, Line 24.

[114]  C.R. Vol 2 at Pg. 8, Line 23 to Pg. 9, Line 6; and C.R. Vol. 2 at Pg. 10, Line 10 to Pg. 11, Line 21.

[115]  C.R. Vol 2 at Pg. 11, Line 22 to Pg. 12, Line 5.

[116]  C.R. Vol 2 at Pg. 12, Line 17 to Pg. 13, Line 3.

[117]  C.R. Vol 2 at Pg. 14, Line 4 to Pg. 15, Line 6; C.R. Vol 2 at Pg. 16, Line 9 to Pg. 18, Line 20; and C.R. Vol. 2 at Pg. 23, Line 23 to Pg. 24, Line 24.

120. Plaintiff lied to Mr. Perkins and Ms. Hawkins when he said in the October 23, 2018 letter he had a recording of a phone call between himself, Mr. Gregg, and Mr. Smith where Mr. Gregg informed Plaintiff that a complaint had been made against Plaintiff for making inappropriate comments.[118]

121. Plaintiff lied to Mr. Perkins and Ms. Hawkins when he said in the October 23, 2018 letter he had a recording of Brogan Smith saying that the person in question taught him to stab someone in the back and not give it a second thought.[119]

122. Plaintiff represented to Mr. Perkins and Ms. Hawkins in the October 23, 2018 letter he had a recording of Mr. Keller telling Plaintiff he is doing a great job and his safety meetings were the best he has ever attended but he did not have the recording.[120]

123. Plaintiff represented to Mr. Perkins and Ms. Hawkins in the October 23, 2018 letter he had a recording of Mr. Keller telling Plaintiff he should stay away from the person who advised him to commit the illegal act because he will throw Plaintiff under the bus but he did not have the recording.[121]

124. Plaintiff represented to Mr. Perkins and Ms. Hawkins in the October 23, 2018 letter he had a recording of employees making inappropriate comments by employees but he did not have the recording.[122]

125. Plaintiff represented to Mr. Perkins and Ms. Hawkins in the October 23, 2018 letter he had a recording of an employee speaking about chemicals being able to enter the body anally but he did not have the recording.[123]

126. Plaintiff lied to Targa about having a recording of the following:

- The telephone call between himself and Mr. Berthelot where Mr. Berthelot asked him to commit a crime (i.e., dilute the water or sewage samples);[124]

---

[118] C.R. Vol 2 at Pg. 14, Line 4 to Pg. 15, Line 6.

[119] C.R. Vol 2 at Pg. 16, Line 9 to Pg. 18, Line 20.

[120] C.R. Vol 2 at Pg. 15, Lines 7-17.

[121] C.R. Vol 2 at Pg. 15, Lines 18-25.

[122] C.R. Vol 2 at Pg. 16, Lines 1-8.

[123] C.R. Vol 2 at Pg. 18, Line 24 to Pg. 19, Line 19.

[124] C.R. Vol 2 at Pg. 10, Line 10 to Pg. 11, Line 21.

- The telephone call between Plaintiff and Mr. Smith immediately after the alleged telephone call with Mr. Berthelot;[125]

- The telephone call between Plaintiff, Mr. Smith, and Mr. Gregg on October 10, 2019;[126]

- Comments made by Brogan Smith about Mr. Berthelot;[127] and

- About the very thing Plaintiff is suing about in this lawsuit.[128]

127. Plaintiff had a telephone call with Ms. Hawkins on October 31, 2018.[129]

128. Plaintiff recorded the October 31, 2018 telephone call with Ms. Hawkins for his attorneys.[130]

129. During the October 31, 2018 telephone call with Ms. Hawkins, Plaintiff lied to Ms. Hawkins that he had a recording of Mr. Berthelot asking him to commit a crime.[131]

130. During the October 31, 2018 telephone call with Ms. Hawkins, Plaintiff intentionally lied to Ms. Hawkins when he said he was not recording the conversation.[132]

131. On December 10, 2018, Plaintiff filed a Voluntary Petition for Individuals Filing for Bankruptcy in the United States Bankruptcy Court for the Western District of Louisiana.[133]

132. In his Bankruptcy Petition, Plaintiff represented under oath that he was not receiving any unemployment when he had already received his October and November 2018 payments.[134]

---

[125] C.R. Vol 2 at Pg. 14, Line 4 to Pg. 15, Line 6.

[126] C.R. Vol 2 at Pg. 14, Line 4 to Pg. 15, Line 6.

[127] C.R. Vol 2 at Pg. 24, Line 25 to Pg. 26, Line 1; and Pg. 26, Lines 14-21.

[128] C.R. Vol 2 at Pg. 10, Line 10 to Pg. 11, Line 21.

[129] C.R. Vol 2 at Pg. 29, Line 17 to Pg. 30, Line 8.

[130] C.R. Vol 2 at Pg. 31, Lines 15 to Pg. 32, Line 3.

[131] C.R. Vol 2 at Pg. 32, Lines 4-12; and C.R. Vol. 2 at Pg. 33, Line 21 to Pg. 34, Line 20.

[132] C.R. Vol 2 at Pg. 34, Line 21 to Pg. 35, Line 7.

[133] C.R. Vol 2 at Pg. 36, Lines 10-14.

[134] C.R. Vol 2 at Pg. 39 Lines 11-20.

133.   In his Bankruptcy Petition, Plaintiff represented under oath that he was not receiving any family support when he had been receiving $500 a month from his wife's sisters.[135]

134.   In his Bankruptcy Petition, Plaintiff represented under oath that he was not receiving any rental income when he had been receiving $977 a month total from three individuals living at his residence.[136]

135.   In his Bankruptcy Petition, Plaintiff represented under oath that he was not renting his residence when he had been receiving $977 a month total from three individuals living at his house.[137]

136.   In a Court ordered letter from Plaintiff's company, Advance Investigative Technologies, it states that Plaintiff has not received any distributions, dividends, or income from October 2018 to April 9, 2019.[138]

137.   As a part of his bankruptcy, Plaintiff filed a Form 1061 on February 14, 2019, whereby Plaintiff represented that he was receiving $5,600 a month from his company, Advance Investigative Technologies.[139]

138.   Plaintiff claims that he did not work between October 2018 to April 9, 2019.[140]

139.   As a part of his bankruptcy, Plaintiff filed a Form 1061 on December 10, 2018, whereby Plaintiff represented that he was employed by Safety Management Systems receiving $5,600 a month.[141]

140.   Plaintiff testified that Mr. Berthelot allegedly asked him to only dilute the sewage samples at the Delta Gathering Station, but in the October 23, 2018 letter to Targa, Plaintiff alleged that Mr. Berthelot asked him to dilute both water and sewage samples.[142]

---

[135] C.R. Vol 2 at Pg. 41, Lines 5-22; and C.R. Vol. 2 at Pg. 43, Lines 4-7.

[136] C.R. Vol 2 at Pg. 41, Line 23 to Pg. 42, Line 14; and C.R. Vol. 2 at Pg. 43, Lines 8-10.

[137] C.R. Vol 2 at Pg. 41, Line 23 to Pg. 42, Line 14; and C.R. Vol. 2 at Pg. 43, Lines 11-14.

[138] C.R. Vol 2 at Pg. 44, Line 23 to Pg. 45, Line 19.

[139] C.R. Vol 2 at Pg. 45, Line 20 to Pg. 48, Line 8; *see also* Defendant's Exhibit 38 at Pg. 1.

[140] C.R. Vol 2 at Pg. 48, Lines 20-22.

[141] C.R. Vol 2 at Pg. 48, Line 1 to Pg. 50, Line 3; *see also* Defendant's Exhibit 37 at Pg. 46.

[142] C.R. Vol 2 at Pg. 20, Line 9 to Pg. 22, Line 5; and C.R. Vol. 2 at Pg. 22, Line 20 to Pg. 23, Line 5.

*Findings On Targa Total Suspended Solids Exceedances At Its Venice Plant*

141.  Plaintiff testified that Mr. Berthelot allegedly asked him to dilute the sewage samples at the Delta Gathering Station because Targa was having issues with exceedances in the past.[143]

142.  Plaintiff stated that during his telephone call with Mr. Berthelot, Mr. Berthelot talked about all the problems Targa was having with the sewage at the Delta Gathering Station.[144]

143.  Plaintiff testified that he reviewed Targa's records dating back to 2016 and the Delta Gathering Station had several failed total suspended solids sewage samples.[145]

144.  Targa's Delta Gathering Station had only one (1) total suspended solids sewage failure between January 2016 to January 2019.[146]

145.  According to Plaintiff, twenty-four (24) total suspended solids pond exceedances in one (1) year would be considered high, and six (6) to eight (8) total suspended solids pond exceedances in one (1) year would be considered low.[147]

146.  In a three (3) year period, Targa only had six (6) total suspended solids pond exceedances.[148]

147.  Plaintiff has no direct evidence of anyone at Targa ever diluting water samples.[149]

148.  Mr. Keller, Mr. Smith, and Brogan Smith never asked Plaintiff to dilute any samples.[150]

149.  During his time at Targa, no one ever asked Plaintiff not to report a total suspended solids exceedance.[151]

---

[143] C.R. Vol 2 at Pg. 52, Line 22 to Pg. 53, Line 1.

[144] C.R. Vol 2 at Pg. 56, Lines 5-8.

[145] C.R. Vol 2 at Pg. 53, Line 6 to Pg. 54, Line 16; and C.R. Vol. 2 at Pg. 55, Lines 14-23.

[146] C.R. Vol 2 at Pg. 56, Line 16 to Pg. 57, Line 15; *see also* Defendant's Exhibit No. 1 at Targa 0609.

[147] C.R. Vol 2 at Pg. 90, Line 19 to Pg. 91, Line 15.

[148] C.R. Vol 2 at Pg. 91, Lines 16-19.

[149] C.R. Vol 2 at Pg. 93, Lines 5-8.

[150] C.R. Vol 2 at Pg. 93, Lines 9-17.

[151] C.R. Vol 2 at Pg. 93, Lines 18-20.

150. According to Plaintiff, the only way you can have a very high exceedance to a very low exceedance in the next sample is through water dilution.[152]

151. On June 13, 2018, Plaintiff took a sample that had a total suspended solids of 66 milligrams per liter, which is 21 milligrams per liter over the permit limit.[153]

152. On the very next recording, Plaintiff's sample recorded a total suspended solids of 28 milligrams per liter, which is well below the permit limit.[154]

153. Plaintiff states he did not dilute the water samples between these two (2) samples.[155]

*Findings On Perry Berthelot*

154. Brogan Smith enjoyed working with Mr. Berthelot, thought he was good, and had no problems with Mr. Berthelot while working at Targa.[156]

155. During Brogan Smith's interactions with Mr. Berthelot while he was the ES&H Specialist, Mr. Berthelot never made him feel uncomfortable or asked him to do anything he should not do.[157]

156. Mr. Duncan's opinion of Mr. Berthelot is that he is a good guy who is determined to do the right thing about everything that needs to go on with the job.[158]

157. Mr. Harvey's dealings with Mr. Berthelot have always been good.[159]

158. Mr. Ancalade has never heard any negative things about Mr. Berthelot, nobody has ever warned him about Mr. Berthelot, and nobody has ever warned him to be careful around Mr. Berthelot.[160]

---

[152] C.R. Vol 2 at Pg. 96, Lines 21-25.

[153] C.R. Vol 2 at Pg. 95, Line 13 to Pg. 96, Line 8; *see also* Joint Exhibit No. 6.

[154] C.R. Vol 2 at Pg. 96, Lines 9-20; *see also* Joint Exhibit No. 6.

[155] C.R. Vol 2 at Pg. 97, Lines 3-6.

[156] Brogan Smith Deposition at Pg. 40, Lines 1-4 and Pg. 42, Lines 6-7.

[157] Brogan Smith Deposition at Pg. 41, Line 24 to Pg. 42, Line 7.

[158] David Duncan Deposition at Pg. 33, Lines 9-19.

[159] Jasper Harvey Deposition at Pg. 47, Lines 14-17.

[160] Jordie Ancalade Deposition at Pg. 48, Lines 3-17.

*Findings On Plaintiff's MySafeWorkplace Complaint*

159.   Plaintiff made a MySafeWorkplace complaint to Targa alleging that he was terminated for failing to follow the instructions of a supervisor in performing an improper water test.[161]

160.   Plaintiff did not make a MySafeWorkplace complaint until after he was terminated.[162]

161.   Ms. Hawkins conducted an investigation into Plaintiff's MySafeWorkplace complaint on behalf of Targa.[163]

162.   As a part of her investigation, Ms. Hawkins and Plaintiff exchanged multiple emails.[164]

163.   As a part of her investigation, Ms. Hawkins interviewed Plaintiff, Plaintiff's prior attorney, David McQuade, Mr. Keller, Mr. Smith, and Mr. Berthelot.[165]

164.   During her interview with Mr. Berthelot, Mr. Berthelot denied having asked Plaintiff to dilute the water samples.[166]

165.   During her interviews with Mr. Keller and Mr. Smith, both of them denied that Plaintiff told them about Mr. Berthelot asking Plaintiff to dilute the water samples.[167]

166.   At the end of Ms. Hawkins's investigation, her investigation revealed no facts to support Plaintiff's allegations.[168]

---

[161]   C.R. Vol 1 at Pg. 138, Lines 3-13; and C.R. Vol. 2 at Pg. 111, Lines 22-24.

[162]   C.R. Vol 2 at Pg. 111, Lines 16-24.

[163]   C.R. Vol 2 at Pg. 34, Lines 13-20; and Elizabeth Hawkins Deposition at Pg. 52, Line 23 to Pg. 53, Line 1.

[164]   Elizabeth Hawkins Deposition at Pg. 58, Line 6 to Pg. 60, Line 10.

[165]   Elizabeth Hawkins Deposition at Pg. 54, Lines 5-7; Pg. 60, Line 11 to Pg. 61, Line 2; Pg. 66, Line 25 to Pg. 67, Line 15; Pg. 68, Lines 6-25; Pg. 79, Lines 10-17; Pg. 83, Lines 15-23; Pg. 84, Lines 14 to Pg. 86, Line 22; Pg. 87, Line 11 to Pg. 88, Line 5; Pg. 88, Lines 10 to Pg. 89, Line 6; Pg. 90, Lines 13-23; Pg. 93, Line 22 to Pg. 94, Line 13; Pg. 95, Lines 5-12; Pg. 97, Line 4 to Pg. 98, Line 3; Pg. 98, Line 4 to Pg. 100, Line 9; and Pg. 100, Line 10 to Pg. 102, Line 19.

[166]   Elizabeth Hawkins Deposition at Pg. 101, Line 15 to Pg. 102, Line 6.

[167]   Elizabeth Hawkins Deposition at Pg. 110, Lines 20-25.

[168]   C.R. Vol 1 at Pg. 138, Lines 3-13; and Elizabeth Hawkins Deposition at Pg. 110, Lines 9-14.

*Findings On Plaintiff's Complaint To The Louisiana Department of Environmental and Quality*

167. Plaintiff did not make a complaint to the Louisiana Department of Environmental and Quality until December 20, 2018, two (2) months after he was terminated from Targa.[169]

168. Plaintiff's attorneys drafted the complaint to the Louisiana Department of Environmental and Quality.[170]

*Findings On Plaintiff's Alleged Damages*

169. Plaintiff found another job on April 9, 2019, and is not seeking any lost wages after that date.[171]

170. Plaintiff received $3,888.00 in unemployment compensation between October 21, 2018 to April 8, 2019.[172]

171. Plaintiff is unable to tell with absolute certainty how much he allegedly lost in future interest and investment opportunity with his 401(k) and any number provided would be based on speculation.[173]

172. Plaintiff is not sure how much in bonuses he would have received at Targa or if he would have even received a bonus had he stayed on at Targa.[174]

173. Plaintiff has no proof that Targa has given him a bad reputation.[175]

174. Plaintiff has suffered from panic attacks since he was fifteen (15) years old.[176]

175. Plaintiff was on anti-anxiety medication before he started at Targa.[177]

---

[169] C.R. Vol 2 at Pg. 111, Line 25 to Pg. 112, Line 12.

[170] C.R. Vol 2 at Pg. 112, Lines 16-21.

[171] C.R. Vol 1 at Pg. 307, Line 25 to Pg. 308, Line 2; and C.R. Vol 1 at Pg. 330, Lines 2-5.

[172] C.R. Vol 2 at Pg. 35, Line 15 to Pg. 36, Line 6.

[173] C.R. Vol 2 at Pg. 102, Lines 11-18.

[174] C.R. Vol 2 at Pg. 102, Line 22 to Pg. 103, Line 11.

[175] C.R. Vol 2 at Pg. 104, Lines 1-12.

[176] C.R. Vol 2 at Pg. 97, Lines 18-21.

[177] C.R. Vol 2 at Pg. 97, Lines 22-24.

176.   Plaintiff was seeing a Nurse Practitioner before he was terminated from Targa.[178]

177.   Plaintiff was dealing with some other things in his life at the time he was terminated that could have contributed to his mental anguish.[179]

178.   Plaintiff had a pregnant fiancé at the time of his termination.[180]

179.   Plaintiff was talking about divorce with his wife at the time.[181]

180.   There was friction between Plaintiff's fiancé and his wife at the time.[182]

181.   Plaintiff was working ten (10) hours from his children and only got to see them every four (4) or five (5) months.[183]

182.   Prior to his termination, Plaintiff had a substantial amount of debt.[184]

183.   To the extent any of the findings of fact are actually conclusions of law, the Court hereby designates those findings of fact as conclusions of law.

## II.   CONCLUSIONS OF LAW

1.   The Court has jurisdiction over the parties and the subject matter of this lawsuit.

2.   Plaintiff's lawsuit is a retaliation case.

3.   Plaintiff's lawsuit is not a wrongful termination case.

4.   Plaintiff has alleged a retaliation claim under the Louisiana Environmental Whistleblower Statute ("LEWS").

---

[178] C.R. Vol 2 at Pg. 97, Line 25 to Pg. 98, Line 3.

[179] C.R. Vol 2 at Pg. 99, Lines 6-10.

[180] C.R. Vol 2 at Pg. 99, Lines 17-18.

[181] C.R. Vol 2 at Pg. 99, Lines 19-21.

[182] C.R. Vol 2 at Pg. 99, Line 24 to Pg. 100, Line 1.

[183] C.R. Vol 2 at Pg. 100, Lines 6-15.

[184] C.R. Vol 2 at Pg. 100, Lines 16-19; and C.R. Vol 2 at Pg. 101, Line 24 to Pg. 102, Line 2.

5.      LEWS protects an employee who: "[d]iscloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation."[185]

6.      Plaintiff's reporting of Perry Berthelot's alleged request to dilute the sewage samples did not constitute a protected activity because it was part of Plaintiff's normal job responsibilities.[186]

7.      In his denial of Targa's Motion for Summary Judgment, the Court determined that Plaintiff's refusal to dilute the sewage samples is a protected activity under LEWS.[187]

8.      If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer could not have retaliated against the employee based on that conduct.[188]

9.      The only person at Targa who was allegedly aware that Plaintiff engaged in a protected activity (i.e., refusal to dilute sewage samples) was Perry Berthelot.

10.     Under LEWS, a plaintiff must ultimately establish that his employer retaliated against him because of an "illicit motivation" (i.e., that the employer was motived to fire the employee because he engaged in conduct protected under the statute.)[189]

11.     A plaintiff asserting a LEWS retaliation claim must establish that, in the absence of his protected activity, the employer's prohibited conduct would not have occurred when it did.[190]  Thus, the plaintiff must establish a "but for" causal nexus between the protected activity and the prohibited conduct.[191]

---

[185]  La. R.S. 30:2027(A)(1).

[186]  Document No. 76 – Ruling and Order dated June 17, 2020 at Pg. 2.

[187]  Document No. 76 – Ruling and Order dated June 17, 2020 at Pg. 3.

[188]  *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).

[189]  *Powers v. Vista Chem. Co.*, 109 F.3d 1089, 1094 (5th Cir. 1997); *Collins v. State ex rel. Dep't of Nat. Res.*, 2012-1031 (La. App. 1 Cir. 5/30/13), 118 So.3d 43, 49.

[190]  *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (*quoting Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)); *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir. 1985); *see also Menard v. Targa Resources LLC*, 2020 WL 3271992, * 2 (E.D. La., June 17, 2020).

[191]  *See Thibodeaux v. Dow Chem. Co.*, CV 16-00567-BAJ-RLB, 2018 WL 2269906, at *10 (M.D. La. May 17, 2018).

12.     The causal connection standard for a but-for causation is more stringent than a prima facie cause determination in a retaliation case.[192]

13.     In determining causality between the protected activity and the subsequent adverse employment action, a court must focus on the ultimate decisionmaker.[193]

14.     If the ultimate decisionmaker was unaware of the plaintiff's protected activity, "then it could not be said (even as an initial matter) that the decisionmaker might have been retaliating against the plaintiff for having engaged in that activity."[194]

15.     If a plaintiff is unable to demonstrate that the ultimate decisionmaker knew of his protected activity, and therefore lacked any retaliatory animus, he may still establish the requisite causation under a "narrow exception" to this general rule: the "cat's paw" theory of liability.[195]

16.     In order to show causation pursuant to the "cat's paw" analysis, a plaintiff must establish two conditions: (1) that a co-worker exhibited retaliatory animus; and (2) that the same co-worker possessed leverage, or exhibited influence, over the ultimate decisionmaker.[196]

17.     A plaintiff may not carry this burden by merely speculating that the individual could have learned of the plaintiff's protected activity by virtue of their position within the company.[197]

18.     A plaintiff may not carry this burden by presenting evidence that the alleged wrongdoer had some sort of superior/subordinate relationship to an individual who did have knowledge.[198]

---

[192] *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n. 4 (5th Cir. 1996).

[193] *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).

[194] *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003); *see also Chaney*, 179 F.3d at168 ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.").

[195] *See Halasa v. ITT Educ. Services, Inc.*, 690 F.3d 844, 848 (7th Cir. 2012).

[196] *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).

[197] *See Peters v. Harrah's New Orleans*, 418 F. Supp. 2d 843, 850 (E.D. La. 2006) (**speculation that the plaintiff's supervisor "would have consulted other employees or [the plaintiff's] personnel file before making the decision" insufficient evidence of supervisor's knowledge**).

[198] *See id.* at 851 (**finding the plaintiff failed to raise a genuine issue of material fact on alleged wrongdoer's knowledge simply because he reported to an individual who was aware of the plaintiff's protected conduct**).

19.    In addition to showing the individual was aware of his protected activity, the plaintiff must present evidence that such individual's awareness of the protected activity was "particularly likely to cause retaliatory animus."[199]

20.    This Court concluded in his Ruling and Order dated June 17, 2020: "At trial, Plaintiff must demonstrate that Smith, Keller, or Fitzgerald had retaliatory animus and used Keiser to bring about the intended retaliatory action."[200]

21.    There was no competent evidence submitted at trial establishing that David Smith, Ted Keller, or Matthew Fitzgerald had retaliatory animus and used Jessica Keiser to bring about the intended retaliatory action.

22.    Temporal proximity and a subjective belief are insufficient to demonstrate the causal link necessary in a retaliation case.[201]

23.    An employer's "mere knowledge" that the plaintiff engaged in protected activity alone is insufficient to establish the requisite causal link.[202]

24.    Under Louisiana's employment-at-will statutes, an employer may terminate an employee even if the reason for termination was based on incorrect or carelessly gathered information.[203]

25.    Courts do not sit as a super-personnel department that reexamines an entity's business decisions.[204]

---

[199] *Zamora*, 798 F.3d at 333.

[200] Document No. 76 – Ruling and Order dated June 17, 2020 at Pg. 3.

[201] *See Eberwein v. Auto Zoners Inc.*, 46 F. App'x 731, 2002 WL 1973206, at *2 n.6 (5th Cir. 2002) ("Eberwein's subjective beliefs of retaliation and the temporal proximity of her termination with her complaint are insufficient, by themselves, to show pretext and allow a reasonable juror to conclude from the summary judgment evidence that AutoZone would not have terminated Eberwein "but for" her complaint.") (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)); *Hawkins v. Avalon Hotel Group, LLC*, 986 F. Supp. 2d 711, 725 (M.D. La. 2013) ("Plaintiff's subjective beliefs of retaliation and the temporal proximity of her termination with the filing of her complaint are insufficient, by themselves, to show pretext and allow a reasonable juror to conclude from the summary judgment evidence that Avalon would not have terminated Plaintiff 'but for' her complaint."); *White v. Rouses Enterprises, LLC*, CV 15-1384, 2016 WL 3127232, at *9 (E.D. La. June 3, 2016) ("the alleged harassment occurred in close temporal proximity to Plaintiff's termination, but the only other evidence the Plaintiff has offered to establish a causal connection is his own subjective deposition testimony that the events were related.").

[202] *Standley v. Rogers*, 202 F. Supp. 3d 655, 668 (W.D. Tex. 2016), *aff'd*, 680 F. App'x 326 (5th Cir. 2017) (citing *Hutto v. Univ. of Houston Sys.*, Civ. Ac. No. V–05–70, 2008 WL 4453427, at *7 (S.D. Tex. Sept. 28, 2008)).

[203] *Johnson v. Delchamps, Inc.*, 897 F.2d 808, 811 (5th Cir. 1990) (holding that, under Louisiana law, an employer may terminate an at-will employee even if the reason for termination was based on incorrect or carelessly gathered information).

[204] *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988).

26.   Retaliation laws do not require an employer to make proper decisions, "only non-retaliatory ones."[205]   The question is not whether an employer made an erroneous decision, it is whether the decision was made with retaliatory motive.[206]

27.   Where an employer decides to terminate an employee based on his violation of a particular rule or policy, or receives complaints about a particular employee's conduct or behavior from co-workers, "the validity of the initial complaint is not the central issue because the ultimate falseness of the complaint proves nothing as to the employer, only as to the complaining employee."[207]   The inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief."[208]

28.   A terminated employee's actual innocence of his employer's accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith.[209]

29.   Deficiencies or issues with an employee's job performance constitute a legitimate reason for termination.[210]   Even an incorrect belief that an employee's performance was inadequate constitutes a legitimate non-discriminatory reason for an employer's decision.[211]

---

[205]   *Id.* (citing *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991) ("even an incorrect belief that an employee's performance is inadequate" is a legitimate reason)).

[206]   *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (holding employee failed to demonstrate pretext where employer was uncertain whether employee engaged in misconduct and employee adamantly denied the allegations); *Harris v. Chem Carriers Towing*, No. 15-596-SDD-RLB, 2017 WL 4158620, at *5 (M.D. La. Sept. 18, 2017) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)); *see also Singh v. Shoney's Inc.*, No. 94-254, 1994 WL 261834, at *2 (E.D. La. June 3, 1994).

[207]   *Willis v. Cleco Corp.*, No. 09-2103, 2011 WL 4443312, at *12 (W.D. La. Sept. 22, 2011) (quoting *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993)) (internal quotation omitted)); *see Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 Fed. Appx. 917, 924 (5th Cir. 2009); *see also Strahan v. Waste Mgmt.*, CV H-10-2441, 2011 WL 13124110, at *5 (S.D. Tex. Dec. 27, 2011) ("When an employee is discharged for failing to comply with a work rule, the issue is whether the employer reasonably and in good faith believed that the violation did occur."); *Bardwell v. GlobalSantaFe Drilling Co.*, CIV A H-06-0171, 2007 WL 2446801, at *11 (S.D. Tex. Aug. 23, 2007*)* ("When an employee is discharged for failing to comply with a work rule, the issue is whether the employer reasonably and in good faith believed that the violation occurred."); *McCombs v. MS Communications Am., Inc.*, CIV.A.SA00CA0623NN, 2002 WL 1491724, at *7 (W.D. Tex. Apr. 23, 2002) ("The critical issue in those cases, as in this case, is whether the defendants believed in good faith that plaintiff had committed the offensive behavior and that plaintiff was terminated for that reason.").

[208]   *Id.* (emphasis added).

[209]   *Cervantez v. KMGP Servs. Co.*, 349 Fed. Appx. 4, 10 (5th Cir. 2009); *see also Jones v. Flagship Intern.*, 793 F.2d 714, 729 (5th Cir. 1986); *Long v. Eastfield College*, 88 F.3d 300, 306 (5th Cir. 1996).

[210]   *Kilgore v. Brookeland Indep. Sch. Dist.*, 538 F. App'x 473, 477 (5th Cir. 2013); *see also Maestas v. Apple, Inc.*, 546 F. App'x 422, 428 (5th Cir. 2013) ("Apple has provided sufficient evidence of its legitimate nondiscriminatory reason for its actions—namely, [plaintiff's] work performance issues.").

[211]   *Plummer v. Marriott Corp.*, 94-2025 La. App. 4 Cir. 4/26/95, 8, 654 So. 2d 843, 848–49, writ denied, 95-1321 La. 9/15/95, 660 So. 2d 460.

30.    Inappropriate comments and behavior constitute legitimate reasons for termination.[212]

31.    Plaintiff showing a picture of his wife's hemorrhoids to a Targa employee is a violation of Targa's Anti-Harassment policy that could result in termination for a single offense.

32.    Targa a had legitimate, non-retaliatory reason for terminating Plaintiff's employment.

33.    The Court concludes that Targa did not retaliate against Plaintiff in violation of LEWS.

34.    The Court concludes that Plaintiff is not entitled to damages under LEWS.

35.    The Court did not find Plainitff's testimony to be credible.

36.    Plaintiff is not entitled to the recovery of his claims for back pay.

37.    Plaintiff is not entitled to the recovery of compensatory damages.

38.    Plaintiff is not entitled to the recovery of attorneys' fees.

39.    Speculative damage awards without a basis of detail or specificity are not permitted.[213]

40.    Plaintiff offered no competent evidence to support an award of lost in future interest and investment opportunity with his 401(k).

41.    Plaintiff is not entitled to the recovery of his claims for lost in future interest and investment opportunity with his 401(k).

42.    Plaintiff offered no competent evidence to support an award of bonuses.

43.    Plaintiff is not entitled to the recovery of his claims for bonuses.

44.    Plaintiff offered no competent evidence to support an award of damages for loss of reputation.

45.    Plaintiff is not entitled to the recovery of his claims for loss of reputation.

---

[212] *Anderson v. Baylor Univ. Med. Ctr.*, 3:13-CV-5039-N, 2015 WL 13742269, at *2 (N.D. Tex. Apr. 16, 2015) (finding inappropriate sexual comments in violation of employer's harassment and discrimination policies constituted legitimate, non-discriminatory reason for termination); *Rogers v. Bromac Title Serv., LLC*, CIV.A. 12-02493, 2013 WL 5348448, at *3 (E.D. La. Sept. 23, 2013), *aff'd sub nom.* 755 F.3d 347 (5th Cir. 2014) (holding the plaintiff's jokes and comments about unprotected sex and drinking constituted legitimate, non-retaliatory reason for termination in Jury Service Improvement Act retaliation case); *Kirby v. SBC Servs., Inc.*, 391 F. Supp. 2d 445, 454 (N.D. Tex. 2005) ("The receipt and distribution of sexually explicit or otherwise offensive e-mails is sufficient grounds for disciplinary action against an employee, up to and including termination.").

[213] *Bieber–Guillory v. Aswell*, 98–559, p. 10 (La.App. 3 Cir. 12/30/98), 723 So.2d 1145, 1151; *Smith v. First Nat'l Bank of DeRidder*, 478 So.2d 185 (La.App. 3 Cir.1985); *Smith v. White*, 411 So.2d 731 (La.App. 3 Cir.1982), *writ denied*, 413 So.2d 508 (La.1982).

46.    Plaintiff offered no competent evidence to support an award of compensatory damages.

47.    Plaintiff is not entitled to the recovery of his claims for compensatory damages.

48.    To the extent Plaintiff received unemployment benefits, those benefits must be subtracted from any damages Plaintiff could rightfully claim under LEWS.  Plaintiff failed, however, to prove any element of his damages, including any claim for backpay. If Plaintiff had proven those damages, the Court would subtract $3,888.00 as unemployment benefits received by Plaintiff.

49.    LEWS only provides for wage type damages to be tripled for a period of three years.[214]

50.    Any property lost as a result of lost wages, lost benefits, and any physical or emotional damages are not permitted to be tripled under LEWS.[215]

51.    All costs of court are taxed against the party incurring the same.

52.    To the extent any of the conclusions of law are actually findings of fact, the Court hereby designates those conclusions as findings of fact

**RESPECTFULLY SUBMITTED:**

/s/ Kyle A. Ferachi
Kyle A. Ferachi, LA No. 27458 (Trial Attorney)
**Hinshaw & Culbertson, LLP**
301 Main Street, Suite 2200
Baton Rouge, Louisiana  70802
Telephone:  (225) 333-3250
kferachi@hinshawlaw.com

Daniel Patton
dpatton@scottpattonlaw.com
Drew Barber
dbarber@scottpattonlaw.com
**Scott Patton PC**
5301 Katy Freeway, Suite 201
Houston, Texas 77007

ATTORNEYS FOR DEFENDANT

---

[214] La. R.S. 30:2027(b)(2)(B); *see also Price v. PCS Nitrogen Fertilizer, L.P.*, 03-CV-153, 2012 WL 528158, at *3 (M.D. La. Feb. 13, 2012), *aff'd*, 541 F. App'x 347 (5th Cir. 2013).

[215] *Price*, 2012 WL 528158, at *3-4.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Defendant's Proposed Findings Of Fact And Conclusions Of Law has been served on all counsel of record via electronic notification by this Court's CM/ECF system.

Baton Rouge, Louisiana, this 4th day of June 2021.

/s/ Kyle Ferachi
KYLE A. FERACHI