# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**KIRK MENARD**                                    **CIVIL ACTION**

**VERSUS**

**TARGA RESOURCES LLC**                    **NO. 19-00050-BAJ-SDJ**

## RULING AND ORDER

This matter is before the Court following a bench trial. For the reasons stated herein, the Court rules in favor of **PLAINTIFF** and against Defendant Targa Resources LLC in all respects.

## I.    BACKGROUND

This is an employment retaliation case. (Doc. 14; Doc. 74). Plaintiff alleges that he was retaliated against when his former employer, Defendant Targa Resources LLC, terminated his employment in violation of the Louisiana Environmental Whistleblower Statute (LEWS), La. Rev. Stat. § 30:2027. (Doc. 14, p. 2, 9–10; Doc. 74, p. 1). Targa asserts that it terminated Plaintiff's employment for non-retaliatory reasons, including Plaintiff's alleged inappropriate conduct. (Doc. 42, p. 3–5; Doc. 74, 6–7). Specifically, Targa alleges that it terminated Plaintiff because he showed a photograph of his wife's hemorrhoids to his co-worker. Targa also asserts that Plaintiff made inappropriate comments about other employees' spouses.

1

## II.   PROCEDURAL HISTORY

Plaintiff initiated this action against Targa. (Doc. 1-2). Thereafter, Targa removed this matter to the Court based on diversity jurisdiction, 28 U.S.C. § 1332. (Doc. 1). Where jurisdiction is founded on diversity, federal courts must apply the substantive law of the forum state. *Meadors v. D'Agostino*, No. CV 18-01007-BAJ-EWD, 2020 WL 1529367, at *3 (M.D. La. Mar. 30, 2020) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

Targa moved to dismiss Plaintiff's initial Petition for Damages and Amended Complaint. (Doc. 10; Doc. 19). The Court denied Targa's Motions. (Doc. 37).

Targa then moved for summary judgment. (Doc. 55). The Court denied summary judgment, finding a genuine dispute of material fact to be tried. (Doc. 76, p. 8). Accordingly, the Court proceeded to a bench trial in this matter.

## III.   UNDISPUTED FACTS

The parties agreed to the following facts in their Pretrial Order (Doc. 74):

1. Plaintiff is an individual residing in Jennings, Louisiana.

2. Targa is a Delaware Limited Liability Company.

3. Targa hired Plaintiff as an Environmental Safety and Health ("ES&H") Specialist for Targa's facility in Venice, Louisiana, on June 11, 2018.

4. Plaintiff's job duties and responsibilities as an ES&H Specialist included, among other things, notifying his supervisor of any safety, health, or environmental issues, identifying and reporting

2

violations of environmental and safety standards under state and federal law, and maintaining compliance and safety under those laws.

5. David Smith, who is employed by Targa as an ES&H Supervisor, was Plaintiff's direct supervisor.

6. Targa employee Brogan Smith trained Plaintiff concerning his duties and responsibilities as ES&H Specialist over a three (3) week period.

7. During his employment, Plaintiff spoke with Mr. Smith approximately once a week after his three (3) weeks of training to discuss how to handle different issues Plaintiff encountered in his job duties and responsibilities.

8. During his employment with Targa and while Plaintiff was on duty at Targa's Venice facility, Plaintiff's fiancée sent a picture of her hemorrhoids to his personal phone.

9. On October 5, 2018, Plaintiff was on a conference call with other Targa employees.

10. Following the conference call, Plaintiff called Perry Berthelot on October 5, 2018.

11. After his call with Mr. Berthelot on October 5, 2018, Plaintiff attempted to call David Smith. David Smith returned Plaintiff's call later that morning.

3

12. Jarrod Gregg, Targa's ES&H Manager, called Plaintiff on October 10, 2018, and told Plaintiff about a report that Plaintiff made inappropriate comments. Additionally, Mr. Gregg told Plaintiff to work from home until further notice.

13. On October 11, 2018, Targa Human Resources ("HR") Representative Trisha Dodson, along with Mr. Gregg, Mr. Smith, and Dawn Strickland called Plaintiff.

14. During the call, Mr. Gregg advised Plaintiff that Targa was ending Plaintiff's employment that day because of his "overall performance."

15. Targa terminated Plaintiff's employment on October 11, 2018.

16. On October 12, 2018, Plaintiff made a complaint to Targa's MySafeWorkplace hotline, claiming he was recently terminated because he failed to follow the instruction of a supervisor in performing an improper water sample test.

17. Plaintiff received $162.00 a week in unemployment compensation from October 21, 2018 to April 8, 2019.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

### A. *Prima Facie* Case

1. The standards governing retaliation claims under the Louisiana Whistleblower Statute and Title VII are materially indistinguishable. *Delouise v. Iberville Par. Sch. Bd.*,

8 F. Supp. 3d 789, 802 (M.D. La. 2014) ("Louisiana courts generally agree that the employer must have committed an actual violation of state law. . . . Other than this difference, the standards governing claims under the Louisiana Whistleblower statute and Title VII retaliation claims are materially indistinguishable.); *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007).

2. Accordingly, the Court will apply the familiar *McDonnell Douglas* framework to Plaintiff's retaliation claim.[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Walter v. BP Am., Inc.*, No. CIV.A. 12-177, 2014 WL 1796676, at *18 (E.D. La. May 6, 2014), *aff'd*, 593 F. App'x 405 (5th Cir. 2015).

3. Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of retaliation by proving the following: (1) he engaged in an activity protected by Louisiana Revised Statutes § 23:967; (2) he suffered an adverse employment action; and (3) "that a causal link existed between the protected activity and the adverse employment action."

---

[1] The Court notes that "after a full trial on the merits, a district court must look at whether the plaintiff had presented sufficient evidence to allow a jury to arrive at a verdict, *i.e.*, whether the plaintiff has met his ultimate burden of proving discrimination or retaliation (depending on the statute at issue), rather than simply focusing on the plaintiff's prima facie case." *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008). The Court will proceed to this issue, but begins by noting its previous findings.

*Walter*, 2014 WL 1796676, at *18.

4. First, the Court previously held that "a refusal to participate in illegal and environmentally damaging conduct is a protected activity under the LEWS." (Doc. 76, p. 6). The first prong of Plaintiff's *prima facie* case is met.

5. Second, it is undisputed that Plaintiff was terminated from his employment with Targa, an adverse employment action. The second prong of Plaintiff's *prima facie* case is met.

6. Third, the Court previously held that the close temporal proximity between the protected activity and Plaintiff's termination was sufficient to establish a "causal link" to satisfy the third prong of Plaintiff's *prima facie* case.[2] (Doc. 76, p. 7).

7. Noting that Plaintiff's burden to show retaliation "at the *prima facie* stage is not onerous," Plaintiff has established his *prima facie* case of retaliation. *Walter*, 2014 WL 1796676, at *20 (citing *Wiley v. Am. Elec. Power Serv. Corp.*, 287 F. App'x 335, 340 n.8 (5th Cir. 2008)); (Doc. 76).

## B. Legitimate, Nondiscriminatory Reason for Termination

1. Because Plaintiff has established a *prima facie* case of retaliation, the burden shifts to Targa to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.

---

[2] Here, the time between the protected activity and Plaintiff's termination is a period of six days.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

2. Defendant articulated the following reasons for terminating Plaintiff. First, Plaintiff showed a picture of his wife's hemorrhoids to another Targa employee. (Doc. 131, p. 4, ¶ 18). Second, Plaintiff made inappropriate comments about co-workers' spouses. (*Id.* at p. 3–4, ¶¶ 14–18). Third, Plaintiff allegedly exhibited work performance and "trustworthiness" issues. (*Id.* at p. 4, ¶¶ 19–20).

3. For the reasons stated below, the Court doubts the credibility of Targa's asserted legitimate, non-retaliatory reasons for terminating Plaintiff.

4. Assuming *arguendo* that Targa indeed had legitimate reasons to terminate Plaintiff, the Court proceeds to determine whether retaliation was the but-for cause of Targa's termination of Plaintiff. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 657 (5th Cir. 2012).

## C. Whether Retaliation Was "But-For" Cause of Termination

1. Plaintiff testified that on October 5, 2018, Perry Berthelot, Targa's District Manager, told Plaintiff to dilute sewage samples in order to pass regulatory checks. (Doc. 132, p. 4–5, ¶¶ 26, 31; 37; Doc. 124, p. 6).

2. Six days later, on October 11, 2018, Targa terminated Plaintiff.

7

(Doc. 132, p. 7, ¶ 56).

3. The termination process began on October 9, 2018. (*Id.* at p. 7, ¶ 57).

4. Temporal proximity is a relevant consideration in determining causation. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *see also Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 882 (S.D. Tex. 2009). This case involves close temporal proximity: six days between the protected activity and termination, including two nonwork days.[3] *See Smith v. Xerox Corp.*, 584 F. Supp. 2d 905, 915 (N.D. Tex. 2008), *aff'd*, 602 F.3d 320 (5th Cir. 2010) (finding a twelve day span established temporal proximity in causation analysis); *see also Watkins v. Tregre*, 997 F.3d 275, 285 (5th Cir. 2021) (finding a two day span to be "near immediate temporal proximity.").

5. The U.S. Court of Appeals for the Fifth Circuit, however, has "affirmatively reject[ed] the notion that temporal proximity standing *alone* can be sufficient proof of but for causation." *Strong*, 482 F.3d at 808 (emphasis added).

6. Accordingly, the Court looks to whether Plaintiff has presented other evidence that retaliation was the "but for" cause of his

---

[3] The protected activity occurred on Friday, October 5, 2018. Defendant was terminated on Thursday, October 11, 2018. Accordingly, this six-day period included the weekend.

termination.

7. The Fifth Circuit has held that, "in the context of Title VII retaliation claims, cat's paw analysis remains a viable theory of causation." *Zamora v. City Of Houston*, 798 F.3d 326, 333 (5th Cir. 2015). Specifically, the Circuit emphasized:

> Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action— harbored any retaliatory animus. Under this theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action.

*Id.* at 331. Accordingly, Plaintiff must demonstrate that the person with retaliatory animus used the decisionmaker to terminate Plaintiff. *Id.* at 333; (Doc. 76).

8. The Court finds that the following evidence, together with the close temporal proximity, establishes causation in this matter.

   a. Plaintiff testified that Perry Berthelot, District Manager, asked him to dilute sewage samples. (Doc. 124, p. 6; Doc. 132, p. 4–5, ¶¶ 26, 37).

   b. Berthelot was the direct supervisor of Ted Keller, Area Manager. (Doc. 132, p. 44, ¶ 28; Doc. 123, p. 31).

   c. Keller recommended that Plaintiff be terminated. (Doc. 123, p. 38).

d. Keller's recommendation to HR directly led to Plaintiff's termination.

e. No one in the decision-making process questioned Keller or undertook any independent investigation to verify the information that resulted in Plaintiff's termination. (Doc. 132, p. 44, ¶ 30).

f. Targa performed no independent investigation of the claims made against Plaintiff, and instead, terminated him based solely on the information provided by Keller. (*Id.* at p. 48–49, ¶ 36).

g. Lack of Investigation; No Direct Information

### *Jessica Keiser—Ultimate Decisionmaker*

i. Jessica Keiser, Senior Vice President of Sustainability and Environmental Safety and Health, made the ultimate decision to terminate Plaintiff. (Doc. 124, p. 260).

ii. Keiser could not recall anything about Plaintiff's employment with Targa. (*Id.*).

iii. Keiser could not recall anything about Plaintiff's work performance. (*Id.*).

iv. Keiser could not recall specifics about how she came to the decision to terminate Plaintiff. (*Id.*).

v.  Keiser could not recall to whom Plaintiff made inappropriate comments. (*Id.* at p. 268).

vi.  Keiser could not recall to whom Plaintiff showed the inappropriate photograph. (*Id.*).

vii.  Keiser only recalled that HR approached her, and "that there was something about inappropriate behavior, maybe some pictures, and uncomfortably enough, talking to other employees about their wives. That's what I remember of the details." (*Id.* at p. 260).

viii.  Keiser made no independent investigation before terminating Plaintiff. (*Id.*).

ix.  Keiser relied solely on the information that the HR department presented to her.[4] (*Id.* at p. 268).

***Tricia Dodson—Human Resources Department***

x.  Tricia Dodson, HR representative, testified that HR "relied 100 percent on what Ted Keller had to say in order to move forward with [Plaintiff's] termination." (Doc. 124, p. 192).

xi.  Dodson accepted Keller's word as "fact" and moved forward with Plaintiff's termination. (*Id.* at p. 190).

---

[4] Keiser did not speak to Keller before deciding to terminate Plaintiff. (Doc. 124, p. 272).

xii.   No one in the HR department questioned whether they should ask Plaintiff about these serious allegations. (*Id.* at p. 192–193).

xiii.  Dodson could not recall the details of the inappropriate comments that Plaintiff made. (*Id.* at p. 203).

xiv.   Dodson could not recall "getting any more details" other than that Plaintiff expressed interest in the spouses of other employees in a romantic way. (*Id.*).

xv.    Dodson testified that Keller's report *alone* was sufficient to move forward with Plaintiff's termination. (*Id.* at p. 193).

xvi.   Dodson testified, however, that Keller did not report whether he actually saw the photograph at issue. Instead, Keller reported that another employee reported the photograph to him. (*Id.*).

xvii.  Dodson never knew the name of the employee who reported the photograph because she felt she "didn't need to." (*Id.* at p. 195).

xviii. Dodson did not know whether the employee that actually saw the photograph reported it to Keller. (*Id.*).

xix.    Dodson relied "solely on one person who received [the information] thirdhand." (*Id.* at p. 250–51). Dodson made no effort to confirm the veracity of Keller's statements. (*Id.*). Dodson never spoke to the person who actually saw the photograph. (*Id.*). Dodson never spoke to Plaintiff. (*Id.*).

### Ted Keller—Area Manager and Berthelot's Direct Report

xx.    Keller was the only person with knowledge of the facts reported to justify Plaintiff's termination. (Doc. 123, p. 39).

xxi.    Keller testified that HR would not have moved forward with Plaintiff's termination had it not been for his recommendation. (*Id.* at p. 43).

xxii.    Keller never provided HR specifics about Plaintiff's untrustworthiness. Keller did not believe "that there were any specifics." (*Id.* at p. 44).

xxiii.    Keller could not recall which employee reported the inappropriate photo to him. (*Id.* at p. 58).

xxiv.    Keller believed that either Tony Williams or Keith Adams told him that Plaintiff showed an inappropriate photograph to another employee—Nick Richards. (*Id.*).

xxv.    Plaintiff did not show the photograph to Keller, Williams, or Adams.

**Nick Richard—Employee Actually Involved in Allegations Regarding Plaintiff**

xxvi.    Plaintiff showed the photograph to Richard. (*Id.* at p. 173–74).

xxvii.    Keller did not ask Richard about the photo until two weeks after Plaintiff's termination. (*Id.* at p. 176).

xxviii.    No one from HR contacted Richard about the photograph. (*Id.* at p. 178).

xxix.    Richard is still unsure of how Keller learned about the photograph. (*Id.* at p. 176).

xxx.    Until Keller asked Richard about the photograph, Richard believed that Plaintiff was terminated for performance issues rather than inappropriate conduct. (*Id.*).

xxxi.    Plaintiff made a comment to Richard along the lines of "your wife is cute." (*Id.* at p. 180). No other employees were in the vicinity at the time. (*Id.*). Plaintiff's comment did not bother Richard to the point where he could not be around Plaintiff. (*Id.*). Richard never reported the comment.

xxxii.    No one from HR ever asked Richard about Plaintiff's

comment to him. (*Id.* at p. 181). Richard does not know how HR would have known about this comment. (*Id.* at p. 182). Richard does not know how Plaintiff's comment has become part of this litigation. (*Id.*).

### Conclusion

xxxiii.   In conclusion, Keiser relied solely on information from HR. HR relied "100 percent" on information from Keller. Keller could not recall which employee reported the allegations to him, but believed it was one of two employees who had no direct knowledge of the allegations. No investigation was ever conducted. No one ever asked Richard, the person who saw the photograph, about the allegations prior to Plaintiff's termination. Plaintiff himself was never asked about the allegations. The first time Richard was asked about the allegations was two weeks *after* Plaintiff's termination.

h.   Unclear Official Reason for Termination

i.   There is nothing regarding inappropriate conduct, the main reason for Plaintiff's termination, in his personnel file. (Doc. 123, p. 41).

ii.   Keller agreed that, according to his understanding of Targa's policies, the reason for Plaintiff's termination should be reflected in his personnel file. (*Id.* at p. 41).

iii.  Keller did not recall seeing any indication in Plaintiff's personnel file that Plaintiff was terminated for inappropriate conduct. (*Id.* at p. 40).

iv.   Plaintiff's personnel file indicates that he was terminated for "performance" issues. (*Id* at p. 36–42).

v.    Keller would not have recommended Plaintiff's termination based on performance alone. (*Id.* at p. 43).

vi.   Keller did not believe that Plaintiff was terminated because of work performance. (*Id.* at p. 37).

vii.  Keller could recall only one complaint lodged with him about Plaintiff's work. This complaint came from Berthelot. (*Id.* at p. 52).

i. <u>Perry Berthelot and Ted Keller</u>

i.   Again, Berthelot was Keller's direct supervisor.

ii.  Keller admitted that he told Plaintiff that if he "made Berthelot look bad, [] Berthelot would throw

him under the bus." (Doc. 123, p. 55).

iii.  Keller further admitted that he told Plaintiff that "if he made [] Berthelot look bad[,] [] it would not be good." (*Id.*).

iv.  Around October 9th, four days after the protected activity, Keller spoke to Berthelot about his plans to report Plaintiff to HR, even though Plaintiff was not in Berthelot's chain of command. (Doc. 132, p. 44, ¶ 28; Doc. 123, p. 54).

v.  Keller testified that he had "plenty of time" to speak to Berthelot between October 5th and 9th—the time between the protected activity and Keller's report to HR—about the actions that would be taken as a result of Berthelot and Plaintiff's conversation regarding diluting samples. (Doc. 123, p. 33).

vi.  After Keller learned of Plaintiff's claim that Berthelot asked him to dilute samples, Keller never asked Plaintiff about the truthfulness of his claim. (*Id.* at p. 57).

vii.  The termination process began four days after Berthelot asked Plaintiff to dilute samples. (*Id.* at p. 58).

viii.    Berthelot was very selective about what he recalled regarding the investigation of Plaintiff's termination. (Doc. 132, p. 44, ¶ 28).

ix.    Elizabeth Hawkins, an attorney at Targa's in-house legal department, contacted Berthelot to inform him that he was the subject of an investigation regarding his alleged violation of the Code of Conduct. (Doc. 124, p. 9; 172).

x.    Although this was the first time "anything like this" had ever happened to Berthelot, he, incredibly, could not recall the details of this conversation. (*Id.* at p. 153–72).

xi.    Again, Keiser, as the final decisionmaker in the termination process, did not ask for any information, conduct any investigations, or speak with anyone other than the HR representatives prior to terminating Plaintiff. The HR representatives did not take any steps to investigate Keller's allegations against Plaintiff. (Doc. 132, p. 49, ¶ 36). Accordingly, the chain of command was left unbroken. (*Id.*). The decision leads directly to Keller and Berthelot.

9. Taken together, the Court finds that Plaintiff has provided

sufficient circumstantial evidence to show that the person with the retaliatory animus used the decisionmaker to bring about the intended retaliatory action. *See Zamora v. City Of Houston,* 798 F.3d 326, 333 (5th Cir. 2015).

## D. Damages

1. A plaintiff who prevails under the Louisiana Environmental Whistleblower Statute is entitled to recover from the defendant "triple damages resulting from the action taken against him." La. Rev. Stat. § 30:2027(B)(1). The damages to be tripled include "lost wages, lost anticipated wages due to a wage increase, or loss of anticipated wages which would have resulted from a lost promotion." La. Rev. Stat. § 30:2027(B)(2)(b).

2. Plaintiff was not employed from the date of his termination, October 11, 2018, until he began working at another job on April 9, 2019. (Doc. 132, p. 33, ¶ 256; Doc. 123, p. 307–308).

3. Plaintiff is seeking six months of lost wages. (Doc. 132, p. 57).

4. Plaintiff received $3,678.33 in bimonthly earnings. (Doc. 123, p. 48; Exhibit J-13, p. 19; Doc. 132, p. 32).

5. Six months of lost wages is $43,750. (Doc. 132, p. 57).

6. The LEWS entitles Plaintiff to triple damages resulting from the action taken against him, including lost wages. Triple damages of six months of $43,750 in lost wages is $131,250.

19

7. A prevailing plaintiff may also recover damages for "any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom." La. Rev. Stat. § 30:2027(B)(2)(b).

8. Plaintiff also requests the value of six months of group life insurance benefits, lost payroll taxes, lost vacation benefits, and lost sick leave benefits, as reflected in his paystub and offer letter. (Doc. J-13, p. 19, p. 27–28).

9. Plaintiff seeks damages for mental and emotional distress. (Doc. 132, p. 35).

10. The Fifth Circuit has recognized that "hurt feelings, anger and frustration are part of life and are not the types of harm that could support a mental anguish award," but has deemed "sleeplessness, anxiety, stress, marital problems, and humiliation," as well as other manifestations of emotional harm, sufficient to support an award of damages for emotional distress. *Sarah Underwood v. Miss. Dep't. Of Corrections*, No. 1:18-CV-24-HSO-JCG, 2022 WL 950872, at *8–9 (S.D. Miss. Mar. 29, 2022) (citing *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998); *see also DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007)).

11. Here, Plaintiff testified credibly that while he suffered with

anxiety prior to termination, his anxiety worsened due to the events at Targa. (Doc. 123, p. 311–12). Plaintiff experienced three to four panic attacks a year prior to the events discussed herein. (*Id.* at p. 312). At the time of these events, Plaintiff's panic attacks increased to three to four times a week. (*Id.*). Plaintiff's doctor increased the prescribed dosage of his anti-anxiety medication during this time. (Doc. 123, p. 313; Doc. 124, p. 98). Although Plaintiff had other stressors in his life at the time of his termination, it is uncontroverted that his termination caused a severe flare-up in his anxiety.[5] (*Id.*).

12. An award of $30,000.00 for damages for mental and emotional distress in a wrongful termination case under the LEWS is reasonable and consistent with the case law. *See Brown v. Catalyst Recovery of La., Inc.,* 2001-1370 (La. App. 3d Cir. 4/3/02), 813 So. 2d 1156 (affirming award of $30,000 for mental anguish in whistleblower case under La. Rev. Stat. § 30:2027).

---

[5] While expert testimony from Plaintiff's doctor would have been preferred, a plaintiff's testimony alone is sufficient proof of mental damages in certain cases. *Sarah Underwood v. Miss. Dep't. Of Corrections,* No. 1:18CV24-HSO-JCG, 2022 WL 950872, at *8–9 (S.D. Miss. Mar. 29, 2022). After scrupulously analyzing Plaintiff's testimony regarding his anxiety, the Court finds that his uncontradicted testimony regarding his increased anxiety and panic attacks was credible, and that his testimony was particularized and extensive as to the nature, extent, and duration of his claimed emotional harm.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff has proven his retaliation claim under the Louisiana Environmental Whistleblower Statute by a preponderance of the evidence.

**IT IS FURTHER ORDERED** that judgment is rendered in favor of Plaintiff Kirk Menard and against Defendant, Targa Resources LLC.

**IT IS FURTHER ORDERED** that Defendant Targa Resources LLC shall pay Plaintiff Kirk Menard the following damages:

1. Treble damages on six months of lost wages of $39,862 for a total of $119,586.[6]

2. Lost benefits as follows:

   a. Group life insurance benefits of $172.56, plus interest;

   b. Lost payroll taxes of $3,090.00, plus interest;

   c. Lost vacation benefits of $3,533.50, plus interest;

   d. Lost sick leave benefits of $673.05, plus interest;

   e. Mental and emotional distress damages in the amount of $30,000.00, plus interest; and

3. Attorney's fees, in a manner to be determined by the Court pending Plaintiff's motion for attorney's fees pursuant to Federal Rule of Civil Procedure 54 and Local Civil Rule 54.

---

[6] It is undisputed that Plaintiff received $162 per week in unemployment compensation during this six-month period. Accordingly, over six months, Plaintiff received $3,888 in unemployment benefits. The Court has reduced this $3,888 from Plaintiff's lost wages amount. (*See* Doc. 131, p. 28, ¶ 48).

**IT IS FURTHER ORDERED** because the Court finds in favor of Plaintiff, Defendant's **Motion for Judgment on Partial Findings (Doc. 118)**, requesting that the Court enter judgment against Plaintiff and for Defendant on Plaintiff's retaliation claim under the Louisiana Environmental Whistleblower Statute, is **DENIED AS MOOT.**

Baton Rouge, Louisiana, this _31 st_ day of March, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**